1

2

3

4

5

6

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

NATURAL RESOURCES DEFENSE COUNCIL,
*et al.*,

        Plaintiffs,

    v.

GALE A. NORTON, in her official
capacity as Secretary of the Interior,
*et al.*,

        Defendants,

    v.

SAN LUIS & DELTA-MENDOTA WATER
AUTHORITY, *et al.,*

        Defendant-Intervenors.

PACIFIC COAST FEDERATION OF
FISHERMEN'S ASSOCIATIONS, *et al.,*

        Plaintiffs,

    v.

CARLOS M. GUTIERREZ, in his official
capacity as Secretary of Commerce, *et
al.*,

        Defendants,

    v.

SAN LUIS & DELTA-MENDOTA WATER
AUTHORITY, *et al.,*

        Defendant-Intervenors.

1:05-CV-01207 OWW LJO
1:06-CV-245 OWW LJO

ORDER DENYING MOTIONS
TO DISMISS, REMAND,
AND STAY.

1

# I.  **INTRODUCTION**

Before the court for decision are a number of procedural motions in two parallel cases: *NRDC v. Kempthorne* ("*NRDC*"), 1:05-cv-01207, which concerns the impact of the 2004 Operations and Criteria Plan ("OCAP")[1] on the endangered Delta smelt; and *Pacific Coast Federation of Fishermen's Associations v. Gutierrez* ("*PCFFA*"), 1:06-cv-00246, which concerns the impact of the OCAP on several endangered and threatened species of salmonids.

In both cases, Plaintiffs challenge biological opinions ("BiOps") issued under the ESA by the United States Fish and Wildlife Service ("USFWS") (for the Delta smelt case) and the National Marine Fisheries Service ("NMFS") (for the salmonid case), which address whether the OCAP will jeopardize the respective listed species.  Among other things, the lawsuits allege that the BiOps fail to consider the best available science and rely upon uncertain (and allegedly inadequate) adaptive management processes to monitor and mitigate the potential impacts of the OCAP.

In mid-2006, USFWS and NMFS announced that they would re-initiate consultation, respectively, on the challenged biological opinions.  It is anticipated that new BiOps will be issued within 18 months.  For several months during the fall of 2006, the parties attempted to reach a settlement as to the management of the SWP and CVP during the interim period.  These negotiations

---

[1]   The OCAP governs the coordinated operation of the federal Central Valley Project ("CVP") and the State Water Project.

1 failed to resolve the parties' remaining disputes.  Among others,

2 dispute continue over: (1) the fact that the Federal and State

3 Defendants plan to continue to implement the OCAP in accordance

4 with the challenged BiOps and (2) that the federal defendants

5 have not promised to maintain the pre-2004 status quo, although

6 the exact actions they plan to take are unclear.

7      In both *NRDC* and *PCFFA*, the federal defendants now move:

8 (1) to dismiss on prudential mootness grounds; (2) for a

9 voluntary remand without vacatur; or (3) for a stay pending the

10 completion of renewed consultation based on the doctrine of

11 primary jurisdiction.  In addition, federal defendants move to

12 consolidate *NRDC* and *PCFFA* for the purposes of deciding the above

13 motions and for the purpose of deciding how the CVP and SWP

14 should be operated during the interim period, should any such

15 decision be necessary.

16      Plaintiffs oppose dismissing, remanding, staying, or

17 consolidating these cases.  Rather, Plaintiffs request a prompt

18 hearing on the merits in the *NRDC* case.  If they prevail,

19 Plaintiffs anticipate asking the court to impose some form of

20 interim relief.

21      Defendant-Intervenors and the Sederal Defendants support the

22 issuance of a stay in this case, rather than dismissal, remand,

23 or a hearing on the merits.  Relative to a hearing on the merits,

24 which Defendant-Intervenors suggest would be a waste of judicial

25 resources, Defendant-Intervenors suggest that Plaintiffs always

26 have the option of appealing to the court for injunctive relief,

27 should any of the management activities threaten the species.

28

**3**

1

## II.  <u>BACKGROUND</u>

2      Both the Delta smelt (*NRDC*) and salmonid (*PCFFA*) cases

3 concern the coordinated operation of the federally-managed

4 Central Valley Project ("CVP") and the State of California's

5 State Water Project ("SWP").  Both projects divert large volumes

6 of water from the California Bay Delta ("Delta") and use the

7 Delta to store water.

8      The Delta is home to a number of endangered and threatened

9 species, including the endangered Delta smelt (*Hypomesus*

10 *transpacificus*), a small, slender-bodied fish endemic to the

11 Delta.  Historically, the Delta smelt could be found throughout

12 the Delta, but the population has declined significantly in

13 recent years.  The Delta and its tributaries are also home to

14 various endangered salmonid species, including the endangered

15 Sacramento River winter-run Chinook salmon; the threatened

16 Central Valley spring-run Chinook salmon; the threatened Central

17 Valley steelhead; the threatened Southern Oregon/Northern

18 California coho salmon; and the threatened California Coast

19 steelhead.  Plaintiffs concede that the population of one of

20 these species, the winter-run Chinook, has increased somewhat in

21 recent years, but the administrative record reveals that their

22 population remains small and vulnerable.  All of the other

23 salmonid species are alleged to remain low in abundance and face

24 threats from limited habitat, low stream flows, higher than ideal

25 water temperatures, and entrainment in CVP/SWP facilities.

26 //

27 //

28 //

**4**

**A.   Coordinated Operations and the ESA.**

The state and federal agencies charged with management of the CVP and SWP share certain facilities and coordinate operations with one another pursuant to a Coordinated Operating Agreement ("COA").  The COA, which originated in 1986, has evolved over time to reflect, among other things, changing facilities, delivery requirements, and regulatory restrictions. The most recent document concerning coordinated management is the Operating Criteria and Plan (OCAP).  The OCAP proposes a number of changes to the coordinated operation of the CVP and SWP, some of which are discussed in greater detail below.

Because various endangered and/or threatened species reside in the area affected by the CVP and SWP, the OCAP must comply with various provisions of the ESA.[2]  In this case, the Bureau of Reclamation entered into formal and early consultation with both the USFWS and NMFS concerning the OCAP's impact on the various species under each agency's jurisdiction.

---

[2]   Specifically, prior to authorizing, funding, or carrying out any action, a federal agency must first consult with USFWS and/or NMFS" to "insure that [the] action...is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined...to be critical...." 16 U.S.C. § 1536(a)(2) [ESA § 7(a)(2)].  (This form of consultation is called "formal consultation."  50 C.F.R. § 402.02.)  In addition, an independent consultation obligation arises under § 1536(a)(3) where the federal agency "has reason to believe that an endangered species or a threatened species may be present in the area affected by this project and that implementation of such action will likely affect such species." (This form of consultation is called "early consultation."  50 C.F.R. § 402.02.)

1        **B.    The Development of the 2005 USFWS OCAP BiOp**.

2        Prior to 2004, the OCAP operated under Biological Opinions

3    issued in 1993 and 1995.  (The age of these prior BiOps is

4    potentially important, as Plaintiffs seek to vacate the more

5    recent documents.  Although there is little information about the

6    1993/1995 BiOps in this record, USFWS asserts that the

7    information contained within them is now seriously outdated.)

8        On June 30, 2004, USFWS issued a Biological Opinion (the

9    "2004 USFWS OCAP BiOp"), addressing the impact of the OCAP on the

10   Delta smelt.[3]  On February 16, 2005, USFWS issued an amended BiOp

11   (the "2005 USFWS OCAP BiOp"), which superceded the 2004 USFWS

12   OCAP BiOp.

13       The 2005 USFWS OCAP BiOp addresses the operation of the CVP

14   and SWP as well as several future actions.  These future actions,

15   some of which are discussed in greater detail below, are:

16   (1) increasing flows in the Trinity River; (2) "8500 Banks";

17   (3) operating permanent barriers in the South Delta;

18

19          [3]    On August 4, 2005, the Ninth Circuit decided *Gifford
20   Pinchot Task Force v. United States Fish & Wildlife Serv.*, 378
     F.3d 1059, 1069 (9th Cir. 2004), which held that the USFWS's
21   definition of "adverse modification" to critical habitat is an
     impermissible interpretation of the ESA because it focuses on
22   whether critical habitat modifications would impact the survival
     of a species, effectively ignoring the statutorily-mandated goal
23   of "recovery."  In November 4, 2004, presumably in response to
     this ruling, the Bureau requested reinitiation of formal
24   consultation to address critical habitat issues.
25          Plaintiffs, a coalition of non-profit conservation
     organizations, filed suit on February 15, 2005, alleging that the
26   2004 USFWS OCAP BiOp was legally inadequate in light of *Gifford
     Pinchot* and should be invalidated.  (Doc. 1.)  Plaintiffs named
27   as defendants the Department of the Interior and the USFWS.
     (*Id.*)
28

1   (4) operating an intertie between the California Aqueduct and the

2   Delta-Mendota Canal; (5) a long-term Environmental Water Account

3   ("EWA"); (6) delivery of CVP water to the Freeport Regional Water

4   Project ("FRWP"); and (7) various other operational changes,

5   including changes to a monitoring program at the North Bay

6   Aqueduct.  (2005 USFWS OCAP BiOp at 10, 76-77.)

7        The 2005 USFWS OCAP BiOp concludes that the coordinated

8   operation of the SWP and CVP, including the proposed future

9   actions, will not jeopardize the Delta smelt's continued

10  existence.  (2005 USFWS OCAP BiOp at 223.)  Although the 2005

11  USFWS OCAP BiOp recognizes that existing protective measures may

12  be inadequate, the USFWS concluded that certain proposed

13  protective measures, including the EWA and a proposed "adaptive

14  management" protocol would provide adequate protection.  The

15  proposed adaptive management protocol is known as the Delta Smelt

16  Risk Assessment Matrix ("DSRAM").  The DSRAM utilizes a list of

17  trigger criteria monitored on a monthly basis from December to

18  July.  (Id. at 98-103.)  If any trigger criteria is met or

19  exceeded, a Delta Smelt Working Group ("DSWG") is convened.  The

20  DSWG consists of representatives from USFWS, the California

21  Department of Fish and Game, DWR, the United States Environmental

22  Protection Agency, the Bureau, and the California Bay-Delta

23  Authority.  The DSWG then recommends corrective actions to a

24  Water Operations Management Team ("WOMT").  The 2005 USFWS OCAP

25  BiOp identifies four specific actions that the DSWG and WOMT must

26  consider: (1) export reductions at one or both of the projects;

27  (2) changes in the south Delta barrier operations; (3) changes in

28  San Joaquin River flows; and (4) changes in the operation of the

**7**

Delta cross channel.[4]

The federal government now acknowledges that shortly before the 2005 USFWS OCAP BiOp was completed, a fall midwater trawl survey of Delta smelt revealed a "substantial decline in the population index for the species." At the time the BiOp was issued, the government asserts that "limited analysis of this data existed, and the Service relied on the raw data, and its own professional judgments, as the best scientific and commercial data available." However, since the issuance of the BiOp, the CALFED agencies have analyzed the new trawl data. In part as a result of their analyses, the Service and Bureau "have concluded that substantial new information indicates that the agencies should revisit the [2005 USFWS OCAP BiOp], including the jeopardy and adverse modification analysis, and incidental take statement." (Doc. 240 at 4-5.)[5]

Scientists from CALFED Bay-Delta Program participant agencies recently developed a document based upon the new data: the Interagency Ecological Program Synthesis of 2005 Work to Evaluate the Pelagic Organism Decline (POD) in the Upper San Francisco Estuary (the "IEP POD Synthesis"). This document led the federal defendants to conclude that the OCAP for the CVP and

---

[4]    The 2005 USFWS OCAP BiOp also includes an incidental take statement that insulates operations implemented according to the OCAP from liability for taking Delta smelt. (2005 USFWS OCAP BiOp at 223.)

[5]    50 C.F.R. § 402.16(b) calls for the reinitiation of formal consultation "[i]f new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered."

SWP may affect Delta smelt in a manner or to an extent not previously considered.  (IEP POD Synthesis, Doc. 240, Attachment 1.)

In addition, other new information recently became available, including information concerning changes to the operation of project elements and new studies on the impact of climate change.  The Federal Defendants submit that this new information may affect the 2005 USFWS OCAP Biop in several ways:

> First, the environmental baseline and jeopardy analysis will be revisited, because whether or not the OCAP implementation will appreciably reduce the likelihood of survival and recovery of the Delta smelt must be evaluated against what may likely be a new baseline, potentially with a lower species population than was previously understood to exist. Second, the critical habitat analysis will be revisited, because data on salinity concentrations, declining population recruitment activity from downstream areas, and invasion of the exotic clam species, potamocorbula amurensis, require further analysis of whether the implementation of the OCAP adversely modifies critical habitat, in terms of both survival and recovery of the species. Third, and finally, the existing incidental take statement may need to be revised to take into account recent Delta smelt populations changes.

(Doc. 242 at 6.)

On July 6, 2006, the Bureau of Reclamation (the "Bureau") requested that the USFWS re-initiate consultation concerning the impact of the OCAP on the Delta smelt.  (Doc. 240.)  In a July 6, 2006 letter from the Bureau to the USFWS, the Bureau acknowledged that "emerging data indicates an apparent substantial decline in the Delta smelt population index."  (Doc. 240-2.)

//

//

//

//

**9**

1        **C.    The NMFS OCAP BiOp**.

2        In the *PCFFA* case, a parallel consultation process resulted
3   in the issuance by NMFS of a Biological Opinion ("BiOp") on
4   October 21, 2004, (the "2004 NMFS OCAP BiOp"), which addressed
5   the impact of the OCAP on the salmonid species.  The 2004 NMFS
6   OCAP BiOp concludes that the salmonid species may be adversely
7   affected by the CVP and SWP.  For example the systems' dams and
8   other water management structures have altered some salmonid
9   species' habitat and limited the habitat available for spawning
10  and rearing.  In addition the salmonid species may be adversely
11  affected by project operations.  The storage and release of water
12  will affect river flows and temperatures, and the diversion of
13  water may result in entrainment at fish screens and pumps.

14       Subsequent to the issuance of the 2004 NMFS OCAP BiOp, NOAA
15  listed the green sturgeon population segment as threatened and
16  designated critical habitat for numerous salmonid and steelhead
17  species.  The Bureau acknowledges that this is "new information"
18  requiring the reinitiation of ESA § 7 consultation on the 2004
19  NMFS OCAP BiOp.  In addition, the federal defendants acknowledge
20  that independent peer-reviews and an audit "provided important
21  feedback" on the 2004 NMFS OCAP BiOp.  (Doc. 81 at 7.)
22  Accordingly, the Bureau and NMFS are revisiting the 2004 NMFS
23  OCAP BiOp, including "the potential effects of ongoing CVP and
24  SWP operations to the newly listed species and newly designated
25  critical habitat, the jeopardy and adverse modification, analysis
26  and the incidental take statement."  (*Id*.)

27

28

**10**

### III.   **EVIDENTIARY DISPUTES**

**A.   Plaintiffs' Requests for Judicial Notice**.

In opposition to the federal defendants motion to dismiss, remand and or stay in the Delta smelt case, Plaintiffs request that the district court take judicial notice of a number of documents.  One of the documents is an unpublished court decision in *Rock Creek Alliance v. U.S. Fish & Wildlife Serv.*, No. CV 01-152-M-DWM (D. Mont. Mar. 19, 2002) (Docket No. 24).  This is a judicially noticeable court record.  No party objects to the court taking judicial notice of another court document, consisting of excerpts from the CALFED Programmatic Record of Decision, issued August 8, 2000, and obtained from the CALFED website.

The remaining documents appear to post-date the issuance of the challenged biological opinions.  Federal defendants object to the court taking judicial notice of these documents on the ground that the scope of review in this case should be limited to the administrative record.  (*NRDC* Doc. 283; *PCFFA* Doc. 88.)  Section 706 of the Administrative Procedure Act (APA), 5 U.S.C. § 706, provides for judicial review of federal administrative actions based upon "the whole record or those parts of it cited by the party."  In general, review should be of "the full administrative record that was before the [agency decisionmaker] at the time he made his decision."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971).  For example, post-decisional documents are not ordinarily included in the administrative record.  *See Rock Creek Alliance v. United States Fish and Wildlife Serv.,* 390 F. Supp  2d 993, 998 (D. Mont. 2005)(refusing

**11**

to consider post-decisional information not available to the

agency in that particular form at the time of the decision).  The

Ninth Circuit recognizes several exceptions to this general rule,

however.  District courts are permitted to admit extra-record

evidence:

>             (1) if admission is necessary to determine whether the
>             agency has considered all relevant factors and has
>             explained its decision,
>
>             (2) if the agency has relied on documents not in the
>             record,
>
>             (3) when supplementing the record is necessary to
>             explain technical terms or complex subject matter, or
>
>             (4) when plaintiffs make a showing of agency bad faith.

*Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2004).

"These limited exceptions operated to identify and plug holes in

the administrative record...[and] are narrowly construed and

applied."  *Id.*

>             The scope of these exceptions permitted by our
>             precedent is constrained, so that the exception does
>             not undermine the general rule. Were the federal courts
>             routinely or liberally to admit new evidence when
>             reviewing agency decisions, it would be obvious that
>             federal courts would be proceeding, in effect, de novo,
>             rather than with the proper deference to agency
>             process, expertise, and decision-making.

*Id.*

Plaintiffs make no effort to provide legal authority to

support supplementation of the administrative record with these

post-decisional documents, nor do they suggest why the record of

this case should not be limited to the administrative record.

Although post-decisional information might be relevant in the

context of a motion for interim injunctive relief, Plaintiffs do

not explain why these documents should be considered as part of

their continued challenge to the merits of the challenged BiOps. The request for judicial notice is **DENIED WITHOUT PREJUDICE,** except with respect to the unpublished decision from *Rock Creek Alliance* and the excerpts from the 2000 CALFED Programmatic Record of Decision of which judicial notice has been taken.

### B.    Defendant-Intervenors' Requests for Judicial Notice.

In both cases, Defendant-Intervenors request that the district court take judicial notice of:

> The August 15, 2002 order of The Honorable Robert E. Coyle, United States District Judge for the Eastern District of California in Association of California in *Water Agencies v. Evans*, E.D. Cal. Case No. CV-F-00-6148 REC/DLB.

This is a judicially noticeable public record. *Schweitzer v. Scott*, 469 F. Supp. 1017, 1020 (C.D. Cal. 1979)("Although each case must be viewed on its merits, the Court is empowered to and does take judicial notice of court files and records.").

In addition, in the *NRDC* case, Defendant-Intervenors request that the court take judicial notice of:

> The October 27, 2006 Memorandum to the Administrative Record from Deputy Assistant Secretary, Fish and Wildlife and Parks explaining the contents of an email sent by Deputy Assistant Secretary Julie MacDonald to Steve Thompson, et al., on April 1, 2004, regarding the Fish and Wildlife Service's five-year status review for the Delta smelt. This document was previously made part of the administrative record in *San Luis & Delta-Mendota Water Authority v. United States Department of the Interior* (E.D.Cal., Oct. 27, 2006) F-02-6461-OWW-DLB.

This document is capable of being judicially notice, because a court can take judicial notice of its own files and records in other cases. *Wible v. Aetna Life Ins. Co.*, 375 F. Supp. 2d 956, 965-66 (C.D. Cal. 2005); *Del Puerto Water Dist. v. United States*

13

*Bureau of Reclamation*, 271 F. Supp. 2d 1224, 1233 (E.D. Cal. 2003) (holding that a federal court "may take notice of proceedings in other courts...if those proceedings have a direct relation to the matters at issue.").

Defendant-Intervenors' request for judicial notice is **GRANTED**.

### C.   <u>Objections to Declaration of Christina Swanson, Submitted by Plaintiffs</u>.

Plaintiffs present the declaration of a Dr. Christina Swanson, PhD, an experienced fisheries biologist. (*NRDC* Doc. 280.)  In her declaration Dr. Swanson summarizes recent referenced literature and an oral presentation from a recent conference.  Defendant-Intervenors object to substantial portions of Dr. Swanson's declaration the grounds of hearsay.  They also argue that certain portions constitute inadmissible opinion testimony. (*NRDC* Doc. 294)   As a threshold matter, however, the district court need not address these evidentiary objections because Plaintiffs have not demonstrated why Dr. Swanson's declaration should be considered by the district court at this time.  Her opinions are based at least in part on post-decision evidence and are essentially irrelevant to the pending motions.

### IV.   <u>ANALYSIS</u>

### A.   <u>Overview</u>.

In both *NRDC* and *PCFFA*, the federal defendants move (1) to dismiss on prudential mootness grounds; (2) to remand the case to the agency; or (3) for a stay pending the completion of renewed

**14**

1   consultation based on the doctrine of primary jurisdiction.

2   Defendant Intervenors oppose dismissal or remand, but support the

3   issuance of a stay.  Plaintiffs oppose dismissing, remanding, or

4   staying the case.  Instead, <u>emphasizing the fact that Defendants</u>

5   <u>continue to rely on the challenged BiOps</u>, Plaintiffs advocate

6   proceeding with a decision on the merits (i.e., they seek a

7   determination as to whether the BiOps violate the ESA).  If they

8   prevail, Plaintiffs intend to seek interim remedial relief.

9       The federal defendants have also moved to consolidate *NRDC*

10  and *PCFFA* for all purposes.  The Defendant-Intervenors have all

11  joined the motion to consolidate.  Plaintiffs oppose

12  consolidation.

13

14      **B.   Motion to Dismiss on Prudential Mootness Grounds**.

15      The federal defendants argue that both cases should be

16  dismissed based on the doctrine of prudential mootness.  The

17  doctrine of prudential mootness permits a court, in its

18  discretion, to dismiss a case when

19              a controversy, though not moot in the strict Article
            III sense, is so attenuated that considerations of
20          prudence and comity for coordinate branches of
            government counsel the court to stay its hand, and to
21          withhold relief it has the power to grant... Under both
            Article III and prudential mootness doctrines, the
22          central inquiry is essentially the same: have
            circumstances changed since the beginning of the
23          litigation that forestall any occasion for meaningful
            relief.
24
    *Sierra Club v. Babbitt*, 69 F. Supp. 2d 1202, 1244 (E.D. Cal.
25
    1999).  "[T]he doctrine of prudential mootness...has particular
26
    applicability in cases...where the relief sought is an injunction
27
    against the government."  *Southern Utah Wilderness Alliance v.*
28

**15**

*Smith*, 110 F.3d 724, 727 (10th Cir. 1997).  A court should decline to grant declaratory or injunctive relief where the government "has already changed or is in the process of changing is policies or where it appears that any repeat of the actions in question is otherwise highly unlikely." *Building and Const. Dept. v. Rockwell Intern. Corp.*, 7 F.3d 1487, 1492 (10th Cir. 1993).

Here, Federal Defendants assert that the reinitiation of formal consultation is a change in circumstance that forestalls any possibility of meaningful relief in this court.  Federal Defendants also assert that Plaintiffs' claims will be considered through the reinitiated consultation process.  (*NRDC* Doc. 242-1 at 8.)  Federal Defendants cite an unpublished district court case that considered the applicability of prudential mootness after a federal agency defendant reinitiated ESA § 7 consultation. *See, e.g. Or. Natural Res. Council v. Keys*, 2004 WL 1048168 (D. Or. May 7, 2004) (applying doctrine of prudential mootness where agency was in the process of reinitiating consultation and "plaintiffs' concerns [would] be fully addressed in the new consultation").

But, Plaintiffs correctly point out that courts have refused to dismiss on prudential mootness grounds where the action agency did not indicate an intent to change its operations. *See Am. Rivers, Inc. v. NOAA Fisheries*, No. CV-04-0061, 2004 WL 2075032 at *3 (D. Or. Sept. 14, 2004).  In that case, the district court refused to dismiss on prudential mootness grounds despite reinitiation of consultation because the agencies involved did not intend to change their opinion or alter their operations

**16**

significantly.

Here, the Defendants have volunteered to change their operations to a certain extent.  For example, DWR has promised that it will NOT increase pumping above pre-2004 levels.  The Federal Defendants have made a less firm commitment to maintain pumping from the Tracy Pumping Plant at "recent historic" levels. In addition, Federal Defendants have promised that, during the interim period, they will

- not execute long-term water service contracts for CVP water deliveries; and

- not further implement new construction activities or long term projects in the Sacramento Delta without necessary ESA consultation;

Apart from these promises, however, the Federal Defendants continue to maintain that the challenged BiOps are valid and lawful, continue to implement at least some portions of the measures set forth therein, and continue to operate under the protection of the incidental take statements included in the BiOps.

Plaintiffs point to some specific examples of actions the Federal Defendants plan to take in reliance on the challenged BiOps.  In the salmonid case, the Federal Defendants want to alter the the pre-2004 temperature compliance point at Bend Bridge[6] and refuse to promise compliance with the pre-2004

---

[6]    This temperature compliance point is the geographical point at which the temperature must be maintained at or below a certain level, to protect the salmonids' ability to successfully spawn and ensure that their offspring can survive downstream migration.  The Federal Defendants advocate allowing the compliance point to move geographically upstream during non-critical times of the year, because this will conserve cold water resources for more critical times of the year.

requirement that 1.9 million acre feet ("MAF") be held behind
Shasta Dam as a cold water carryover.[7]   Plaintiffs maintain that
the corrective measures (such as the EWA) set forth in the BiOps
are insufficient to protect the species against such changes.

Plaintiffs' concerns have not been fully addressed by the
reinitation of consultation.   Federal Defendants are relying in
part on the challenged BiOps in operating the CVP and intend to
continue to do so.   The controversy over whether the BiOps and
OCAP should have continued viability is real and substantial.
and this court could provide relief, in the form of a decision
invalidating the BiOps followed by hearings on interim remedies.[8]
Under these circumstances, it is not appropriate to deem this
case prudentially moot.[9]

_____

[7]     The 1.9 MAF coldwater carryover refers to an amount of
cold water that is to be held behind Shasta Dam for the purpose
of maintaining the appropriate coldwater compliance point.

[8]     The Defendants and Defendant-Intervenors suggest in the
alternative that the court should forgo a decision on the merits,
opting instead to stay the case while allowing Plaintiffs the
opportunity to move at any time for interim injunctive relief.
This option is discussed in greater detail below.

[9]     The parties also engage in a detailed debate over
issues that essentially go to the merits of the complaint or are
relevant to the issuance of an interim remedy.   For example,
Plaintiffs maintain that the record indicates that USFWS and NMFS
relied upon flawed science and analyses in reaching the "no-
jeopardy" conclusions contained in the BiOps.   Plaintiffs also
point to evidence that calls into question the Federal Defendants
prediction that interim operation of the CVP and SWP under the
OCAP will not have any "long-term" impacts on the species.
Essentially, Plaintiffs argue that the Federal Defendants have no
way of knowing whether any long term impacts will result because
their analyses have been based on flawed information.   Defendants
strenuously dispute these assertions, maintaining that the BiOps
were lawfully promulgated given the state of the record at the

1    Federal Defendants' motion to dismiss on prudential mootness

2 grounds is **DENIED**.

3

4    **C.    Motion for Voluntary Remand Without Vacatur**.

5    Alternatively, Federal Defendants move in both cases for

6 voluntary remand without vacatur.  (Doc. 242)

> Voluntary remand is consistent with the principle that
> "administrative agencies have an inherent authority to
> reconsider their own decisions, since the power to
> decide in the first instance carries with it the power
> to reconsider." *Trujillo v. General Electric Co.*, 621
> F.2d 1084, 1086 (10th Cir. 1980). Voluntary remand also
> promotes judicial economy by allowing the relevant
> agency to reconsider and rectify an erroneous decision
> without further expenditure of judicial resources. *See,
> e.g.*, *Ethyl Corp. v. Browner*, 989 F.2d 522, 524 (D.C.
> Cir. 1993) (granting EPA's opposed motion for voluntary
> remand) ("We commonly grant such motions [for voluntary
> remand], preferring to allow agencies to cure their own
> mistakes rather than wasting the courts' and the
> parties' resources reviewing a record that both sides
> acknowledge to be incorrect or incomplete."); id. at
> 524 n.3 (collecting cases); cf. Marathon Oil v. EPA,
> 564 F.2d 1253, 1268-69 (9th Cir. 1977) (discussing
> motion for voluntary remand).

*NRDC v. United States Dept. of the Interior*, 275 F. Supp. 2d

1136, 1141 (C.D. Cal. 2002)(citations edited).  The district

court in *NRDC v. United States Department of the Interior* also

held that a voluntary remand need not lead to the vacatur of

the agency action being remanded:

> The test for whether to remand an arbitrary and
> capricious rule without vacating depends in part on
> "the <u>seriousness of the order's deficiencies</u> (and thus
> the extent of doubt whether the agency chose correctly)
> and the <u>disruptive consequences of an interim change
> that may itself be changed</u>."

---

time.  For the purposes of deciding the instant procedural
motions, these fact-specific disputes are largely irrelevant.  So
long as there is a live controversy and Plaintiffs can obtain
meaningful relief from the district court, dismissal on mootness
grounds is inappropriate.

1   *Id.* at 1143 (emphasis added).

2       Applying this general framework is difficult here, because

3   the alleged deficiencies in the challenged BiOps have not yet

4   been fully litigated.  In fact, Federal Defendants continue to

5   maintain that the BiOps were, in whole or part, validly

6   promulgated.  Federal Defendants do suggest that a change to the

7   status quo "would have huge ramifications for regional water

8   users and agriculture (a point on which Federal Defendants defer

9   to Intervenors)."  (Doc. 242 at 12.)  But, the water user

10  Defendant-Intervenors do not support a voluntary remand without

11  vacatur, nor have they yet presented any evidence or argument

12  regarding the nature of the prejudice they might suffer if the

13  BiOps were invalidated.

14      Federal Defendants suggest that the district court's vacatur

15  analysis should also consider whether continued operation of the

16  CVP and SWP under the challenged biological opinions would

17  constitute an irreversible or irretrievable commitment of

18  resources, invoking the language of ESA § 7(d).[10]  Federal

19  Defendants point to the 2001 unpublished opinion in *Southwest*

20

21          [10]   ESA § 7(d), 16 U.S.C. § 1536(d), provides:

22              Limitation on commitment of resources

23
                After initiation of consultation required under
24              subsection (a) (2) of this section, the Federal agency
                and the permit or license applicant shall not make any
25              irreversible or irretrievable commitment of resources
                with respect to the agency action which has the effect
26              of foreclosing the formulation or implementation of any
                reasonable and prudent alternative measures which would
27              not violate subsection (a) (2) of this section.

28

**20**

1  *Center for Biological Diversity v. United States Forest Service*,

2  2001 U.S. Dist. LEXIS 25027 (D. Ariz. Mar. 30, 2001), which

3  applied the "irreversible or irretrievable commitment of

4  resources" test under somewhat similar circumstances.  *In*

5  *Southwest Center*, the agency sought a voluntary remand of a

6  biological opinion to evaluate impacts of new grazing allotments

7  on endangered species.  The plaintiffs sought an injunction

8  against implementation of the existing biological opinion.  The

9  *Southwest Center* court denied the injunction, applying a hybrid

10  injunctive relief standard that incorporated the standard set

11  forth in ESA §7(d).  The *Southwest Center* court reasoned:

> Although the Supreme Court has made clear that in balancing the hardships of the parties, threatened and endangered species are to be given the highest priority, under the circumstances of this case, where the Forest Service and the FWS are committed to complying with the ESA, the economic hardship to ranchers in issuing an injunction should be considered. Because there has been an insufficient showing that continued grazing on these allotments would result in irreparable harm to the loach minnow and spikedace while Defendants are consulting, Plaintiff's request for injunctive relief is denied...

> ***

> The record demonstrates that despite allowing cattle grazing to continue, conditions on these allotments are improving. The Forest Service has excluded livestock from directly accessing key watersheds in the national forests, in particular, watersheds containing loach minnow and/ or spikedace habitat. This exclusion has contributed to improved watershed conditions and has minimized the adverse effects of livestock grazing to the loach minnow and the spikedace. <u>Therefore, there is no evidence that maintenance of the current status quo, which allows grazing, would result in an irreversible and irretrievable commitment of resources foreclosing the implementation of future alternatives, especially when as here the Forest Service can prevent any irreversible or irretrievable commitment of resources by moving the livestock to other pastures or removing the livestock from national forest lands</u>.

*Southwest Center*, 2001 U.S. Dist. LEXIS 25027, 121-123 (emphasis added).   *See also Washington Toxics Coalition v. EPA*, 413 F.3d 1024, 1035 (9th Cir. 2005), (under ESA § 7(d) "non-jeopardizing agency actions [may] continue during the consultation process.").

Federal Defendants maintain that, like in *Southwest Center*, maintenance of the status quo will not present an irreversible or irretrievable commitment of resources.   In support of this assertion, Federal Defendants argue that there are various provisions in the existing OCAP BiOps designed to protect the Delta smelt and the salmonid populations.

With respect to the Delta smelt, the Federal Defendants note that the 2005 USFWS OCAP BiOp could require cessation of CVP operations in some circumstances.   In addition, the Federal Defendants emphasize that numerous other rules, regulations, subgroups, and teams exist to protect the Delta smelt, including those teams and processes which make up the Delta Smelt Risk Assessment Matrix (DSRAM), which is designed to recognize when take limits are being exceeded and then take action to address such problems.   The problem with relying upon these protective measures to justify voluntary remand without vacatur is that Plaintiffs allege that the adaptive management structures relied upon in the 2005 USFWS OCAP BiOp's no jeopardy finding are inadequate and unlawful.   The government preemptively responded to this objection by offering to somewhat strengthen DSRAM.

> Despite Plaintiffs' claims that the DSRAM process is entirely voluntary, *Pl. Memo* at 13, there is a significant record of actions taken to benefit the smelt in response to recommendations made by the Delta Smelt Working Group to the WOMT...However, in light of recent data on the Delta smelt, and to ensure the adequacy of actions taken to protect the Delta smelt by

**22**

1
2
3
4
5
6
7
8
9

> the WOMT during the pendency of the reinitiation of the
> §7 consultation process, the Service will require the
> Delta Smelt Working Group to adequately document the
> technical reasons for its recommendations to the WOMT.
> If the WOMT does not accept the recommendations by the
> Delta Smelt Working Group, then the WOMT will need to
> document the technical justification for why the
> actions they are proposing for implementation will be
> sufficiently protective of the smelt. This finding will
> need to be transmitted to the Sacramento Fish and
> Wildlife Office of the Service, who will determine if
> the WOMT is correct in its determination, thereby
> finding that the operations of the facilities remain
> within the project description, or in the alternative,
> find that the action is inadequate to conserve the
> smelt.

(*NRDC* Doc. 242 at 19-20.)  But this does not definitively answer

the question of whether USFWS lawfully concluded that the DSRAM

process is adequate to protect the Delta smelt from harm caused

by implementation of other aspects of the OCAP.[11]

    With respect to the salmonid species, the Federal Defendants

similarly maintain that the 2004 NMFS OCAP BiOp contains

sufficient measures designed to protect salmonid species:

> According to the National Marine Fisheries
> Service, the measures being undertaken by Reclamation
> to manage salmonid species concerns have, in the recent
> past, led to increases in salmonid populations, and
> decreases in salmonid species entrainment at the CVP
> and SWP project pumps. Declaration of Michael E.
> Aceituno, Attachment 3, ¶5 (also discussing charts
> accompanying the declaration.) Reclamation's ongoing
> measures, including properly timed cold water releases
> and dam operations along the Sacramento River, are
> expected to continue to provide a measure of protection
> for the salmonid species. Id. at ¶13 (discussing
> temperature control device at Shasta Dam, gate
> operations at the Red Bluff Diversion Dam, and
> continued real time management by the Interagency

---

    [11]    Similarly, the Federal Defendants point to the EWA and
to CVPIA(b)(2) water deliveries as protective measures that will
ensure no harm comes to the smelt in the interim period.  Again,
Plaintiffs assert in this lawsuit that these mechanisms are
inadequate.

1
2
3
4
5
6
7

> Sacramento River Temperature Control Task Force.) In
> addition, no expected long-term effects on listed
> salmonids are expected within the interim period of
> consultation because of above normal hydrology (i.e.,
> full reservoirs and banked water available for fish
> protection) and because short-term effects (less than
> 18 months) are unlikely to have any effect on migratory
> salmon species that take 36 months to return as adults.
> Id. Accordingly, ongoing operation of the CVP and SWP
> in this case will not result in any irreversible or
> irretrievable commitment of resources which have the
> effect of foreclosing the formulation or implementation
> of any reasonable and prudent alternative measures.

8  (*PCFFA*, Doc. 81 at 16-17.)

9       Plaintiffs respond to each assertion by Federal Defendants

10  that the challenged BiOps will benefit or at least not harm the

11  salmonids.  For example, with respect to the alteration of the

12  temperature compliance point, Plaintiffs rejoin that "[t]he

13  Federal Defendants fail to explain how the diminution of cold

14  water spawning habitat in the Sacramento River as well as the

15  Feather and American Rivers as a result of interim operations is

16  consistent with ESA requirements."

17
18
19
20
21
22
23
24
25
26
27

> As discussed above, the 2004 Salmonid BO found that
> operations under the 2004 OCAP would have numerous,
> serious adverse impacts to salmonid spawning habitat
> due to moving the Sacramento River temperature
> compliance point 19 miles upstream, elimination of the
> Shasta Reservoir cold water carryover storage
> requirement, and reduced stream flows. According to
> NMFS's own analysis, which independent science
> reviewers suggested underestimated adverse impacts, the
> temperature and carryover "targets" identified in the
> 2004 BO are inadequate to maintain suitable spawning
> habitat. The 2004 Salmonid BO found, for example, that
> the change in the Sacramento River compliance point
> would eliminate over 40 percent of winter-run Chinook
> critical habitat, decrease spawning success, and
> effectively limit the population size due to restricted
> availability of suitable spawning habitat. NMFS AR
> 5844, 5920, 5939. Such adverse effects could easily
> reverse the rebound the winter-run population
> experienced after these temperature controls were put
> in place....

28

**24**

1  (*PCFFA*, Doc. 85 at 12.)

2      At the very least, there are factual disputes as to the

3  effectiveness of the various protective measures relied upon by

4  the challenged BiOps.  This makes it impossible to undertake a

5  proper § 7(d) analysis on the pleadings at this stage of the

6  case.  More critically, it is not entirely clear that the § 7(d)

7  analysis is relevant to deciding whether a remand without vacatur

8  is appropriate.  Although § 7(d) was taken into consideration in

9  *Southwest Center,* the instant case is in a very different

10  procedural posture than was *Southwest Center.*  In *Southwest*

11  *Center*, the court had already ruled in favor of the plaintiffs on

12  the merits of their ESA claim.  The district court subsequently

13  denied plaintiffs' request for a preliminary injunction that

14  would have vacated the BiOp, applying a test that incorporated a

15  detailed examination of the § 7(d) standard.  Here, in contrast,

16  the Federal Defendants request that the case be remanded without

17  vacatur <u>prior</u> to any decision on the merits.

18      Plaintiffs argue that the Federal Defendants should not be

19  permitted to "have it both ways," by being permitted to operate

20  under the challenged BiOps while maintaining that all litigation

21  regarding those BiOps should cease.  In support of this argument,

22  Plaintiffs cite *Rock Creek Alliance v. U.S. Fish & Wildlife*

23  *Serv.*, No. CV 01-152-M-DWM, Order (D. Mont. Mar. 19, 2002), in

24  which the district court refused to authorize a voluntary remand

25  where the agency refused to withdraw its BiOp.  Federal

26  Defendants attempt to distinguish *Rock Creek*, arguing:

27          In *Rock Creek*, a voluntary remand without vacatur was

28                              **25**

1
2
3
4
5
6

> rejected because the agency sought to continue the
> construction and operation of a copper and silver mine
> in Montana. In contrast, here, Federal Defendants have
> explained that any future construction actions require
> further ESA §7 review. Declaration of Kirk Rodgers
> (Oct. 18, 2006) at paragraph 4 and footnote 1. Instead,
> this Court is asked only not to vacate the current,
> ongoing operation of the nation's largest federal water
> project, to which additional limitations were adopted
> for the specific purposes of protecting Delta smelt and
> salmonid species.

7  (*PCFFA*, Doc. 92 at 22.)

8      Federal Defendants' argument begs the question, however, of

9  what potentially detrimental aspects of the OCAP they intend to

10  implement during the interim period.  The mere presence in the

11  challenged BiOps of programs that might potentially benefit the

12  fish does not distinguish this case from *Rock Creek* if Defendants

13  intend to implement significant detrimental water management

14  actions (above and beyond those in place prior to the issuance of

15  the challenged BiOps).[12]

16      Again, the Ninth Circuit's general standard for vacatur is

17  as follows:

18
19
20
21

> The test for whether to remand an arbitrary and
> capricious rule without vacating depends in part on
> "the <u>seriousness of the order's deficiencies</u> (and thus
> the extent of doubt whether the agency chose correctly)
> and the <u>disruptive consequences of an interim change
> that may itself be changed</u>."

22
23
24
25
26
27

      [12]  Plaintiffs also cite *Greenpeace v. Nat'l Marine
Fisheries Serv.,* 80 F. Supp.2d at 1151 (W.D. Wash. 2000), in
which the district court rejected the agency's attempts to rely
on a BiOp to defend against a motion for summary judgment while
at the same time arguing the BiOp has been withdrawn and
plaintiffs' claims should be dismissed on Article III mootness
grounds.  The Greenpeace court reasoned that the agency "cannot
have it both ways."  Federal Defendants correctly point out that
this case is less relevant because it involved Article III
mootness.

28

**26**

*NRDC,* 275 F. Supp. 2d at 1143.  Similarly, in *Modesto Irrigation District v. Evans et. al.*, Case No. 1:02-cv-06553-OWW-DLB (May 12, 2004), Doc. 79 at 48, this district court considered whether to vacate the listing of a salmonid species and articulated seven factors to be evaluated in determining whether or not to set aside a rule when it was subjected to an APA based challenge and remand:

> (1)   the purposes of the substantive statute under which the agency was acting;
>
> (2)   the magnitude of the administrative error and how extensive, substantive and serious it was;
>
> (3)   the possibility the agency will be able to substantiate its decision given an opportunity to do so;
>
> (4)   the likelihood that the errors can be mended and that such changes can be made without altering the order;
>
> (5)   equity and public interest considerations;
>
> (6)   the potential prejudice to those who will be affected by maintaining the status quo; and
>
> (7)   the disruptive consequences of an interim change, which could include invalidating or enjoining the agency action.

Here, there are significant factual disputes concerning most if not all of the factors noted above.  Federal Defendants continue to maintain that no administrative errors occurred in the promulgation of the challenged BiOps.  Moreover, Defendants continue to rely, at least to some extent, on the challenged BiOps, effectively adopting portions of the OCAP as of 2004 as the status quo.  Plaintiffs' lawsuits assert that the OCAP was never properly evaluated for its impacts on the Delta smelt and

**27**

salmonids and impliedly assert that a different status quo should serve as the baseline.  Perhaps most critically, Federal Defendants deferred to the water users, who arguably would be the parties most disrupted by returning to the pre-2004 status quo, to make such a showing.  However, the water users do not support a voluntary remand without vacatur, nor have they presented any evidence or argument regarding the nature of the prejudice they might suffer.

Under all these circumstances it is not possible to conclude that remand without vacatur is appropriate here.  This motion is **DENIED**.

### D.   Motion for Stay Pending Completion of Re-Consultation (Based on Doctrine of Primary Jurisdiction).

Federal Defendants, along with all Defendant-Intervenors invoke the doctrine of primary jurisdiction to support the imposition of stays in both cases pending the completion of re-consultation.  Federal Defendants and Defendant Intervenors suggest, however, that the stay should include an exception that would permit Plaintiffs to bring a motion for injunctive relief under ESA § 7(d).  Plaintiffs oppose this approach, and instead request that the cases be heard on their merits.

Whether to grant a stay lies within the sound discretion of the district court:

> [T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing

**28**

1        interests and maintain an even balance...
2    *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936).

3        In cases which "contain some issue within the special
4    competence of an administrative agency," a court may issue a stay
5    to permit the administrative agency an opportunity to apply its
6    special expertise. *Davel Communs., Inc. v. Qwest Corp., 460 F.3d*
7    *1075, 1080* (9th Cir. 2006).  The Ninth Circuit has considered a
8    number of factors when deciding whether a stay based on primary
9    jurisdiction is appropriate  The doctrine has been applied where
10   there is "(1) the need to resolve an issue that (2) has been
11   placed by Congress within the jurisdiction of an administrative
12   body having regulatory authority (3) pursuant to a statute that
13   subjects an industry or activity to a comprehensive regulatory
14   scheme that (4) requires expertise or uniformity in
15   administration." *Id*. at 1087.

16       In determining whether to grant a stay based on primary
17   jurisdiction, the Court must "weigh the benefits of obtaining the
18   agency's aid against the need to resolve the litigation
19   expeditiously." *Wagner & Brown v. ANR Pipeline Co.*, 837 F.2d
20   199, 201 (5th Cir. 1988).  In addition, a court should take into
21   consideration "the possible damage which may result from the
22   granting of a stay, the hardship or inequity which a party may
23   suffer in being required to go forward, and the orderly course of
24   justice measured in terms of the simplifying or complicating of
25   issues, proof, and questions of law which could be expected to
26   result from a stay." *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th
27   Cir. 1962).  "[A party seeking] a stay must make out a clear case

28

1  of hardship or inequity in being required to go forward, if there
2  is even a fair possibility that the stay for which he prays will
3  work damage to someone else." *Lockyer v. Mirant Corp.*, 398 F.3d
4  1098, 1109 (9th Cir. 2005)(emphasis added).  In *Lockyer*, the
5  plaintiff demonstrated the possibility of harm to its interests
6  from a stay and the defendant failed to make out a clear case of
7  hardship or inequity.  *Id*. at 1112-13.  The Ninth Circuit held
8  that "being required to defend a suit, without more, does not
9  constitute a 'clear case of hardship or inequity'..." *Id*.

10      The Federal Defendants contend that this case is one in
11  which there is a need for judicial consideration of the expert
12  and specialized knowledge of the agencies.  *Forest Guardians v.*
13  *United States Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir.
14  2003)("When the agency is making predictions, within its special
15  expertise, at the frontiers of science, we must be at our most
16  deferential.").  Applying the four-part analytical approach from
17  *Davel*, 460 F.3d at 1086-1087, the federal government argues that
18  a stay is appropriate here because there is a need to resolve an
19  issue – whether the operation of the CVP and SWP jeopardizes the
20  continued existence of Delta smelt - that is of a type that was
21  placed by Congress within the jurisdiction of an administrative
22  agency.

23      Plaintiffs respond that a stay here would harm their
24  interests because it would permit the defendants to implement the
25  challenged BiOps without observing the requirements of the ESA,
26  until at least April 2008.  In theory, this would permit the
27  defendants to operate the CVP and SWP pursuant to the 2004 OCAP

28

**30**

1   (which calls for increased pumping and other types of potentially

2   detrimental changes).  Plaintiffs maintain that the challenged

3   BiOps provide inadequate protection for the Delta smelt and

4   salmonids.  Plaintiffs submit that allowing the continued

5   implementation of aspects of the OCAP under the admittedly flawed

6   BiOps would likely result in harm to the species.

7        Federal Defendants and Defendant-Intervenors rejoin that,

8   under the framework they propose, Plaintiffs' would have ample

9   opportunity to protect their interests by moving for injunctive

10  relief under the standard set forth in ESA § 7(d).  But,

11  Plaintiffs would be at a disadvantage if they were required to

12  proceed directly to a § 7(d) proceeding.  Without a ruling that

13  the challenged BiOps were unlawful, Defendants start from a

14  position of legal validity, with two "lawful" BiOps.  In

15  contrast, if the BiOps are first declared unlawful, there is some

16  authority suggesting that the government would then assume the

17  burden to prove that its actions were non-jeopardizing.  For

18  example, in *Washington Toxics Coalition v. EPA*, 413 F.3d 1024,

19  1035 (9th Cir. 2005), a case relied upon by Federal Defendants,

20  the EPA attempted to register a number of pesticides that

21  plaintiffs feared might harm endangered fish species.  In

22  approving the pesticides, EPA complied with the registration

23  requirements of the Federal Insecticide, Fungicide and

24  Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136 et seq., but did not

25  consult with NMFS pursuant to the ESA.  The district court ruled

26  that EPA must comply with the ESA as well as with FIFRA and

27  ordered EPA to initiate and complete § 7 consultation according

28

**31**

to a prescribed schedule.  Having already ruled in favor of
plaintiffs on the merits, the district court entertained a motion
for interim injunctive relief under § 7(d).  The Ninth Circuit
affirmed the district court's decision to place the burden under
§ 7(d) of "showing that its actions were non jeopardizing to
endangered or threatened species" on the action agency.

> ....We have not [previously] expressly stated who bears
> the burden of showing that the action is
> non-jeopardizing, but the burden should be on the
> agency, the entity that has violated its statutory
> duty.
>
> Placing the burden on the acting agency to prove the
> action is non-jeopardizing is consistent with the
> purpose of the ESA and what we have termed its
> "institutionalized caution mandate[ ]." *Sierra Club v.
> Marsh*, 816 F.2d at 1389. We said as much in *Thomas v.
> Peterson*, where the defendant, the U.S. Forest Service,
> urged the district court to conclude that absent proof
> by the plaintiffs to the contrary, a proposed project
> was not likely to affect an endangered or threatened
> species. 753 F.2d at 765. We held that this was an
> inappropriate finding for the district court to make.
> *Id*. "It is not the responsibility of the plaintiffs to
> prove, nor the function of the courts to judge, the
> effect of a proposed action on an endangered species
> when proper procedures have not been followed." *Id*. The
> district court correctly assigned EPA the burden of
> proving that its actions were non-jeopardizing.
>
> The district court was not required to balance
> interests in protecting endangered species against the
> costs of the injunction when crafting its scope.
> Congress has decided that under the ESA, the balance of
> hardships always tips sharply in favor of the
> endangered or threatened species. *See Marbled Murrelet
> v. Babbitt*, 83 F.3d 1068, 1073 (9th Cir.1996).

*Id*. at 1035 (emphasis added).  But, this ruling is premised on
the fact that the agency was found to have been in violation of a
statutory duty.  Without such a finding, there would be little
support for the application of this burden-shifting approach.

Even under Federal Defendants' and defendant-intervenors' proposal that Plaintiffs would remain free to seek provisional relief pending re-consultation, such relief will require the parties to litigate on the merits the validity of the BiOps.

Plaintiffs are entitled to have their complaint decided on the merits, particularly given the fact that Defendants continue to rely on the challenged BiOps as if they were lawfully enacted. The motion for a stay is **DENIED**.

### E. <u>Motion to Consolidate</u>.

The Federal Defendants move to consolidate *NRDC* with *PCFFA* for all purposes.  Rule 42(a) of the Federal Rules of Civil Procedure provides:

> When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issues in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

A district court has broad discretion to decide whether consolidation is appropriate.  *In re Consol. Parlodel Litig.*, 182 F.R.D. 441, 444 (D.N.J. 1998).  A court "must balance the interest of judicial convenience against the potential for delay, confusion and prejudice that may result from such consolidation." *Bank of Montreal v. Eagle Assoc.*, 117 F.R.D. 530, 532 (S.D.N.Y. 1987)  Factors such as differing trial dates or stages of discovery usually weigh against consolidation.  9 Wright & Miller, Federal Practice and Procedure § 2383 (2006).

**33**

The Federal Defendants first point out that the *PCFFA* case
was transferred to this Court because it was found to be related
to the *NRDC* case:

> These two cases have (1) overlapping facts and legal
> issues and (2) arise out of the same agency action. In
> light of the danger of inconsistent relief, these two
> cases should be decided by the same court.

(*PCFFA*, Doc. 13.)  But, as Plaintiffs point out, that these
factors favored a <u>transfer</u> does not necessarily indicate that
<u>consolidation</u> of two cases already before the same district judge
is necessary or appropriate.

Federal Defendants maintain that consolidation is
appropriate here because, although there may have been factual
distinctions when these cases were first filed, any factual
distinctions between the two cases vanished when the agencies
reinitiated consultation.  This argument, which is related to
Federal Defendants' contention that the cases are prudentially
moot on the merits, has been rejected.  The factually distinct
merits claims are still live.

Federal Defendants also point out that both *NRDC* and *PCFFA*
involve disputes over federal and state government management of
the same regional water resources and the Bureau's regional water
management obligations under the CVPIA.  From a practical
perspective, the Bureau is required to manage the water resources
for both species.  Accordingly, Federal Defendants maintain,
consolidation would facilitate the interim management of the CVP
and SWP in a manner that would benefit both species.  According
to the Federal Defendants, allowing the cases to proceed

**34**

independently risks inconsistent judgments.  While true in
theory, if Plaintiffs prevail on the merits and the Delta smelt
case proceeds to a remedies phase, Reclamation will be afforded
an opportunity to explain not only how various remedies would
impact the Delta smelt, but how any altered management action
would impact the salmonids and/or any other legally protected
interests.

Finally, Federal Defendants note that all of the *NRDC*
plaintiffs are also plaintiffs in *PCFFA* and the same counsel are
assigned to both cases for these organizations.  Federal
Defendants maintain that consolidated briefing could help avoid
duplicative proceedings and redundancies.  But any efficiencies
gained by consolidation would be countered (or more likely
outweighed) by the additional confusion for the district court of
dealing with two independent sets of scientific facts, not to
mention separate administrative records.  For example, with
regard to Delta smelt, the district court may have to examine
whether the adaptive management system upon which FWS based its
original no jeopardy conclusion is adequate to protect Delta
smelt during interim operations.  In contrast, in the salmonids
case, the court may need to examine whether the weakening of
temperature controls on the upper Sacramento River will destroy
critical habitat and cause serious harm to the salmon and
steelhead species during the interim period.

Finally, Plaintiffs argue that consolidation of the two
cases would substantially delay resolution of the Delta smelt
case, prejudicing Plaintiffs' interests.  The *NRDC* and *PCFFA* are

**35**

1   at significantly different stages of development.  *NRDC* will be

2   ready for a merits-type hearing almost immediately, while *PCFFA*

3   is at a much earlier stage.  Plaintiffs emphasize that time is of

4   the essence in the Delta smelt case because of the species'

5   precarious state.

6       Under the totality of the circumstances, consolidation is

7   not appropriate at this time.  The sole factor weighing in favor

8   of consolidation is the possibility that a remedy in the Delta

9   smelt case might adversely impact the salmonid species.  However,

10  should Plaintiffs prevail in the Delta smelt case, the district

11  court can consider evidence of any such potential adverse impacts

12  at that time.  Moreover, any potential benefits of consolidation

13  are far outweighed by the benefits of allowing these cases to

14  proceed separately, namely (1) avoiding the confusion that would

15  be caused by litigating cases with independent factual

16  backgrounds and administrative records; and (2) avoiding further

17  delay to the Delta smelt case.

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28

1      **F.     <u>Miscellaneous Issues</u>.**

2          Federal Defendants also assert, in the context of their

3  motion to dismiss/stay in the salmonid case, that "whatever legal

4  mechanism this Court uses to allow Federal Defendants to complete

5  a new biological opinion, Plaintiffs' future attorney's fees

6  claims should be denied.  Here, Federal Defendants are asking for

7  an advisory opinion on an issue that has not yet been presented

8  to the court for review.  The court declines to rule on the issue

9  of attorney's fees at this time.

10

11                    **V.    <u>CONCLUSION</u>**

12         For the reasons set forth above,

13     (1)   Federal Defendants' motion for Dismissal on prudential

14           mootness grounds is **DENIED;**

15     (2)   Federal Defendants' motion for Voluntary remand without

16           vacatur is **DENIED;**

17     (3)   All Defendants' and Defendant-Intervenors' motion for a

18           stay is **DENIED.**

19         All Defendants shall have 20 days from the entry of this

20  order to answer the complaints in both the *NRDC* and *PCFFA* cases.

21

22   Dated: December 29, 2006          /s/ OLIVER W. WANGER

23                                     United States District Judge

24

25

26

27

28

                                 **37**