UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATION/INSTITUTE FOR FISHERIES RESOURCES, *et al.*, <br><br> Plaintiff, <br><br> v. <br><br> CARLOS M. GUTIERREZ, in his official capacity as Secretary of Commerce, *et al.*, <br><br> Defendants, <br><br> and <br><br> SAN LUIS & DELTA-MENDOTA WATER AUTHORITY and WESTLANDS WATER DISTRICT; CALIFORNIA FARM BUREAU FEDERATION; GLENN-COLUSA IRRIGATION DISTRICT; and STATE WATER CONTRACTORS, et al. <br><br> Defendant-Intervenors. | 1:06-CV-00245 OWW LJO <br><br> MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION |

1.   **INTRODUCTION**

This case concerns the coordinated operation of the federally-managed Central Valley Project ("CVP") and the State of California's State Water Project ("SWP")(collectively "the

1

Projects".)  Both projects divert large volumes of water from the California Bay Delta ("Delta") and use the Delta to store water. Over the past few decades, the Projects have been operated pursuant to a series of cooperation agreements.  Before the court is Defendants' motion to dismiss Plaintiff's Seventh Claim for relief under the National Environmental Policy Act ("NEPA") for lack of jurisdiction.

## 2.  PROCEDURAL BACKGROUND

Plaintiffs filed their first amended complaint on September 11, 2006.  (Doc. 69, First Amended Complaint, September 11, 2006.)  On February 2, 2007, Federal Defendants and Defendant-Intervenors all filed Motions to Dismiss.  (Doc. 107, Motion to Dismiss by State Water Contractors and California Farm Bureau Federation, Filed February 2, 2007.; Doc. 111, Motion to Dismiss by San Luis & Delta-Mendota Water Authority, Westlands Water District, Filed February 2, 2007; Doc. 114, Motion to Dismiss for Lack of Jurisdiction by Carlos M. Gutierrez, William T Hogarth, Gale A. Norton, John W. Keyes, Filed February 2, 2007.)  Several Defendants also joined in the motion to dismiss on that day. (Doc. 116, Joinder re Doc. 107 by Glenn-Colusa Irrigation District, Natomas Central Mutual Water Co., Pelger Mutual Water Co., Pleasant Grove Verona Mutual Water Company, Princeton-Codora-Glenn Irrigation District, Provident Irrigation District, Reclamation District 108, River Garden Farms, Filed February 2, 2007.; Doc. 117, Joinder re. Doc. 110-111, by Glenn-Colusa Irrigation District, Natomas Central Mutual Water Co., Pelger Mutual Water Co., Pleasant Grove Verona Mutual Water Company, Princeton-Codora-Glenn Irrigation District, Provident Irrigation

District, Reclamation District 108, River Garden Farms, Filed February 2, 2007.)

On March 2, 2007 Plaintiffs filed their opposition to all motions to dismiss.  (Doc. 125, Opposition to Motions to Dismiss, Filed March 2, 2007.).  Defendants filed their respective replies.  (Doc. 126, Reply to Opposition by Intervenor California Farm Bureau Federation, Filed March 8, 2007.; Doc. 129, Reply to Response to Motion by Intervenors San Luis & Delta-Mendota Water Authority and Westlands Water District, Filed March 9, 2007.; Doc. 130, Reply to Response to Motion by Intervenor Defendants Glenn-Colusa Irrigation District to California Farm Bureau Federation's Reply, Filed March 9, 2007.;  Doc. 131, Reply to Response to Motion by Intervenor Defendants Glenn-Colusa Irrigation District to San Luis & Delta-Mendota Water Authority and Westlands Water District's Reply, Filed March 9, 2007.)

### 3.  <u>FACTUAL BACKGROUND</u>

Over the past several decades, the state and federal agencies charged with management of the CVP and SWP have operated the Projects in an increasingly coordinated manner pursuant to a Coordinated Operating Agreement ("COA").  The COA, which dates to in 1986, has evolved over time to reflect, among other things, changing facilities, delivery requirements, and regulatory restrictions.  The most recent document surveying how the COA is implemented in light of these evolving circumstances is the 2004 Operating Criteria and Plan ("2004 OCAP" or "OCAP").

### A.  **Overview of the 2004 OCAP**

The OCAP begins with a "Purpose of Document" section which states:

**3**

1   This document has been prepared to serve as a baseline
2   description of the facilities and operating environment
3   of the Central Valley Project (CVP) and State Water
4   Project (SWP).  The Central Valley Project - Operations
5   and Criteria Plan (CVP-OCAP) identifies the many
6   factors influencing the physical and institutional
7   conditions and decision-making process under which the
8   project currently operates.  Regulatory and legal
9   instruments are explained, alternative operating models
10  and strategies described.

11
12  The immediate objective is to provide operations
13  information for the Endangered Species Act, Section 7,
14  consultation.  The long range objective is to integrate
15  CVP-OCAP into the proposed Central Valley document.

16  It is envisioned that CVP-OCAP will be used as a
17  reference by technical specialists and policymakers in
18  and outside the Bureau of Reclamation (Reclamation) in
19  understanding how the CVP is operated.  The CVP-OCAP
20  includes numeric and nonnumeric criteria and operating
21  strategies.  Emphasis is given to explaining the
22  analyses used to develop typical operating plans for
23  simulated hydrologic conditions.

24
25  All divisions of CVP are covered by this document,
26  including the Trinity River Division, Shasta and
27  Sacramento Divisions, American River Division and
28  Friant Division.

**4**

(AR 506.)

The introductory chapter provides an overview of all of the physical components of the CVP and SWP (AR 507-520), as well as all of the relevant legal authorities affecting CVP operations (508-512).

Chapter 2, explains, among other things, that water needs assessments have been performed for each CVP water contractor, to confirm each contractor's past beneficial use in order to anticipate future demands.  (AR 521.)  Chapter 2 also reviews the 1986 COA and how it is implemented on a daily basis by Reclamation and DWR.  (AR 523-25.)  Also provided is a detailed overview of the "changes in [the] operations coordination environment since 1986," which include:

- Changes due to temperature control operations on the Sacramento River;

- Increases in the minimum release requirements on the Trinity River;

- Implementation of CVPIA 3406(b)(2) and Refuge Water Supply contracts;

- Commitments made by the CVP and SWP pursuant to the Bay-Delta Accord and the subsequent implementation of State Water Resources Control Board ("SWRCB") Decision-1641;

- The Monterey Agreement;

- The Operation of the North Bay Aqueduct (which was not included in the 1986 COA).

- The SWP's commitment to make up for 195,000 acre-feet

1        of pumping lost to the CVP due to SWRCB Decision 1485;

2    •        Implementation of the Environmental Water Account; and

3    •        Constraints imposed by various endangered species act

4        listings, including that of the Sacramento River

5        Winter-Run Chinook Salmon, the Sacramento River Spring-

6        Run Chinook Salmon, the Steelhead Trout, and the Delta

7        Smelt (which resulted in the issuance of biological

8        opinions in 1993, 1994, and 1995 concerning CVP/SWP

9        operations and the South Delta Temporary Barriers

10        Biological Opinion in 2001)

11    (AR 525-28.)  The OCAP also reviews the regulatory standards

12    imposed by SWRCB D-1641, which include water quality standards

13    based on the geographic position of the 2-parts-per-thousand

14    isohale (otherwise known as "X2"), a Delta export restriction

15    standard known as the export/inflow (E/I) ratio, minimum Delta

16    outflow requirements, and Sacramento River and San Joaquin River

17    flow standards.  (AR 530-537.)  In addition to imposing

18    requirements, D-1641 granted the Bureau and DWR permission to use

19    each project's capabilities in a coordinated manner.  (AR 537-

20    37.)

21        This is not meant to be a complete overview of the material

22    covered in the OCAP.  Numerous regulatory and operational changes

23    have taken place in recent years.  As the OCAP's "Purpose of

24    Document" section explains, the immediate objective of the OCAP

25    is to describe and document all such regulatory and other

26    operational information so that ESA Section 7 consultation can

27    proceed to evaluate how project operations will affect the Delta

28    smelt under various projected future conditions.

**6**

**B.    2004 OCAP Biological Assessment**

Because endangered and/or threatened species, including the Winter Run Chinook salmon, Spring Run Chinook salmon, and Steelhead Trout at issue in this case, reside in the area affected by the CVP and SWP, the 2004 OCAP, administered on behalf of the federal government by the Bureau of Reclamation ("Bureau") must comply with various provisions of the ESA. Specifically, prior to authorizing, funding, or carrying out any action, the acting federal agency (in this case, the Bureau) must first consult with FWS and/or NMFS to "insure that [the] action...is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined...to be critical...." 16 U.S.C. § 1536(a)(2) [ESA § 7(a)(2)]. This form of consultation is called "formal consultation.," and concludes with the issuance of a biological opinion. 50 C.F.R. § 402.02.

Alternatively, under certain circumstances, a federal agency may pursue "early consultation," on behalf of an agency or private party (referred to as a "prospective applicant") who will require formal approval or authorization to undertake a project. 16 U.S.C. § 1536(a)(3). Early consultation may be requested when the prospective applicant "has reason to believe that an endangered species or a threatened species may be present in the area affected by this project and that implementation of such action will likely affect such species." 50 C.F.R. § 402.11(b). The result of early consultation is a "preliminary biological opinion," the contents of which are "the same as for a biological

**7**

opinion issued after formal consultation except that the
incidental take statement provided with a preliminary biological
opinion does not constitute authority to take listed species." §
402.11(e).  Subsequently, the preliminary biological opinion may
be "confirmed" after the prospective applicant applies to the
federal agency for a permit or licence.  Once a request for
confirmation is received, the FWS must either confirm that the
preliminary biological opinion stands as the final biological
opinion or must request that the federal agency initiate formal
consultation.  § 402.11(f).

     In order to fulfill its obligations under the ESA,
Reclamation prepared a biological assessment and initiated both
formal and early consultation with the United States Fish and
Wildlife Service (FWS) and NMFS. See Court Order, dated Jan. 3,
2007 at 5.  NMFS issued a biological opinion on October 22, 2004
(the NMFS 2004 OCAP BiOP), and the FWS issued an amended
biological opinion on February 16, 2005.

     After issuance of the NMFS 2004 OCAP BiOp, the National
Oceanic and Atmospheric Administration (NOAA) listed as
threatened a population segment of the North American Green
Sturgeon located in the Sacramento Delta region and designated
critical habitat for several species, including Central Valley
spring-run Chinook salmon, Central Valley steelhead and Central
California Coast Steelhead.  Following the listing and critical
habitat designation, Reclamation requested reinitiation of ESA §
7 consultation on the NMFS 2004 OCAP BiOp.  Despite the fact that
Defendants have reinitiated consultation on the NMFS 2004 OCAP
BiOp, Plaintiffs are challenging the NMFS 2004 BiOp and the FWS

**8**

1  2005 BiOp under the APA.  Those claims are pending in this case

2  (challenging the 2004 NMFS OCAP BiOp) and the companion case *NRDC*

3  *v. Kempthorne*, 1:05-CV-01207 (E.D. Cal.) (challenging the 2004

4  FWS OCAP BiOP as to the Delta Smelt).

5      Plaintiffs' Seventh Claim for Relief, titled "Failure to

6  Prepare an Environmental Impact Statement ("EIS") on the 2004

7  OCAP," alleges a violation of NEPA and the APA. (Doc. 69 FAC, ¶¶

8  113-115.)  In their amended complaint, Plaintiffs allege that

9  Reclamation's "approval and implementation of the 2004 OCAP,

10  including the approval and implementation of changes to project

11  operations included in the 2004 OCAP, constitutes a major Federal

12  action," which triggers Section 102(2)(C) of NEPA.  Id. ¶ 114.

13  According to Plaintiffs, "the Bureau was obligated to prepare an

14  EIS on the 2004 OCAP," and Reclamation's decision to not prepare

15  such an EIS was "arbitrary, capricious, an abuse of discretion,

16  not in accordance with law, and without observance of procedure

17  required by law, contrary to the APA, 5 U.S.C. § 706(2)."  Id. ¶

18  115.

19      This motion is limited to Plaintiffs' Seventh Claim for

20  Relief.

21      **C.   Plaintiff's Seventh Claim for Relief under NEPA**

22      In their First Amended Complaint, Plaintiffs allege the

23  following:

24      The Bureau's approval and implementation of the 2004

25      OCAP, including the approval and implementation of

26      changes to project operations included in the 2004

27      OCAP, constitutes a major Federal action significantly

28      affecting the quality of the human environment within

**9**

the meaning of Section 102(2)(C) of NEPA, 42 U.S.C.
§4332(2)(C). Under NEPA the Bureau was required to
prepare an EIS, for at least the following reasons:

    a.    The San Joaquin River/Sacramento River Delta area
has "[u]nique characteristics . . . such as
proximity to . . . wetlands, wild and scenic
rivers, or ecologically critical areas" within the
meaning of 40 C.F.R. § 1508.27(b)(3);

    b. The effects of the action on the quality of the
human environment are likely to be "highly
controversial" within the meaning of 40 C.F.R. §
1508.27(b)(4);

    c. The possible effects on the human environment are
"highly uncertain" and involve "unique [and]
unknown risks" within the meaning of 40 C.F.R. §
1508.27(b)(5);

    d. The action is "related to other actions with
individually insignificant but cumulatively
significant impacts" within the meaning of 40
C.F.R. § 1508.27(b)(7); and

    e. The action "may adversely affect an endangered or
threatened species or its [critical] habitat"
within the meaning of 40 C.F.R. §1508(b)(9).

Consequently, the Bureau was obligated to prepare an
EIS on the 2004 OCAP. The Bureau's failure to prepare
an EIS or even an EA before approving and implementing
the 2004 OCAP, including the changes to project
operations contained in the 2004 OCAP, violated and

**10**

1    continues to violate Section 102(2)(C) of NEPA, 42

2    U.S.C. § 4332(2)(C).  (Doc. 69-1, First Amended

3    Complaint, ¶ 114.)   The Bureau's decision not to

4    prepare an EIS for the 2004 OCAP was arbitrary,

5    capricious, an abuse of discretion, not in accordance

6    with law, and without observance of procedure required

7    by law, contrary to the APA, 5 U.S.C. § 706(2).  (Doc.

8    69-1, First Amended Complaint, ¶ 115.)

9        Federal Defendants reply that the OCAP and OCAP BiOp

10   are not the result of the Bureau's decision-making process

11   and neither is an "action" from which legal consequences

12   will flow.

### 4.  STANDARD OF REVIEW

14       "Federal courts are courts of limited jurisdiction.  They

15   possess only that power authorized by Constitution and

16   statute....It is to be presumed that a cause lies outside this

17   limited jurisdiction, and the burden of establishing the contrary

18   rests upon the party asserting jurisdiction." *Kokkonen v.*

19   *Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)(internal

20   citations omitted); *see also Tosco Corp. v. Communities for a*

21   *Better Environment,* 236 F.3d 495, 499 (9th Cir. 2001)(plaintiff

22   bears the burden of proving subject matter jurisdiction).

23       A motion to dismiss on jurisdictional grounds can be "either

24   facial or factual." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir.

25   2000).  In a facial attack, a court must "take all of the

26   allegations of material fact stated in the complaint as true and

27   construe them in the light most favorable to the nonmoving

28   party." *See Rodriguez v. Panayiotou*, 314 F.3d 979, 983 (9th Cir.

**11**

2002).  In a factual challenge, "a court may look beyond the complaint to matters of public record without having to convert the motion into one for summary judgment... It also need not presume the truthfulness of the plaintiffs' allegations." *White,* 227 F.3d at 1243.  In this case, Defendants jurisdictional challenge is facial against Plaintiff's seventh claim for failure to prepare an EIS under NEPA 42 U.S.C. § 4332(2)(C).

## 5.  <u>DISCUSSION</u>

### A.   Request for Judicial Notice

"A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b) (1984).  "A court shall take judicial notice if requested by a party and supplied with the necessary information."  Fed. R. Evid. 201(d) (1984).  Judicially noticed facts often consist of matters of public record, such as prior court proceedings, *see, e.g., Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1198 (9th Cir. 1988); administrative materials, *see, e.g., Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994); city ordinances, *see, e.g., Toney v. Burris*, 829 F.2d 622, 626-27 (7th Cir. 1987) (holding that federal courts may take judicial notice of city ordinances); official maps, *see, e.g., Aiello v. Town of Brookhaven*, 136 F. Supp. 2d 81, 86 n.8 (E.D.N.Y. 2001) (taking judicial notice of geological surveys and existing land use maps); or other court documents, *see, e.g., Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (taking judicial notice of a filed

**12**

complaint as a public record).  Federal courts may "take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to the matters at issue." *U.S. ex rel Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992).

Defendant-Intervenors San Luis & Delta-Mendota Water Authority and Westlands Water District request judicial notice of the CVP OCAP, June 30, 2004.  (Doc. 113, Request for Judicial Notice by San Luis & Delta-Mendota Water Authority, Westlands Water District, Filed February 2, 2007.)

Defendant-Intervenors California Farm Bureau Federation ("California Farm Bureau") also filed a request for judicial notice.  California Farm Bureau Requests that the court take Notice of a January 11, 2007 letter from Rodney R. McInnis, Regional Administrator of NMFS to Alan R. Candlish, Regional Planning Officer of the Bureau of Reclamation.  (Doc. 127, Request for Judicial Notice by State Water Contractors, California Farm Bureau Federation, re Doc. 126 Reply to Response to Motion, Filed March 8, 2007.)

Defendants do not object to judicial notice of these documents.  The documents are matters of public record.

Defendant-Intervenors' requests for Judicial Notice are **GRANTED**.

**B.    Nepa and the APA**

The National Environmental Policy Act ("NEPA") is the basic "national charter for protection of the environment."  40 C.F.R. § 1500.1.  Its purposes include: "To declare a national policy

**13**

1   which will encourage productive and enjoyable harmony between man

2   and his environment; to promote efforts which will prevent or

3   eliminate damage to the environment and biosphere and stimulate

4   the health and welfare of man; [and] to enrich the understanding

5   of the ecological systems and natural resources important to the

6   Nation."  42 U.S.C. § 4321."  To accomplish these purposes, NEPA

7   requires all agencies of the federal government, including the

8   Bureau, to prepare a "detailed statement" that discusses the

9   environmental impacts of, and reasonable alternatives to, all

10  "major Federal actions significantly affecting the quality of the

11  human environment."  42 U.S.C. § 4332(2)(C).  This statement is

12  commonly known as an environmental impact statement ("EIS").

13       However NEPA does not provide for a private right of action.

14  *Gros Ventre Tribe v. United States*, 469 F.3d 801, 814 (9th Cir.

15  2006).  Therefore Plaintiffs may obtain relief only by properly

16  invoking the judicial review provisions of the APA, 5 U.S.C. §§

17  701-706. *See Nat'l Wildlife Fed'n*, 497 U.S. at 882-83 (NEPA

18  claims must satisfy APA requirements).  The APA waives sovereign

19  immunity and prescribes standards for judicial review of certain

20  agency actions. *See* 5 U.S.C. § 702 (granting standing to

21  plaintiffs "suffering legal wrong because of agency action, or

22  adversely affected or aggrieved by agency action within the

23  meaning of a relevant statute").

24       The APA's waiver of sovereign immunity contains several

25  limitations. *See Gallo Cattle Co. v. United States Dep't of

26  Agriculture*, 159 F.3d 1194, 1198 (9th Cir. 1998). One of those

27  limitations is the requirement that the challenged decision be a

28  "final agency action for which there is no other adequate remedy

**14**

1   in a court. . . ." 5 U.S.C. § 704 (emphasis added); *accord.,*
2   *Lujan v. National Wildlife Federation*, 497 U.S. 871, 882 (1990).
3   Conversely, where a plaintiff challenges something other than a
4   final agency action, judicial review is not authorized.  These
5   requirements have been considered jurisdictional in nature and
6   absent these elements a reviewing court cannot reach the merits
7   of a claim. *See DRG Funding Corp. v. Secretary of Housing & Urban*
8   *Development*, 76 F.3d 1212, 1214 (D.C. Cir. 1996), reh'g denied,
9   83 F.3d 1482 (D.C. Cir. 1996). Plaintiff's bear the burden of
10  proving the existence of subject matter jurisdiction which here
11  includes "identifying specific federal conduct and explaining how
12  it is final agency action within the meaning of [5 U.S.C. §
13  551(13).] *Colorado Farm Bureau Federation v. United States*
14  *Forest Service*, 220 F.3d 1171, 1173 (10th Cir. 2000).

15      The first issue is whether the OCAP is an agency "action" by
16  Defendants under the APA to trigger NEPA jurisdiction.

17          **i.   "Action" under the APA**

18      The APA authorizes suit by "[a] person suffering legal wrong
19  because of agency action, or adversely affected or aggrieved by
20  agency action within the meaning of a relevant statute." 5 U.S.C.
21  § 702.; *Norton v. Southern Utah Wilderness Alliance*, 542 U.S.
22  55, 61 (2004).  Where no other statute provides a private right
23  of action, the "agency action" complained of must be "final
24  agency action." 5 U.S.C. § 704l; *Norton*, 542 U.S. at 62.  "Agency
25  action" is defined in 5 U.S.C. § 551(13) to include "the whole or
26  a part of an agency rule, order, license, sanction, relief, or
27  the equivalent or denial thereof, or failure to act."

28      An "agency action" falls under one of "five categories of

**15**

decisions made or outcomes implemented by an agency--'agency rule, order, license, sanction [or] relief.'" *Norton*, 542 U.S. at 62.; 5 U.S.C. § 551(13).  All of those categories involve circumscribed, discrete agency actions, as their definitions make clear:

> 1. "[a rule is] an agency statement of . . . future effect designed to implement, interpret, or prescribe law or policy;
> 2. [an order is] a final disposition . . . in a matter other than rule making;
> 3. [a license is] a permit . . . or other form of permission;
> 4. [a sanction is] a prohibition . . . or taking [of] other compulsory or restrictive action; and
> 5. [a relief is] (a) a grant of money, assistance, license, authority, etc., or (b) recognition of a claim, right, immunity, etc., or (c) a taking of other action on the application or petition of, and beneficial to, a person."

5 U.S.C. §§ 551(4), (6), (8), (10), (11); *see also*, *Norton*, 542 U.S. at 62.

In *Oregon Desert* the United States Forest Service ("Forest Service") issued annual operating instructions ("AOI") to permittees who graze livestock on national forest land.  *Oregon Natural Desert Association v. United States Forest Service,* 465 F.3d 977, 979 (9th Cir. 2006).  One of the issues in *Oregon*

**16**

*Desert* was whether issuance of AOI's constituted an agency action.  The administrative record showed that prior to the beginning of a grazing season, the Forest Service issued an AOI to grazing permit holders.  *Id.* at 980.  As with NEPA, the applicable substantive statute in *Oregon Desert* did not provide for a private right of action, requiring the challenge to the AOI under the APA judicial review provisions.  *Id.* 982.  The Forest Service contested the court's subject matter jurisdiction by arguing that the AOI lacked finality and did not constitute an "agency action" under the APA as interpreted by *Norton*.  *Id.* at 982.  The Ninth Circuit rejected the Forest Service's argument, finding that a grazing permit is a license and the issuance of a grazing permit is an agency action under 5 U.S.C. § 551(13) of the APA.  *Id.* at 983.  Under the APA a license "includes the whole or a part of an agency permit... or other form of permission."  *Id.*; *see also,* 5 U.S.C. § 551(8).

     Plaintiffs claim that the 2004 OCAP and OCAP BiOp are more than descriptive documents.  Plaintiffs allege that when biologists first reviewed the 2004 OCAP, their draft BiOp found that CVP operations would jeopardize the continued survival of some of the salmon species.  (Doc. 69-1, FAC, ¶ 2, Filed September 11, 2006.)  Plaintiffs also allege that, under 2004 OCAP, the Bureau and DWR plan to substantially revise and expand the existing operations of the CVP and SWP.  According to Plaintiffs the revisions will have a significant impact on the Sacramento River and San Joaquin River watersheds in general, and, in particular, on the following five salmon and steelhead evolutionary significant units ("ESUs") listed under the

**17**

1 Endangered Species Act ("ESA"):

2     1.   winter run Chinook salmon

3     2.   spring run Chinook salmon

4     3.   threatened Central Valley steelhead

5     4.   threatened Southern Oregon/Northern California

6         Coast coho salmon ("SONCC coho");

7     5.   threatened Central California Coast steelhead

8         ("Central Coast steelhead")

9 (Doc. 69-1, FAC, ¶ 73.)  Plaintiffs therefore argue that the

10 proposed actions should be subject to NEPA review.

11     Before NEPA review of the OCAP and OCAP BiOp is required,

12 they must constitute  final agency action under the APA.

13 Plaintiff alleges that the BiOp provides for an "adaptive

14 management" process under which the Bureau, NMFS and the FWS will

15 discuss potential changes in water storage and release to benefit

16 the five salmon and steelhead ESUs.  (Doc. 69-1, FAC, ¶ 73.)

17 Plaintiffs argue that the BiOp does not provide any assurances of

18 any particular level of protection for the ESU's as a result of

19 this promise of future adaptive management.  (Id.).  The BiOp

20 also does not identify reasonably certain, enforceable measures

21 that will be implemented if changes in operations are necessary

22 to protect the species.  (*Id.*)  According to Plaintiff, the BiOp

23 assumes that only a fraction of the amount of water authorized

24 for delivery under the long-term renewal contracts will actually

25 be delivered.  (Doc. 69-1, FAC, ¶ 74.)  However, Plaintiffs'

26 argue the Bureau has stated that it intends to deliver the full

27 amount of water authorized in the contracts.  (*Id.*)  By

28 significantly underestimating the amount of water to be diverted

**18**

1  and exported under contract, the BiOp likewise significantly

2  underestimates the effects of the 2004 OCAP on listed species and

3  their habitat.  (*Id.*)

4      Plaintiff's therefore contend that the documents incorporate

5  substantial changes to the CVP and SWP.  Plaintiffs, however, do

6  not dispute that the proposed changes that would allegedly harm

7  the salmon have not yet to been adopted.  Plaintiffs also

8  complaint does not allege any proposed changes are imminent or

9  that their adoption is imminent.  In their pleadings, Plaintiffs

10  specifically point to the following proposed actions to support

11  their argument that the OCAP and OCAP BiOp are final agency

12  action:

13      1.   The Bureau proposed to move the temperature

14           compliance point on the Sacramento River 19 miles

15           downstream,

16      2.   The Bureau proposed to modify project operations

17           in "numerous interrelated ways" so as to further

18           impair the ability to meet the 1.9 million acre-

19           feet Shasta Reservoir carryover storage

20           requirement established for fish protection,

21      3.   The proposed increase of the amount of export

22           pumping from the Delta to 8,500 cfs.

23      There is no dispute that the OCAP BiOp covers the effects of

24  the proposed OCAP for the CVP and SWP.  There is also no dispute

25  that the OCAP BiOp is considered to be the primary informational

26  basis for the biological opinion prepared by NMFS.  The opinion

27  itself states, "This document is the biological opinion on [CVP]

28  and [SWP] long-term operations as described in the Long-Term CVP

**19**

and SWP OCAP BiOp."  However, Plaintiffs do not allege in the complaint that either the 2004 OCAP or OCAP BiOp constitute a "rule, order, license, permit, sanction, or relief" or taking of other action such that either document would be considered an "agency action" for purposes of the APA.

Because NEPA does not have a citizen suit provision, an action must be considered an "agency action" under the APA before triggering a NEPA analysis.  That the OCAP or OCAP BiOp is the informational basis for the NMFS biological opinion is not sufficient to show that either document is a "rule, order, license, permit, sanction, or relief" or taking of other action. Also, contrary to Plaintiff's arguments, the proposed actions in the OCAP or OCAP BiOp cannot result in harm to the salmon, because the actions have not yet been adopted or implemented by the Bureau.

Plaintiffs also refer to the language of the OCAP BA:

The OCAP BiOp states, for example, that "[i]n addition to current-day operations, several future actions are to be included in the consultation.

These actions are:

1. Increased flows in the Trinity River,

2. Increased pumping at Banks Pumping Plant

3. Permanent barriers operated in the South Delta,

4. An intertie between California Aqueduct (CA) and the Delta-Mendota Canal (DMC),

5. A long term environmental Water Account

6. Freeport Regional Water Project and

**20**

1          7.   Various operational changes that are

2                identified in this project description.

3      Some of these items will be part of early consultation

4  including increased Banks Pumping to 8500 cubic feet per second

5  (cfs), permanent barriers and the long-term EWA.  These proposed

6  actions will come online at various times in the future.   The

7  status quo is that the OCAP and OCAP BA describe operation of the

8  CVP and SWP.  The proposed actions and operations are in the

9  future.  *see,* Bureau of Reclamation, U.S. Department of the

10 Interior, Long-Term Central Valley Project and State Water

11 Project Operations Criteria and Plan Biological Assessment

12 (2004), *available at*

13 www.usbr.gov/mp/cvo/ocap/OCAP_BA_6_30_04.pdf.

14     However, Plaintiff fails to point out that the OCAP BiOp

15 specifically states, "The actions listed in the preceding

16 paragraph are not being implemented at present;  however, they

17 are part of the future proposed action on which Reclamation is

18 consulting." (Id.)  The BiOp also states that for each proposed

19 action, the ESA § 7 consultation will be reinitiated.  Defendants

20 have also stated that some of the proposed actions will qualify

21 as agency action and they will undertake NEPA review for all such

22 actions.

23     Plaintiffs in this case have failed to show how the 2004

24 OCAP or the OCAP BiOp's proposed future actions, that may or may

25 not be implemented, constitute an "action" as defined in 5 U.S.C.

26 § 551(13) of the APA.

27     Although Plaintiffs seek to have the 2004 OCAP or the OCAP

28 BiOp treated as "rules" they offer no legal or factual support

**21**

that 2004 OCAP or the OCAP BiOp qualifies as "an agency statement of future effect designed to implement, interpret, or prescribe law or policy." Neither is the 2004 OCAP or the OCAP BiOp an "order." Plaintiffs have not sufficiently alleged nor does it appear that they can establish that either the OCAP or BiOP is "a final disposition... in a matter other than rule making."

The OCAP and OCAP BiOp serve the function of an environmental consultation on proposed projects rather than implementing or prescribing law or policy. According to the purpose statement of the 2004 OCAP:

> "This document has been prepared to serve as a baseline description of the facilities and operating environment of the CVP and SWP. The *Central Valley Project – Operations Criteria and Plan* (CVP-OCAP) identifies the many factors influencing the physical and institutional conditions and decision-making process under which the project currently operates. Regulatory and legal requirements are explained, alternative operating models and strategies described. The immediate objective is to provide operations information for the Endangered Species Act, Section 7, consultation. The long range objective is to integrate CVP-OCAP into the proposed Central Valley document. It is envisioned that CVP-OCAP will be used as a reference by technical specialists and policymakers in and outside the Bureau of Reclamation (Reclamation) in understanding how the CVP is operated. The CVP-OCAP includes numeric and nonnumeric criteria and operating strategies. Emphasis

**22**

1    is given to explaining the analyses used to develop

2    typical operating plans for simulated hydrologic

3    conditions."

4    Nothing in this statement of purpose indicates that the 2004

5    OCAP is intended to control or govern project operations or to

6    dictate any activity or action.  Unlike the action in *Oregon*

7    *Desert*, the 2004 OCAP or the OCAP BiOp in this case is purely

8    informational and has the purpose of imparting information and

9    knowledge to technical specialists and policy makers who seek to

10   understand how the CVP is operated..  Neither the 2004 OCAP or

11   the OCAP BiOp qualifies as an "action" as contemplated by 5

12   U.S.C. § 551(13) of the APA.

13              **ii.  "Final Agency Action" under the APA**

14   For an action to be final under the APA, two conditions must

15   be met:

16      1.   The action must mark the 'consummation' of the

17           agency's decision making process and must not be

18           of a merely tentative or interlocutory nature,

19           and

20      2.   The action must be (a) "one by which rights or

21           obligations have been determined," or (b) "from

22           which legal consequences flow."

23   *Bennett v. Spear*, 520 U.S. 154, 178 (1997).[1]

24

25        [1] *Bennett* involved the Klamath Project, a federal
26   reclamation scheme consisting of a series of lakes, rivers, dams,
     and irrigation canals in northern California and southern Oregon.
27   *Bennett*, 520 U.S. at 158.  One of the issues addressed in *Bennett*
     was whether petitioners, two Oregon irrigation districts, had
28   standing to seek judicial review of a biological opinion under

**23**

1    Whether an action constitutes a final agency action is
2  premised on the observation that the action has "no direct
3  consequences" and serves "more like a tentative recommendation
4  than a final binding determination." *Id.*  In other words, if the
5  agency action is purely advisory and in no way affects the legal
6  rights of the relevant actors it is not a "final agency action"
7  under the APA.  *see, Id.*

8    In the Ninth Circuit, the core question is whether the
9  agency has completed its decision making process and whether the
10  result of that process is one that will directly affect the
11  parties.  *Oregon Desert,* 465 F.3d at 982.  The *Oregon Desert*
12  court articulated three ways in which an agency's action is
13  deemed final:

14    1.   If the action "amounts to a definitive statement
15         of the agency's position" or
16    2.   If the action "has a direct and immediate effect
17         on the day-to-day operations" of the subject
18         party, or
19    3.   If, based on the action, "immediate compliance
20         with the terms is expected."
21  *Id.*  The focus of the "final agency action" inquiry is on the
22  practical and legal effects of the agency action:  "The finality

23

24

25  the APA.  *Id.* at 157.  The court in *Bennett* ultimately concluded
26  that the Biological Opinion was "final" because the Biological
    Opinion and accompanying Incidental Take Statement altered the
27  legal regime to which the action agency is subject, authorizing
    it to take the endangered species if (but only if) it complies
28  with the prescribed conditions.  *Id.* at 178.

1  element must be interpreted in a pragmatic and flexible manner."
2  *Id.*

### a.   Definitive Statement of Position

4       The *Oregon Desert* court looked to see whether the agency
5  "has rendered its last word on the matter" to determine whether
6  an action is final and is ripe for judicial review.  *Oregon*
7  *Desert*, 465 F.3d at 984.  The administrative record established
8  the following:

9       1.   An AOI is the Forest Service's "last word"
10              authorizing an individual permit holder to graze
11              each season.  *Id.*
12      *2.*   The Forest Service considers such matters as
13              changes in pasture conditions, new scientific
14              information, new rule that have been adopted
15              during the previous season, or the extent of the
16              permit holder's compliance with the previous
17              year's AOI.  *Id.*
18      3.   While grazing permits allow grazing on federal
19              land, the AOI gives the Forest Service the right
20              to impose additional terms and conditions in light
21              of its annual assessment of changed pasture
22              conditions, new scientific information, new rules,
23              and past compliance by permit holders.  *Id.* at
24              985.  When viewed in this context, the AOI
25              represents the consummation of the Forest
26              Service's annual decision making process regarding
27              management of grazing allotments.

28

4.   Also, after the Forest Services issues an AOI, the grazing permit holder is authorized to begin the new grazing season.  *Id.*  The AOI is the only substantive document in the annual application process and pragmatically functions to start the grazing season.[2]  *Id.*

Based on the administrative record, the Ninth Circuit determined the AOI was a critical instrument in the Forest Service's regulation of grazing on national forest lands.  *Id.* at 984.  The *Oregon Desert* court found that the AOI was a consummation of an agency action because it served as a final decision that set the annual parameters of the grazing program and which imposes legal consequences on permittees.  *Id.* at 986, n. 12.

The OCAP and OCAP BiOp are not the "last word" in authorizing any action or inaction by the Bureau.  They do not implement any actions or inactions.  They are informational.  If any proposed changes are initiated that will have the requisite effect on the environment, such changes will be agency action subject to NEPA review.  The purpose of the OCAP is "to serve as a baseline description of the facilities and operating

---

[2]   Every spring, the Forest Service initiates consultation with the permit holder regarding the issuance of the AOI for the forthcoming grazing season.  *Oregon Desert*, 465 F.3d at 985, n. 11.  At the end of this consultation process, the Forest Service sets the terms and conditions for grazing in any particular allotment.  *Id.*  Without the AOI, the permit holder would not know where within the allotment to graze, when, or any specific conservation measures that the Forest Service deemed warranted for the upcoming season.  *Id.*

1  environment of the CVP and SWP."  It "identifies the many factors
2  influencing the physical and institutional conditions and
3  decision-making process under which the project currently
4  operates."  The OCAP BiOp includes an analysis of the actions
5  proposed in the OCAP.  The OCAP BiOp specifically states that the
6  proposed actions "are not being implemented at present… [but
7  rather] a part of the future proposed action on which [the
8  Bureau] is consulting."  Unlike the AOI in *Bennett*, neither the
9  OCAP or the OCAP BiOp give the Bureau the right to implement the
10 contemplated changes.  Neither document consummates the Bureau's
11 decision making process regarding proposed changes to the
12 operation of the CVP and SWP.  The documents merely outline
13 proposed actions and their potential effects if implemented.
14 Plaintiff's concede that both documents outline only proposed
15 changes but claim that such changes will harm the salmon.

16      In their complaint Plaintiffs assert that the Bureau intends
17 to move ahead with implementing operational changes which
18 threaten to jeopardize the five salmon and steelhead ESU's.
19 (Doc. 69-1, FAC, ¶ 78.)  These assertions are in futuro.
20 Plaintiff's also allege that the Bureau's "approval and
21 implementation of the 2004 OCAP, including approval and
22 implementation of changes to project operations included in the
23 2004 OCAP, constitute a major federal action significantly
24 affecting the quality of the human environment within the meaning
25 of NEPA."  (Doc. 69-1, FAC, ¶ 114.)  Plaintiffs argue that the
26 2004 OCAP makes two changes to project operations:
27 1. The 2004 OCAP moves the Sacramento River temperature
28 compliance point contained in earlier OCAPs 10 miles upstream

**27**

from Bend Bridge to Ball's Ferry.

2. The 2004 OCAP eliminates the carryover storage requirement for Shasta Reservoir contained in earlier OCAPs.

However, on May 11, 2007 at the hearing on this matter Plaintiffs acknowledged that the 2004 OCAP has not been approved or implemented, nor is there any real probability that such actions will be taken.

In response Defendants argue:

1. The 2004 OCAP does not move the Sacramento River Temperature Compliance

2. The 2004 OCAP does not eliminate the carryover storage requirement for Shasta Reservoir  as Plaintiffs allege in paragraph 54 of the FAC. It merely describes the operational criteria under the NMFS 1993 BiOP.  Def's Ex. 1 at 3-14-15.

3. The 2004 OCAP neither impacts the current Red Bluff Diversion Dam operations nor proposes or authorizes the SDOP as Plaintiff's appear to allege at paragraphs 58-60 of the FAC.

4. The 2004 OCAP does not discuss, propose, or mandate any operational change.  In addition, the 2004 OCAP does not discuss authorize or implement SDIP which is proposed for the future.

After a biological opinion is issued, the action agency *may* decide to take certain actions and, *if* those actions arise to the level of a "final agency action" under the APA, steps could be reviewable.  While Defendants admit that the 2004 OCAP was the

result of much agency effort, it serves merely as a description
of operational limitations, criteria, and procedures and does not
change any existing legal rights, nor require any action or
inaction.

The Bureau clearly recognizes that any proposed changes will
be submitted for new § 7 consultation and any NEPA review.  Under
these facts the 2004 OCAP or OCAP BiOp is not a "consummation of
an agency action that serves as a final decision setting the
parameters" of the CVP or SWP or resulting in any legal
consequences.  *See, Oregon Desert*,  465 F.3d at 986, n. 12.

### b.   Legal Effects

Even if it is assumed arguendo, that the 2004 OCAP or OCAP
BiOp qualify as "consummation of an agency's decision making
process," it must be shown that the action is (a) "one by which
rights or obligations have been determined," or (b) "from which
legal consequences flow." *Bennett,* 520 U.S. at 178.  In *Bennett*
the Court reasoned that the Biological Opinion ("BiOp") issued by
the Fish and Wildlife Service ("FWS") was a consummation of FWS's
decision making process and resulted in legal consequences that
were fairly traceable to the BiOp.  *Id.* at 178.  After a formal
consultation with the Bureau, the FWS issued a BiOp which
concluded that the "long-term operation of the Klamath Project
was likely to jeopardize the continued existence of the Lost
River and Shortnose Sucker fish."  *Id.* at 159.

First, while the BiOp served as an "advisory function" in
the case, the accompanying Incidental Take Statement ("ITS") had
a powerful coercive effect on any agency seeking to "take" the
endangered species by operation of the Klamath Project.  *Id.*  The

1  ITS was a written statement specifying the measures that the FWS

2  considered necessary and appropriate to minimize an actions

3  impact on the affected species and the terms and conditions that

4  must be complied with by the agency to implement such measures.

5  *Id.* at 170.  The Court reasoned that the ITS constituted a permit

6  authorizing the Bureau of Reclamation to "take" the endangered or

7  threatened species so long as it respected the FWS's terms and

8  conditions.  *Id.*  Legal consequences flowed from the BO and the

9  ITS because, while an agency was technically free to disregard

10  the BO and proceed with its proposed action, "any person who

11  knowingly ["took"] an endangered or threatened species [would be]

12  subject to civil and criminal penalties including imprisonment."

13  *Id.* at 170.  The BiOp and the ITS at issue in *Bennett* instructed

14  that any taking of a listed species [was] prohibited unless "such

15  taking [was] in compliance with the ITS" and warned that "the

16  measures described were non discretionary, and must be taken by

17  the Bureau of Reclamation."  *Id.*  at 170.

18  Courts have consistently interpreted *Bennett* to provide

19  several avenues for meeting the second finality requirement.

20  *Oregon Desert*, 465 F.3d at 986-987.  "[T]he general rule is that

21  administrative orders are not final and reviewable 'unless and

22  until they impose an obligation, deny a right, or fix some legal

23  relationship as a consummation of the administrative process.'"

24  *Id.*; *see also, Ukiah Valley Med. Ctr. v. FTC*, 911 F.2d 261, 264

25  (9th Cir. 1990)(quoting *Chi. & S. Air Lines, Inc. v. Waterman*

26  *S.S. Corp.*, 333 U.S. 103, 113, 68 S. Ct. 431, 92 L. Ed. 568

27  (1948)) (emphasis added).  The legal relationship need not alter

28  the legal regime to which the involved federal agency is subject.

**30**

*See, e.g.*, *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 482-83, 124 S. Ct. 983, 157 L. Ed. 2d 967 (2004) (holding that EPA's order under the Clean Air Act prohibiting the Alaskan Department of Environment from issuing permits to a zinc mining company was a final agency action because the order effectively halted construction of the mine through the threat of civil and criminal penalties, despite lack of alteration of EPA's legal regime); *Cal. Dep't of Educ. v. Bennett*, 833 F.2d 827, 833 (9th Cir. 1987)(holding that the Department of Education's letter informing state that interest would accrue was a final agency action despite lack of alteration of the Department's legal regime); *Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 828 (9th Cir. 2002)(holding that BLM's issuance of grazing permits constituted final agency action despite lack of alteration of BLM's legal regime). These cases demonstrate that *Bennett's* second requirement can be met through different kinds of agency actions, not only one that alters an agency's legal regime. *Oregon Desert*, 465 F.3d at 987.

In the Ninth Circuit an agency action may be final if it has a "'direct and immediate... effect on the day-to-day business' of the subject party." *Id.; see also, Ukiah Valley Med. Ctr.*, 911 F.2d at 264 (quoting *FTC v. Standard Oil*, 449 U.S. 232, 239). The issue is "whether the [action] has the status of law or comparable legal force, and whether immediate compliance with its terms is expected."[3] *Oregon Desert*, 465 F.3d at 987.  In light of

---

[3] The Ninth Circuit found that the AOI had legal force because if a permittee did not comply with its directives, the Forest Service can issue a Notice of Non-Compliance.  *Oregon*

1  these rules, the issue is whether the 2004 OCAP and the OCAP BiOp

2  have any legal effect that qualify as final agency action under

3  *Bennett's* second finality requirement.  *see, Id.*

4      The 2004 OCAP BiOp does contain a description of a take

5  limit for the salmon.  Exceeding the take limits could result in

6  potential criminal consequences.  However, in the companion case

7  of *NRDC v. Kempthorne*, 1:05-CV-01207 (E.D. Cal.), concerning the

8  Delta Smelt, the BiOp's approach to setting incidental take

9  limits was found to be arbitrary and capricious because, inter

10 alia, it failed to fully consider the best available scientific

11 information, did not prescribe enforceable and certain mitigation

12 measures, and failed to impose take limits that reasonably

13 assured the survival of the species and its habitat.

14      Unlike the biological opinion in *Bennett,* the 2004 OCAP or

15 OCAP BiOp does not issue a permit or any other "agency action" as

16 contemplated in 5 U.S.C. § 551(13) that prescribes standards,

17 performance, or other action or inaction that result in "effect"

18 on the environment.  Rather, bot the OCAP and OCAP BiOp describe

19 operations, means, goals, and voluminous data about what must be

20 considered to operate the CVP.  The agency does not prescribe

21 measures that must be taken by the Bureau which will adversely

22

23

24 *Desert*, 465 F.3d at 987.  Specifically, in *Oregon Desert*, the
   Forest Service's notification to Defendant Howard Ranch

25 identified violations of the AOI and imposed a modification of
   the underlying grazing permit as the appropriate sanction for the

26 violation.  *Id.* at 987.  Also, the legal effect of an AOI was
   demonstrated by the Forest Service's use using the AOI to

27 restrict the rights of and confer duties on a grazing permit
   holder to standards and habitat objectives for an endangered

28 species of bull trout.  *Id.* at 989.

affect the salmon species.  Neither document imposes an

obligation, denies a right, or fixes some legal relationship as a

consummation of an administrative process.  *See, Oregon Desert*,

465 F.3d at 986-987.  Neither document has the status of law, a

comparable legal effect, does not prescribe standards or require

immediate compliance with any of its terms, nor do they prescribe

remedies or penalties for any non compliance.[4]  Plaintiffs do not

allege in their complaint that there are legal consequences

referable to either the 2004 OCAP or OCAP BiOp.  Plaintiffs do

not allege that either document has a "powerful coercive effect"

or that there were "direct and immediate effects on the day to

day business" of the Bureau.  Neither document requires or

expects immediate compliance with any of its terms.  The OCAP was

prepared to merely serve as a baseline description of current CVP

and SWP operations.  The OCAP BiOp also includes reference to

proposed changes which could have potential effects on the

endangered salmon.  This is insufficient to establish that either

document result in legal consequences for the Bureau.

### iii. Failure to Conduct a NEPA Analysis as a Final Agency Action Under the APA.

Plaintiffs also argue that the Bureau's decision to not

implement a NEPA analysis is, in itself, a final agency action

under the APA.  According to Plaintiffs, the cumulative and

interrelated effects of the proposed 2004 OCAP and OCAP BiOp

---

[4] Plaintiffs rely on *Animal Legal Defense Fund v. Veneman*,
469 F.3d 826 (9th Cir. 2006.) and argue that the 2004 OCAP OR
OCAP BiOp constitute an "interpretive rule" deemed to be a final
agency action under the APA.  However that opinion has been
vacated.

1   actions "may affect and are likely to adversely affect winter run

2   and spring run Chinook salmon as well as the steelhead."  First,

3   Plaintiff's claim that the Bureau must balance its obligations

4   under water contract provisions, CVPIA, ESA, the CALFED Record of

5   Decision, the EWA, and the Coordinated Operations Agreement

6   between the Bureau and DWR. USBR SAR 4892-4901.  According to

7   Plaintiff, the Bureau's interpretation of those obligations, as

8   well as its decisions regarding how it will carry out CVP and SWP

9   operations in order to meet them, is presented in the 2004 OCAP

10  and OCAP BiOp. USBR SAR 4481-4507 (2004 OCAP description of

11  project constraints and objectives), 4892-4905.  Plaintiffs argue

12  that the interpretations are so basic to determining the nature

13  of the CVP and SWP operations that they are included in the

14  modeling assumptions the Bureau used to analyze the effects of

15  the CVP and SWP operations in the OCAP BiOp.  USBR SAR 5144-98

16  (OCAP BiOp Chapt. 8, "Hydrologic and Temperature Modeling

17  assumptions with [CVPIA] 3406(b)(2) and EWA Analyses")

18       Plaintiffs' concede that the alleged changes to operations

19  are found in the OCAP BiOp rather than the 2004 OCAP.  Plaintiffs

20  accuse the Bureau of choosing to bifurcate the presentation of

21  the long-term CVP and SWP operations in order to avoid its

22  obligation to conduct a NEPA analysis.  Plaintiffs also argue

23  that Defendants cannot show how the 2004 OCAP and OCAP BiOp

24  constitute an "action" for purposes of the ESA but not for

25  purposes of NEPA.

26       Plaintiffs' arguments confuse the legal requirements of what

27  constitutes a "final agency action" under the APA that triggers

28  the application of NEPA.  Plaintiffs argue that the Bureau

**34**

1   clearly understood that the 2004 OCAP was an "action" with
2   environmental impacts that required consultation under the ESA.
3   According to Plaintiffs, no principled reason exists as to why
4   the 2004 OCAP is an "action" for purposes of ESA environmental
5   review but not for NEPA environmental review.  However, it is the
6   APA's requirement of a "final agency action," not the ESA, which
7   protects against jeopardy to species, that determines whether
8   NEPA applies.  Once jurisdiction is established under NEPA via
9   the APA, an EIS is required whenever an action constitutes a
10  "major federal action significantly affecting the quality of the
11  human environment."  The ESA contains its own standard for
12  determining what is an "action."[5]  An "action" under the ESA does
13  not necessarily qualify as an "action" under the APA for the
14  purposes of NEPA and Plaintiffs have not provided legal authority
15  to support for their contention that these terms are synonymous
16  under these two laws.

17      Plaintiffs argue that the very fact that both NMFS and FWS
18  agreed to the Bureau's request for initiation of consultation
19  demonstrates that those agencies believed that the 2004 OCAP was
20  much more than merely a "descriptive" document but rather

21

22

23
24      [5] As defined in the ESA regulations, "action" means "all
    activities or programs of any kind authorized, funded, or carried
25  out, in whole or in part, by Federal agencies in the United
    States or upon the high seas." (50 C.F.R. § 402.02.) This is much
26  broader than the definition of "final agency action" under the
    APA.  Under the APA an action falls under one of "five categories
27  of decisions made or outcomes implemented by an agency--'agency
    rule, order, license, sanction [or] relief.'"  *Norton*, 542 U.S.
28  at 62.; 5 U.S.C. § 551(13).

**35**

constituted an action with legal and environmental consequences
that triggered the need for consultation.[6]

However, "action" under the ESA has a different, broader
definition, not focused on effects.  That an activity or program
is authorized, funded, or carried out for which a biological
assessment under the ESA is required, does not mean such
activities are NEPA reviewable agency actions.  A biological
assessment is a condition precedent for the eventual issuance of
a biological opinion, if a biological opinion is needed.  *See* 50
C.F.R. § 402.12(k)(2) (2006) (stating, *inter alia*, that a
biological assessment may be used in "(I) determining whether to
request the Federal agency to initiate formal consultation or a
conference, (ii) formulating a biological opinion, or (iii)
formulating a preliminary biological opinion").  If, as a result
of preparing a biological assessment, the action agency concludes
that the proposed action is likely to adversely affect listed
species or adversely destroy or modify critical habitat, then
formal consultation under the ESA is required.  See 50 C.F.R. §
402.14 (2006).  If listed species are present and likely to be

_____

[6]Plaintiffs almost entirely rely on *Kandra v. United States of America*, 145 F. Supp. 2d 1192 (Or. 2001.).  *Kandra* is distinguishable.  In *Kandra* there was no dispute that the 2001 annual operation plan at issue was a final agency action under the APA.  There was also no dispute that the plan was adopted and to be implemented.  *Id.* at 1196.  In this case, the 2004 OCAP and OCAP BiOp has not been formally adopted and its implementation is not imminent.  The 2004 OCAP merely describes ongoing operations and the OCAP BiOp outlines proposed actions.  NEPA does not apply retroactively and an EIS is not necessary where a proposed federal action would not change the status quo.  *see, Upper Snake River Chapter of Trout Unlimited v. Hodel*, 921 F.2d 232, 234 (9th Cir. 1990).

36

1  affected by the described action, the consulting agency must

2  prepare a formal biological opinion, which details how the action

3  will affect the listed species and whether the proposed action is

4  likely to "jeopardize" the species or adversely destroy or modify

5  critical habitat. 50 C.F.R. § 402.14(h) (2006).

6      The several cases upon which Plaintiffs rely that address

7  either the timing of preparation of NEPA documents or whether an

8  EA or an EIS is required under NEPA are distinguishable.  Each of

9  the cases involved an undisputed final agency action and the

10  courts in those cases had no cause to question the jurisdictional

11  issue presented here.[7]  Plaintiffs' Opposition Brief cites the

12  same cases to support a lengthy argument that NEPA review is

13  required for "*proposed* actions that may impact the environment."

14  The entire discussion presupposes that there is some final agency

15  action to be implemented and is therefore based on the premise

16  that the 2004 OCAP and the OCAP BiOp are final agency actions

17  under the APA.  They are not.

18

19  ────────────

20      [7] Since there was a final agency action in the cases cited
    by Plaintiffs, the court's jurisdiction under the APA was never
21  in question.  e.g, *Save the Yaak Comm. v. J.R. Block*, 840 F.2d
    714 (9th Cir. 1988) (reconstruction of road); *Churchill County v.
22  Norton*, 276 F.3d 1060 (9th Cir. 2001) (approval of certain land
    and water right purchases); *Metcalf v. Daley*, 214 F.3d 1135 (9th
23  Cir. 2000) (authorization and promotion of Makah whaling
    proposal); *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630
24  (9th Cir. 2004) (issuance of multi-year special-use permits to
    commercial packstock operators); *Klamath Siskiyou Wildlands Ctr.
25  v. Boody*, 468 F.3d 549, 560 (9th Cir. 2006) (amendments to a
    comprehensive forest management plan, which "changed the resource
26  management plans substantially"); *Pitt River Tribe v. USFS*, 469
    F.3d 768 (9th Cir. 2006) (extension of leases and approval of a
27  geothermal plant).
28

1     According to the record, the Bureau noted that NEPA was not

2  implicated in the absence of a final agency action:

3         Development of an OCAP which describes operation of the

4         CVP, development of an associated biological assessment

5         to identify species effects of the operation, and the

6         subsequent ESA consultations are not decision-making

7         processes and thus are not subject to NEPA. Completion

8         of the OCAP ESA consultation does not authorize

9         implementation or make decisions on any new

10        projects/action.

11  USBR AR 02660-02661.

12        The Bureau also recognized in the 2004 OCAP that

13  implementation of any new actions would be accomplished through

14  two processes:

15        The first of these is the programmatic documents

16        developed by Reclamation for the CVPIA, and by

17        Reclamation and others for the CALFED program. The

18        second is that NEPA compliance is being accomplished on

19        all new projects or actions that may change CVP/State

20        Water Project operations such that there is a

21        significant effect on the environment.

22  Id. at 02661.  It is explicit that if and when Reclamation

23  ultimately decides to take a new action that is not  within the

24  scope of historical operations that could have a significant

25  impact on the environment, Reclamation will undertake NEPA

26  analysis.  Accord USBR AR 02649 (email regarding OCAP and NEPA,

27  dated October 7, 2004).

28

**38**

1     Defendants motion to dismiss Plaintiff's seventh claim for

2  relief under NEPA is **GRANTED WITH LEAVE TO AMEND.**

3          **C.    Challenge to Early Consultation On The OCAP BiOp**

4     The California Farm Bureau also argues that Plaintiffs are

5  bringing a challenge to the early consultation aspects of the

6  NMFS 2004 BiOp.

7     Early consultation is "designed to reduce the likelihood of

8  conflicts between listed species or critical habitat and proposed

9  action."  50 C.F.R. § 402.11(a)  Early consultation by the Fish

10 and Wildlife Service usually results in a preliminary opinion,

11 the contents of which are the same as for biological opinion

12 issued after formal consultation.   In either event, early

13 consultation and a preliminary opinion do not, without more,

14 carry the weight of final agency action, as they do not fix any

15 rights or obligations under the law.  50 C.F.R. § 402.11(f)

16    According to the California Farm Bureau, the complaint

17 specifically alleges that the results of the 2004 OCAP and OCAP

18 BiOp's early consultation are arbitrary and capricious and

19 generally states causes of action that allege that all

20 conclusions in the NMFS 2004 BiOp, whether the product of formal

21 or early consultation are arbitrary and capricious.  (Doc. 69,

22 First Amended Complaint, Filed September 11, 2006.)   The

23 California Farm Bureau therefore request that the Court narrow

24 this case to focus only on claims subject to judicial review by

25 issuing an order which states that Plaintiffs' claims will not be

26 reviewed with respect to the preliminary opinion and early

27 consultation aspects of the 2004 OCAP and OCAP BiOp.

28

**39**

1    According to Defendants, it bears emphasis that, under the
2 regulation, the only options following an early consultation are
3 either 1. rejection of the preliminary opinion and initiation of
4 formal consultation, or 2. follow-on agency action to confirm the
5 preliminary biological opinion as a final biological opinion.   In
6 either event, early consultation and a preliminary opinion do
7 not, without more, carry the weight of final agency action, as
8 they do not fix any rights or obligations under the law.

9    This issue was clarified at the May 11, 2007 hearing on this
10 matter.   Plaintiffs informed the court that they do not intend to
11 bring a challenge to the early consultation of the OCAP BiOp .

12    Defendants motion to dismiss any challenges to the early
13 consultation portion of the 2004 OCAP BiOp is **GRANTED.**

**6.   CONCLUSION**

15    Defendants' motion to dismiss Plaintiffs' seventh claim for
16 relief under NEPA is **GRANTED.**   Any amendment shall be filed
17 within 10 days following the service of this decision.

18

19 IT IS SO ORDERED.

20 **Dated:   June 15, 2007**          **/s/ Oliver W. Wanger**
                                    UNITED STATES DISTRICT JUDGE

**40**