1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

9  | Pacific Coast Federation of

10 | Fishermen's Associations,
   | Institute for Fisheries
   | Resources, et al.,

11

12 |      Plaintiffs,

13 |      v.

14 | Carlos M. Gutierrez, in his
   | official capacity as Secretary
   | of Commerce, et al.,

15

16 |      Defendants,

17 | San Luis & Delta-Mendota Water
   | Authority, et al.,

18 |      Defendant-Intervenors.

1:06-cv-00245-OWW-GSA

SECOND AMENDED MEMORANDUM
DECISION GRANTING IN PART AND
DENYING IN PART PLAINTIFFS'
MOTIONS FOR SUMMARY JUDGMENT
(Doc. 145) AND GRANTING IN
PART AND DENYING IN PART
FEDERAL DEFENDANTS' CROSS-
MOTIONS FOR SUMMARY JUDGMENT
(Doc. 160)

19
20
21
22
23
24
25
26
27
28

1   I.    Introduction. . . . . . . . . . . . . . . . . . . 6

2       A.    The Water Projects. . . . . . . . . . . . . 6

3       B.    The Lawsuit: Parties and Contentions. . . . . . . 9

4           1.    The Parties. . . . . . . . . . . . . . . 9

5               a.    Plaintiffs. . . . . . . . . . . . . 9

6               b.    Federal Defendants. . . . . . . . . . 10

7               c.    Defendant-Intervenors. . . . . . . . 11

8           2.    Federal Defendants and DIs' Concessions. . . . 11

9   II.   Procedural Background. . . . . . . . . . . . . . 13

10      A.    Case History. . . . . . . . . . . . . . . . 13

11      B.    Summary of Plaintiffs' Claims in the First Amended

12           Complaint. . . . . . . . . . . . . . . . . . 14

13  III.  Factual Background. . . . . . . . . . . . . . . 17

14      A.    Overview of the 2004 OCAP. . . . . . . . . . . 17

15      B.    Description of Proposed Action in the BiOp. . . . . 20

16      C.    Mitigation Measures. . . . . . . . . . . . . 20

17      D.    Species Life History and Population Dynamics. . . . 21

18          1.    Chinook Salmon. . . . . . . . . . . . . 21

19              a.    General Life History of Chinook Salmon. . 21

20              b.    Winter-run Chinook. . . . . . . . . . 24

21                  (1)   Habitat. . . . . . . . . . . . . 24

22                  (2)   Population Trend. . . . . . . . . 26

23                  (3)   Status of Winter-Run. . . . . . . 27

24              c.    Spring-run Chinook. . . . . . . . . . 29

25                  (1)   Habitat. . . . . . . . . . . . . 29

26                  (2)   Population. . . . . . . . . . . . 30

27                  (3)   Status. . . . . . . . . . . . . 33

28          2.    CV Steelhead. . . . . . . . . . . . . . 35

2

        a.   General Life History. . . . . . . . . . .  35
        b.   Habitat.  . . . . . . . . . . . . . . . .  38
        c.   Population. . . . . . . . . . . . . . . .  38
        d.   Status. . . . . . . . . . . . . . . . . .  40
IV.  Legal Standards Of Review. . . . . . . . . . . . .  41
  A.   Summary Judgment Generally. . . . . . . . . . .  41
    B.   Summary Judgment Under The Administrative
         Procedure Act. . . . . . . . . . . . . . . .  41
V.   Summary of Parties' Cross-Motions for Summary Judgment.
     . . . . . . . . . . . . . . . . . . . . . . . . .  44
  A.   Plaintiffs' Motion for Summary Judgment.  . . . .  44
  B.   Federal Defendants' Motion for Summary Judgment. .  45
VI.  Law And Analysis.  . . . . . . . . . . . . . . . .  47
  A.   Standing. . . . . . . . . . . . . . . . . . . .  47
    1.   PCFFA. . . . . . . . . . . . . . . . . . . .  49
    2.   Bay Institute. . . . . . . . . . . . . . . .  50
    3.   Baykeeper.  . . . . . . . . . . . . . . . . .  51
    4.   California Trout.  . . . . . . . . . . . . . .  53
    5.   FOR. . . . . . . . . . . . . . . . . . . . .  55
    6.   NRDC.  . . . . . . . . . . . . . . . . . . .  57
    7.   The Council. . . . . . . . . . . . . . . . .  58
    8.   The Tribe. . . . . . . . . . . . . . . . . .  59
    9.   The Trust. . . . . . . . . . . . . . . . . .  60
  B.   Plaintiffs' Request for Judicial Notice.  . . . .  62
  C.   The Endangered Species Act. . . . . . . . . . .  64
  D.   NMFS Claims.  . . . . . . . . . . . . . . . . .  66
    1.   Whether NMFS Failed to Establish Any Reasonable
         Connection Between the Impacts It Identified and

the BiOp's "No Jeopardy" and "No Adverse
Modification" Conclusions. . . . . . . . . . .  66

a.   Whether NMFS's Factual Findings Directly
     Contradict the No Jeopardy and No Adverse
     Modification Conclusions in the BiOp. . .  69

     (1)  Winter-run Chinook.  . . . . . . . .  70

     (2)  Spring-run Chinook.  . . . . . . . .  94

     (3)  CV Steelhead.  . . . . . . . . . . . 101

b.   Whether NMFS Failed to Conduct Any Analysis
     of Project Impacts in the Context of the
     Species' Life Cycles and Population Dynamics.
     . . . . . . . . . . . . . . . . . . . . . 104

c.   Whether NMFS's Focus on Incremental Project
     Impacts Arbitrarily Ignored Significant
     Adverse Effects Associated With Baseline
     Conditions and is Unsupported by the BiOp's
     Findings. . . . . . . . . . . . . . . . . 107

d.   Whether NMFS Failed to Conduct a
     Comprehensive Analysis of Impacts Associated
     With the Entire Federal Action During Formal
     Consultation. . . . . . . . . . . . . . . 113

2.   Global Climate Change and the Effects on the
     Hydrology of Northern California Rivers. . . . 123

3.   Sufficiency of Adaptive Management Plan and
     Mitigation Measures. . . . . . . . . . . . . . 126

     a.   Temperature Control.  . . . . . . . . . . 127

     b.   Shasta Carryover Storage. . . . . . . . . 130

     c.   SWRCB Order 90-5.  . . . . . . . . . . . 131

d.    Red Bluff Diversion Dam.  . . . . . . . . 131

e.    The Environmental Water Account.  . . . . 132

f.    South Delta Improvement Program.  . . . . 133

E.    Bureau Claims . . . . . . . . . . . . . . . . . 134

1.    The Bureau's § 7(a)(2) Obligations.  . . . . . 134

a.    The Bureau's Reliance on the 2004 BiOp at the

Time It Was Adopted.  . . . . . . . . . . 134

(1)   Political Bad Faith Contention.  . . 136

(2)   Allegedly "Obvious" Legal Errors.  . 136

(a)   Mitigation Measures.  . . . . . 137

(b)   Internal Contradictions.  . . . 138

(c)   Recovery & Critical Habitat

Analysis. . . . . . . . . . . 138

(d)   Global Climate Change.  . . . . 138

(e)   Temperature Control Point.  . . 139

(f)   Failure to Consider 100% of Water

Deliveries. . . . . . . . . . 140

b.    The Bureau's "Continued Reliance" on the

BiOp.  . . . . . . . . . . . . . . . . . 141

2.    Violation of ESA § 7(d)  . . . . . . . . . . 143

VII.  Conclusion.  . . . . . . . . . . . . . . . . . . . . 145

1                      I.   Introduction.

2        Before the Court are the parties' cross-motions for summary

3   judgment arising from an October 22, 2004, Biological Opinion

4   ("BiOp") issued by the United States National Marine Fisheries

5   Service ("NMFS" also referred to as "NOAA Fisheries," used

6   interchangeably), in response to the United States Bureau of

7   Reclamation's ("Bureau") initiation of formal and early

8   consultation with NMFS.  This is one of a series of cases that

9   address through this and other Biological Opinions, the potential

10  adverse impacts of ongoing Central Valley Project ("CVP") and

11  California State Water Project ("SWP") operations on fish, here,

12  salmonid species, caused by the Long-Term Central Valley Project

13  and State Water Project Operations Criteria and Plan ("2004

14  OCAP") completed June 30, 2004.

15

16       A.   The Water Projects.

17       The CVP is an "extensive system of dams, tunnels, canals and

18  reservoirs that stores and regulates water for California's

19  Central Valley and southward."  *Westlands Water District v.*

20  *Department of Interior*, 376 F.3d 853, 861 (9th Cir. 2004).  The

21  CVP supplies 200 water districts, providing water for about 30

22  million people, irrigating California's most productive

23  agricultural region and generating electricity at nine power

24  plants."  The Projects move water through their Delta pumping

25  facilities to provide flood protection, power generation, and

26  water service to otherwise barren areas of Central California for

27  agricultural, municipal, and environmental uses.  The CVP was

28  taken over by the United States in 1935, has since been a Federal

                               **6**

1  enterprise, and is the largest Federal water management project

2  in the United States.  *Cent. Delta Water Agency v. United States*,

3  306 F.3d 939, 943 (9th Cir. 2002).  The Federal government has

4  administered the CVP since 1935.  *Westlands Water Dist. v. United*

5  *States*, 337 F.3d 1092, 1095 (9th Cir. 2003).  The Bureau

6  administers the CVP.  *Orff v. United States*, 545 U.S. 596, 598

7  (2005).

8      The SWP is the "largest State-built water project in the

9  country, (and) is managed by the California Department of Water

10 Resources ("DWR").  *Natural Res. Def. Council v. Norton*, No. 05-

11 01207-OWW 2006 WL 39094, *1 (E.D. Cal. Jan. 5, 2006).  "The CVP

12 and SWP share certain facilities and coordinate operations with

13 one another pursuant to a Coordinated Operating Agreement

14 ("COA").  The COA which originated in 1986, has evolved over time

15 to reflect, among other things, changing facilities, delivery

16 requirements and regulatory restrictions."  *Id.* at *2.

17     For over thirty years, the projects have been operated

18 pursuant to a series of cooperation agreements.  In addition, the

19 projects are subject to ever-evolving statutory, regulatory,

20 contractual, and judicially-imposed requirements.  The 2004 OCAP

21 is a baseline description of the Projects' operating facilities

22 and operating environment.

23     The Bureau and DWR requested the initiation of formal ESA

24 § 7 consultation for Project operations and proposed operations

25 on March 15, 2004 and March 12, 2004, respectively.  Among

26 proposed changes in operations are the expansion of the Projects'

27 capacity and increased pumping out of the Delta.  The BiOp was

28 intended to address the potential adverse impacts of ongoing (for

7

1  the next twenty-five years) CVP and SWP operations on the
2  salmonid species.[1]

3      The original BiOp concludes that the effects of proposed
4  Project operations under the 2004 OCAP are not likely to
5  jeopardize the continued existence of the Sacramento River
6  winter-run Chinook ("winter-run Chinook"), and are not likely to
7  adversely modify the critical habitat for the winter-run Chinook
8  listed as endangered January 4, 1994.  The BiOp further concludes
9  that proposed operations under the 2004 OCAP are not likely to
10  jeopardize the continued existence of the Central Valley spring-
11  run Chinook ("spring-run Chinook"), listed as threatened on
12  September 16, 1999, or Central Valley steelhead ("CV steelhead")
13  listed as threatened on March 19, 1998.

14      Following the issuance of the BiOp, NOAA Fisheries listed as
15  threatened, a population segment of the North American Green
16  Sturgeon located in the Delta Region.  71 Fed.Reg. 17,757 (April
17  7, 2006).  NOAA designated critical habitat in the Delta region
18  affected by the CVP for two Evolutionarily Significant Units
19  ("ESUs") of Chinook salmon and five ESUs of steelhead.  NOAA,
20  Final Rule Re: Designation of Critical Habitat for Seven ESUs of
21  Pacific Salmon and Steelhead in California.  70 Fed.Reg. 52,488

22

23      [1] Two additional fish species, the threatened Southern
24  Oregon/Northern California Coast coho salmon and the threatened
   Central California Coast steelhead, are also at issue in this
25  case.  Although Plaintiffs believe that the NMFS's analysis of
   Project impacts on these two fish is inadequate, Plaintiffs'
26  arguments are limited in this summary judgment proceeding to the
   winter-run Chinook, spring-run Chinook, and the CV steelhead
27  species.  Only the BiOp's affect on winter-run and spring-run
28  Chinook and CV steelhead are discussed.

**8**

1  (September 2, 2005).  As a result, the Bureau, on April 26, 2006,
2  requested reinitiation of ESA § 7 consultation on the 2004 NMFS
3  BiOp.

4      Project operations affect a variety of salmonid species
5  including the endangered Sacramento River winter-run Chinook
6  salmon ("winter-run Chinook"), the threatened Central Valley
7  spring-run Chinook salmon ("spring-run Chinook"), threatened
8  Central Valley steelhead ("CV steelhead"), threatened Southern
9  Oregon/Northern California Coast Coho salmon; and threatened
10 Central California Coast steelhead.

11     After reinitiation of consultation, Federal Defendants
12 sought to dismiss, remand or stay this case.  That motion was
13 denied on all grounds.  A Fed. R. Civ. Proc. 12(b)(1) motion to
14 dismiss Plaintiffs' Seventh Claim under the National
15 Environmental Protection Act ("NEPA") for lack of jurisdiction
16 was granted June 15, 2007.  Plaintiffs' challenge the Bureau's
17 "early consultation" with NMFS under 16 U.S.C. § 1536(a)(3) and
18 the adoption of the 2004 BiOp.

19
20      B.   The Lawsuit: Parties and Contentions.
21           1.   The Parties.
22                a.   Plaintiffs.

23     Plaintiffs, the Pacific Coast Federation of Fishermen's
24 Association/Institute for Fishery Resources; the Bay Institute;
25 Baykeeper and its Deltakeeper Chapter; California Trout; Friends
26 of the River; Natural Resources Defense Council; Northern
27 California Council of the Federation of Fly Fishers; Sacramento
28 Preservation Trust; and the Winnemem Wintu Tribe, a coalition of

1 environmental and fishing organizations (collectively
2 "Plaintiffs"), challenge the 2004 BiOp's no jeopardy and no
3 adverse modification findings as arbitrary, capricious, and
4 contrary to law under the Administrative Procedure Act, 5 U.S.C.
5 § 702, *et seq.* ("APA").  Plaintiffs allege, among other things:
6 (1) that the conclusions of the BiOp are unsupported and
7 contradicted by the Administrative Record ("AR"); (2) that the
8 BiOp relies on uncertain mitigation measures as a basis for the
9 no jeopardy opinions, (3) that the BiOp fails to consider the
10 best available science; (4) the Bureau is failing to ensure that
11 its actions are not likely to jeopardize the continued existence
12 of the listed species or to adversely modify their critical
13 habitat; (5) that the Bureau is taking actions that may adversely
14 affect the listed species and their critical habitat without a
15 valid biological opinion, and (6) that the Bureau is making
16 irretrievable and irreversible commitments of resources that
17 foreclose the formulation or implementation of any reasonable and
18 prudent alternatives.

19

20                    b.    <u>Federal Defendants</u>.

21        Federal Defendants, Carlos M. Gutierrez, in his official
22 capacity as Secretary of Commerce; William T. Hogarth, in his
23 official capacity as Assistant Administrator for Fisheries,
24 National Marine Fisheries Service, National Ocean & Atmospheric
25 Administration; Dirk Kempthorne, in his official capacity as
26 Secretary of the Interior; and William E. Rinne, in his official
27 capacity as Acting Commissioner, United States Bureau of
28 Reclamation (collectively "Federal Defendants"), filed opposition

                               **10**

1 briefs and their own cross-motion for summary judgment.

2

3          c.    **Defendant-Intervenors**.

4        The Defendant-Intervenors are San Luis & Delta-Mendota Water

5 Authority, Westlands Water District, California Farm Bureau

6 Federation, Glen-Colusa Irrigation District, and State Water

7 Contractors, (collectively "DI"); they filed a joint opposition

8 to Plaintiffs' summary judgment motion.

9

10          2.    **Federal Defendants and DIs' Concessions**.

11

12        Federal Defendants and DI do not contest and admit the

13 validity of some of the claims raised against the 2004 NMFS BiOp

14 in light of the reinitiation of consultation: (1) the BiOp fails

15 to consider and analyze global climate changes and its impacts;

16 (2) the BiOp fails to consider and analyze adverse impacts to CV

17 steelhead and fails to define and consider critical habitat for

18 CV steelhead and its survival and recovery; (3) NMFS also

19 acknowledges the need for further explanation of its "no

20 jeopardy" analysis, particularly to address recovery implications

21 for the three salmonid species; (4) NMFS acknowledges the need

22 for further explanation of its critical habitat analysis for

23 winter-run Chinook salmon, particularly to address the impacts to

24 the primary constituent elements and whether an adverse

25 modification of critical habitat occurred," and in relation to

26 the "no jeopardy" conclusion.

27        The DIs' combined brief on behalf of San Luis & Delta

28 Mendota Water Authority, Westlands Water District, State Water

1  Contractors, and California Farm Bureau Federation, based on
2  reinitiation of consultation and the smelt decision, suggest
3  accepting the collective admissions of the BiOp's shortcomings
4  (uncontested issues) and proceeding directly to an interim remedy
5  phase.  The DI accept as uncontested issues raised by Plaintiff's
6  motion for summary judgment: (1) insufficient explanation of no
7  jeopardy to threatened steelhead species; and (2) failure to
8  analyze effects of global climate change on the species.  The DIs
9  accept that the BiOp is subject to the same defects  involving
10 those claims identified as inadequate by the Delta smelt BiOp.
11 This includes FWS's and NMFS's failure to explain on the record
12 how their no jeopardy conclusions were reached.

13      As to all other NMFS claims DI contend NMFS acted
14 consistently with ESA, the smelt Biop order, and as to all claims
15 against the Bureau:

16      1.   Analyzing the effect of Project operations on
17 threatened spring-run Chinook and its critical habitat;

18      2.   Analyzing the effect of Project operations on
19 endangered winter-run Chinook and its critical habitat;

20      3.   Operating the Project is not a per se or patent
21 violation of the ESA;

22      4.   Sufficiently considering baseline conditions;

23      5.   Applying adaptive management mitigation measures for
24 salmonid species;

25      6.   Meeting its ESA § 7(d) obligations in consulting and
26 relying on the BiOp.

27      Federal Defendants and DI seek remand of the BiOp without
28 vacatur or modification.

1    In the companion case, *NRDC v. Kempthorne*, 506 F.Supp.2d 322
2  (E.D. Cal. 2007) the Court determined the legal invalidity of the
3  2005 Delta smelt BiOp addressing the 2004 OCAP for its failure to
4  discuss and evaluate the impacts of global climate change in
5  relation to the BiOp's no jeopardy conclusion.  Federal
6  Defendants and DI deny that the segment of the *NRDC v. Kempthorne*
7  ruling, which found unlawful and inadequate adaptive management
8  mitigation measures adopted in the smelt case, has any
9  applicability to the salmon species based on the substantive
10 difference in the adaptive management measures for salmonids,
11 including temperature control and compliance and Shasta Dam
12 carryover storage (cold water resource protection).

13    Federal Defendants and DI contend the Bureau has met its ESA
14 obligations in consulting and relying on the BiOp and has not
15 violated ESA § 7(d) as to the BiOp, when it reinitiated
16 consultation.

17

18              II.   Procedural Background.

19    A.   Case History.

20    The complaint was filed August 9, 2005, and amended
21 September 11, 2006.  A motion to dismiss the seventh cause of
22 action for violation of NEPA was granted June 15, 2007.[2]  A June

23 ─────────────────────

24    [2] Plaintiffs' seventh claim for relief alleged violation of
   NEPA and the APA by failing to prepare an environmental impact
25 statement for the 2004 OCAP.  This claim for relief was dismissed
   and is not at issue in this summary judgment proceeding.  By
26 stipulation and order (Doc. 169), Plaintiffs have until thirty
   days after the date this Decision is filed to file any amendment
27 to the First Amended Complaint ("FAC") addressing any further
   NEPA claim.
28

                        13

1  15, 2007, order limited the use of post-record documents to
2  scientific purposes and to show bad faith, if any, on the part of
3  the Bureau.

4

5      **B.   Summary of Plaintiffs' Claims in the First Amended
           Complaint.**
6

7      The FAC advances seven claims for relief.  Claims one
8  through three are directed at NMFS and the BiOp, while claims
9  four through six are directed at the Bureau's actions since NMFS
10 issued the BiOp.

11     The first claim for relief, violation of the APA and ESA,
12 alleges the no jeopardy conclusions in the BiOp are unsupported
13 and contradicted by the administrative record, and are therefore
14 arbitrary and capricious, an abuse of discretion, and contrary to
15 law under APA § 706(2).  According to Plaintiffs, the BiOp fails
16 to establish the necessary link between the facts found and
17 conclusions reached, and it also contains factual findings that
18 contradict its "no jeopardy" conclusions.

19     The second claim for relief, violation of the APA and ESA,
20 asserts the BiOp improperly relies on a promise of adaptive
21 management without identifying concrete actions to ensure
22 protection of the winter-run Chinook, the spring-run Chinook, and
23 the CV steelhead species, and fails to protect the critical
24 habitat of the winter-run Chinook.  According to Plaintiffs, the
25 BiOp's reliance on the uncertain "adaptive management" regime
26 violates ESA § 7(a)(2) and is arbitrary, capricious, an abuse of
27 discretion, and not in accordance with the law, contrary to APA §
28 706(2).

**14**

1       The third claim for relief, violation of the APA and ESA,

2  alleges NMFS failed to consider the best available science to

3  reach the no jeopardy conclusions in the BiOp.  Among other

4  deficiencies, NMFS disregarded the best available science

5  documenting that the 2004 OCAP will jeopardize the continued

6  existence of the spring-run Chinook and CV steelhead, and that it

7  will adversely modify and destroy the winter-run Chinook's

8  critical habitat.  NMFS also allegedly failed to consider the

9  best available scientific data concerning the effects of global

10 climate change which violated ESA § 7(a)(2), and was arbitrary,

11 capricious, an abuse of discretion, and not in accordance with

12 the law, contrary to APA § 706(2).

13      The fourth claim is for the Bureau's violation of the ESA

14 and APA by failing to ensure that its actions are not likely to

15 jeopardize the continued existence of several species or to

16 adversely modify their critical habitat.  Implementation of the

17 2004 OCAP has short-term and long-term adverse impacts on the

18 winter-run Chinook, spring-run Chinook, and CV steelhead that

19 jeopardize their continued existence.  According to Plaintiffs,

20 the Bureau has an independent duty to ensure that its actions

21 avoid jeopardy to listed species, and the Bureau has failed to

22 comply with this duty by implementing the 2004 OCAP.

23      The implementation of the 2004 OCAP will adversely impact

24 several features of the winter-run Chinook's critical habitat

25 including water quality and quantity, water temperature, water

26 velocity, and fish safe passage conditions.  The Bureau's failure

27 to ensure that its actions will not jeopardize the continued

28 existence of the winter-run Chinook, spring-run Chinook, and CV

1  steelhead, or adversely modify their critical habitat, is

2  arbitrary, capricious, an abuse of discretion, and not in

3  accordance with the law, contrary to APA § 706(2).

4       The fifth claim charges the Bureau has violated the ESA and

5  APA by taking actions that "may affect" listed species and their

6  critical habitat without a valid biological opinion.  According

7  to Plaintiffs, the Bureau's implementation of the 2004 OCAP in

8  the absence of a "valid" biological opinion violates ESA §

9  7(a)(2), and is arbitrary, capricious, an abuse of discretion,

10 and not in accordance with the law, contrary to APA § 706(2).

11      The sixth claim asserts the Bureau has violated the ESA and

12 APA by making irretrievable and irreversible commitments of

13 resources that foreclose reasonable and prudent alternatives in

14 violation of ESA § 7(d).  According to Plaintiffs, the Bureau has

15 taken and is taking actions that foreclose implementation of

16 reasonable and prudent alternatives to avoid jeopardy to the

17 species by moving forward with plans to construct physical

18 alterations as part of the South Delta Improvement Project and by

19 signing and implementing new long-term water service contracts

20 committing delivery of substantially increased quantities of CVP

21 water.  The Bureau's actions are claimed to be arbitrary,

22 capricious, an abuse of discretion, and not in accordance with

23 law, contrary to APA § 706(2).

24      Plaintiffs' FAC seeks the following relief:

25      (1)  A declaration that the BiOp is arbitrary and
             capricious, an abuse of discretion, and not in
26           accordance with the law, all in violation of APA §
             706(2);
27
28      (2)  An order holding unlawful and setting the BiOp aside;

**16**

(3)  An Order requiring reinitiation of consultation with respect to the impacts of the 2004 OCAP, including changes to project operations;

(4)  A finding and declaration that Reclamation, in implementing the 2004 OCAP, has failed and is failing to ensure that its actions will not jeopardize the continued existence of the winter-run Chinook, the spring-run Chinook, and CV steelhead, or to adversely modify their critical habitats.

(5)  A finding and declaration that Reclamation, in implementing the 2004 OCAP, is irretrievably and irreversibly committing resources that foreclose the formulation or implementation of reasonable and prudent alternatives.

### III.  Factual Background.

A.  Overview of the 2004 OCAP.

The OCAP's introductory "Purpose of Document" section states:

> This document has been prepared to serve as a baseline description of the facilities and operating environment of the Central Valley Project (CVP) and State Water Project (SWP).  The Central Valley Project - Operations and Criteria Plan (CVP-OCAP) identifies the many factors influencing the physical and institutional conditions and decision-making process under which the project currently operates.  Regulatory and legal instruments are explained, alternative operating models and strategies described.

> The immediate objective is to provide operations information for the Endangered Species Act, Section 7, consultation.  The long range objective is to integrate CVP-OCAP into the proposed Central Valley document.  It is envisioned that CVP-OCAP will be used as a reference by technical specialists and policymakers in and outside the Bureau of Reclamation (Reclamation) in understanding how the CVP is operated. The CVP-OCAP includes numeric and nonnumeric criteria and operating strategies. Emphasis is given to explaining the analyses used to develop typical operating plans for simulated hydrologic conditions.

> All divisions of CVP are covered by this document, including the Trinity River Division, Shasta and Sacramento Divisions, American River Division and Friant Division.

17

USBR AR 4466.

The introductory chapter provides an overview of all of the physical components of the CVP and SWP, as well as all of the relevant legal authorities affecting CVP operations.  USBR AR 4467-80.

Chapter 2, explains, among other things, that water needs assessments have been performed for each CVP water contractor, to confirm each contractor's past beneficial use in order to anticipate future demands.  USBR AR 4481.  Chapter 2 also reviews the 1986 COA and how it is implemented on a daily basis by the Bureau and DWR.  USBR AR 4483-90.  A detailed overview of the "changes in [the] operations coordination  environment since 1986," includes:

- Changes due to temperature control operations on the Sacramento River;

- Increases in the minimum flow release requirements on the Trinity River;

- Implementation of CVPIA 3406(b)(2) and Refuge Water Supply contracts;

- Commitments made by the CVP and SWP pursuant to the Bay-Delta Accord and the subsequent implementation of State Water Resources Control Board ("SWRCB") Decision-1641;

- The Monterey Agreement;

- The Operation of the North Bay Aqueduct (which was not included in the 1986 COA).

- The SWP's commitment to make up for 195,000 acre-feet

18

1        of pumping lost to the CVP due to SWRCB Decision 1485;
2    •    Implementation of the Environmental Water Account; and
3    •    Constraints imposed by various Endangered Species Act
4        listings, including that of the Sacramento River
5        Winter-Run Chinook Salmon, the Sacramento River
6        Spring-Run Chinook Salmon, the Steelhead Trout, and the
7        Delta Smelt (which resulted in the issuance of
8        biological opinions in 1993, 1994, and 1995 concerning
9        CVP/SWP operations and the South Delta Temporary
10        Barriers Biological Opinion in 2001)

11   USBR AR 4485-88.

12        The OCAP reviews the regulatory standards imposed by SWRCB
13   D-1641, which include water quality standards based on the
14   geographic position of the 2-parts-per-thousand isohale
15   (otherwise known as "X2"); a Delta export restriction standard
16   known as the export/inflow (E/I) ratio; minimum Delta outflow
17   requirements; and Sacramento River and San Joaquin River flow
18   standards.  USBR AR 4486-87.  In addition to imposing
19   requirements, D-1641 granted the Bureau and DWR permission to use
20   each project's capabilities in a coordinated manner.  USBR AR
21   4490-91.  Numerous additional regulatory and operational changes
22   have taken place in Project operations in recent years.  As the
23   OCAP's "Purpose of Document" section explains, the immediate
24   objective of the OCAP is to lay out all such regulatory and other
25   operational information so that an ESA § 7 consultation can
26   proceed to evaluate how project operations will effect the
27   salmonid species under various projected future conditions.
28

19

1       B.   <u>Description of Proposed Action in the BiOp</u>.

2       The purpose of the proposed action is to continue to operate

3  the CVP and SWP in a coordinated manner to divert, store, and

4  convey Project water.   NMFS AR 5743.   In addition to current day

5  operations, several future facilities and actions are included in

6  the consultation.[3]  *Id.*  These include (1) increased flows in the

7  Trinity River, (2) an intertie between the California Aqueduct

8  and the Delta-Mendota Canal, (3) the Freeport Regional Water

9  Project, (4) water transfers, and (5) renewal of long term CVP

10 water service contracts and future deliveries.  *Id.*  The proposed

11 actions will come online at various times in the future, except

12 for increased flows in the Trinity River, which are presently

13 being implemented in accordance with the Trinity River Record of

14 Decision.  *Id.*  The proposed action is:  (a) continued operation

15 of the CVP and SWP without these actions, and (b) implementing

16 these operations as they come online.[4]  *Id.*

17

18      C.   <u>Mitigation Measures</u>.

19  _____

20      [3] Early consultation in the BiOp addressed (1) increased
21 pumping at the SWP Banks Pumping Plant, (2) permanent barriers
   operated in the South Delta, (3) a long-term EWA, and (4) various
22 operational changes identified as CVP/SWP project integration.
23 NMFS AR 5743.

24      [4] Only the water operations associated with the proposed
   activities were addressed in the consultation leading up to the
25 issuance of the BiOp.  NMFS AR 5743.  Project activities do not
   include construction of any facilities to implement the actions.
26 *Id.*  All site-specific or localized activities of the actions
   such as construction or screening, and any other site-specific
27 events, will be addressed in future separate action-specific ESA
28 § 7 consultations.   *Id.*

1    The BiOp includes mitigation measures principally related
2  to: (1) movement of the 56°F Sacramento River Temperature
3  Compliance Point from Bend Bridge upstream to Balls Ferry; (2)
4  maintaining the carryover storage for Shasta Reservoir at 1.9
5  million acre-feet ("MAF") as a target; (3) the operation of Red
6  Bluff Diversion Dam ("RBDD") to provide unimpeded fish passage
7  upstream and downstream at RBDD.

8    Plaintiffs complain about mitigation measures that are to be
9  implemented in the future including, but not limited to, (1)
10 Environmental Water Account assets; (2) increased exports
11 resulting from the South Delta Improvement Program; (3)
12 utilization of the Environmental Water Account to augment water
13 flows.

14

15    D.    Species Life History and Population Dynamics.
16         1.    Chinook Salmon.
17              a.    General Life History of Chinook Salmon.
18    Chinook salmon exhibit two generalized fresh water life
19 histories known as "stream-type" and "ocean-type."   NMFS AR 5787.
20 Stream-type Chinook salmon enter fresh water months before
21 spawning and reside in fresh water for a year or more following
22 emergence.  *Id*.  Ocean-type Chinook salmon spawn soon after
23 entering fresh water and migrate to the ocean as fry or parr
24 within their first year.  *Id*.  Spring-run Chinook exhibit a
25 stream-type life form where adults enter fresh water in the
26 spring and spawn in the fall.  *Id*.  Spring-run Chinook juveniles
27 typically spend a year or more in fresh water before emigrating
28 towards the sea.  *Id*.  Winter-run Chinook exhibit characteristics

1  of both stream-type and ocean-type life histories.  *Id.*  Adult
2  winter-run Chinook enter freshwater in winter or early spring and
3  delay spawning until spring or early summer (stream-type).  *Id.*
4  Juvenile winter-run Chinook migrate to the sea after only four to
5  seven months of river life (ocean-type).  *Id.*  Adequate instream
6  flows and cool water temperatures are more critical for the
7  survival of Chinook salmon exhibiting a stream-type life history
8  due to over-summering by adults and/or juveniles.  *Id.*

9       Chinook salmon mature between two and six plus years of age.
10  NMFS AR 5787.  Freshwater entry and spawning timing generally are
11  thought to be related to local water temperature and flow
12  regimes.  *Id.*  Chinook salmon runs are designated on the basis of
13  adult migration timing.  *Id.*  Both spring-run and winter-run
14  Chinook tend to enter freshwater as immature fish, migrate far
15  upriver, and delay spawning for weeks or months.  *Id.*

16      During their upstream migration, adult Chinook salmon
17  require stream flows sufficient to provide olfactory and other
18  orientation cues to locate their natal streams.  NMFS AR 5787.
19  Adequate stream flows are necessary to allow adult passage to
20  upstream holding habitat.  *Id.*  The preferred temperature is 38°F
21  to 56°F.  Adult winter-run Chinook enter San Francisco Bay from
22  November through June and migrate past RBDD from mid-December
23  through early August.  *Id.*  The majority of the winter-run
24  Chinook pass RBDD from January through May, and passage peaks in
25  mid-March.  *Id.*  The timing of migration may vary due to river
26  flows, dam operations, and water year type.  Adult spring-run
27  Chinook enter the Delta from the Pacific Ocean beginning in
28  January and enter natal streams from March to July.  *Id.*  Spring-

1  run Chinook utilize mid to high elevation streams that provide
2  appropriate temperatures and sufficient flow, cover, and pool
3  depth to allow over-summering while conserving energy and
4  allowing their gonadal tissue to mature.  *Id.* at 5787-88.

5       Spawning Chinook salmon require clean, loose gravel in
6  swift, relatively shallow riffles or along the margins of deeper
7  runs, and suitable water temperatures, depths, and velocities.
8  NMFS AR 5788.  Spawning typically occurs in gravel beds that are
9  located at the tails of holding pools.  *Id.*  The upper preferred
10 water temperature for spawning Chinook salmon is 55˚F to 57˚F.
11 *Id.*  Winter-run Chinook spawning occurs primarily from mid-April
12 to mid-August, with peak activity occurring in May and June in
13 the Sacramento River between Keswick dam and RBDD.  *Id.*  The
14 majority of spawning winter-run Chinook are three years old
15 (between 56% and 87%).  *Id.*  Spring-run Chinook spawning occurs
16 between September and October depending on water temperatures.
17 *Id.*

18      The optimal water temperature for egg incubation is 44˚F to
19 54˚F.  NMFS AR 5788.  Incubating eggs are vulnerable to adverse
20 effects from floods, siltation, desiccation, disease, predation,
21 poor gravel percolation, and poor water quality.  *Id.*  The length
22 of time required for eggs to develop and hatch is variable and
23 depends on water temperature.  *Id.*  The lower and upper
24 temperatures resulting in 50% pre-hatch mortality were 37˚F and
25 61˚F, respectively, when the incubation temperature was constant.
26 *Id.*  Winter-run Chinook fry begin to emerge from the gravel in
27 late June to early July and continue through October, generally
28 at night.  *Id.* at 5789.  Spring-run Chinook fry emerge from the

1  gravel from November to March and spend about three to fifteen
2  months in freshwater habitats before emigrating to the ocean.
3  *Id.*

4      When juvenile Chinook salmon reach a length of 50 to 75
5  millimeters, they move into deeper water with higher current
6  velocities.  NMFS AR 5789.  Emigration of juvenile winter-run
7  Chinook past RBDD may begin as early as mid-July, typically peaks
8  in September, and can continue through March in dry years.  *Id.*
9  From 1995 to 1999, all winter-run Chinook outmigrating as fry
10 passed RBDD by October, and all outmigrating pre-smolts and
11 smolts passed RBDD by March.  *Id.*  Spring-run Chinook emigration
12 is highly variable.  *Id.*  Some may begin outmigrating soon after
13 emergence, while others over-summer and emigrate as yearlings
14 with the onset of intense fall storms.  *Id.*  The emigration
15 period for spring-run Chinook extends from November to early May,
16 with up to sixty-nine percent young-of-the-year outmigrants
17 passing through the lower Sacramento River and Sacramento-San
18 Joaquin Delta during this period.  *Id.*

19
20              **b.   Winter-run Chinook**.
21              **(1)   Habitat**.

22      The distribution of winter-run Chinook spawning and rearing
23 historically was limited to the upper Sacramento River and
24 tributaries, where spring-fed streams allowed for spawning, egg
25 incubation, and rearing in cold water.  NMFS AR 5790.
26 Construction of Shasta Dam in 1943 and Keswick Dam in 1950
27 blocked access to these historical waters, except Battle Creek,
28 which is blocked by a weir at the Coleman National Fish Hatchery

                                 **24**

1  and other small hydroelectric facilities.  *Id.* at 5790-91.

2  Approximately 299 miles of tributary spawning habitat in the

3  upper Sacramento River is now blocked.  *Id.* at 5791.  Most

4  components of the winter-run Chinook's life history have been

5  compromised by the habitat blockage in the upper Sacramento

6  River.  *Id.*

7       The winter-run's critical habitat is delineated as the

8  Sacramento River from Keswick Dam to Chipps Island at the

9  westward margin of the Sacramento-San Joaquin Delta, including

10 Kimball Island, Winter Island, and Brown's Island; all waters

11 from Chipps Island westward to Carquinez Bridge, including Honker

12 Bay, Grizzly Bay, Suisun Bay, and the Carquinez Strait; all

13 waters of San Pablo Bay westward of Carquinez Bridge and all

14 waters of the Sam Francisco Bay north of the San Francisco-

15 Oakland Bay Bridge.  NMFS AR 5785.

16      NMFS concluded proposed Project operations will affect 19

17 miles of this critical habitat.  NMFS 5846.  The primary measure

18 adjustment of the Temperature Compliance Point upward from Bend

19 Bridge for temperatures of 56°F upstream to Balls Ferry on the

20 Sacramento River will "not" jeopardize winter-run salmon or

21 adversely modify its critical habitat.  NMFS 6068.

22      The majority of winter-run have spawned upstream of Balls

23 Ferry for the last decade.  NMFS 5845.  During ten years prior to

24 issuance of the BiOp, aerial surveys show that 96.4% of the redds

25 created by spawning winter-run were located above Balls Ferry.

26 *Id.*  The same survey showed that in three years prior to the

27 BiOp, 99% of the redds were located upstream of Balls Ferry.  *Id.*

28

25

1                        **(2)   Population Trend**.

2           Following construction of Shasta Dam, the number of winter-

3     run Chinook initially declined but recovered during the 1960s.

4     NMFS AR 5791.   The initial recovery was followed by a steady

5     decline from 1969 through the late 1980s, after construction of

6     RBDD.   *Id.*   Since 1967, the estimated adult winter-run Chinook

7     population ranged from 117,808 in 1969, to a low of 186 in 1994.

8     *Id.*   The winter-run Chinook population declined from an average

9     of 86,000 adults from 1967 through 1969 to only 1,900 from 1987

10    through 1989, and continued to remain low with an annual average

11    of 2,500 fish for the period from 1998 through 2000.   *Id.*

12    Between the time Shasta Dam was built and the listing of winter-

13    run Chinook as endangered.   Major impacts to the population

14    occurred from warm water releases from Shasta Dam, juvenile and

15    adult passage restraints at RBDD, water exports in the southern

16    Sacramento-San Joaquin Delta, acid mine drainage, and entrainment

17    at a large number of unscreened or poorly screened water

18    diversions.   *Id.*

19          Population estimates for winter-run Chinook increased in the

20    years 2001 through 2003 and in the preceding seven years.   NMFS

21    AR 5791.   The 2003 run was the highest since the winter-run

22    Chinook was listed.   *Id.*   The following table describes winter-

23    run Chinook population estimates from RBDD counts and

24    corresponding cohort replacement rates for the years 1986 through

25    2003.   *Id.*

26

27

28

                                      26

| Year | Population Estimate (Red Bluff DD) | Five Year Moving Average of Population Estimate | Cohort Replacement Rate | Five Year Moving Average of Cohort Replacement Rate |
|------|------|------|------|------|
| 1986 | 2596 | – | – | – |
| 1987 | 2186 | – | – | – |
| 1988 | 2886 | – | – | – |
| 1989 | 697 | – | .27 | – |
| 1990 | 431 | 1759 | .2 | – |
| 1991 | 211 | 1282 | .1 | – |
| 1992 | 1241 | 1093 | 2.0 | – |
| 1993 | 387 | 593 | .6 | .63 |
| 1994 | 186 | 491 | .3 | .64 |
| 1995 | 1287 | 662 | 1.1 | .82 |
| 1996 | 1337 | 888 | 2.8 | 1.36 |
| 1997 | 880 | 815 | 8.5 | 2.66 |
| 1998 | 3005 | 1339 | 1.6 | 2.86 |
| 1999 | 3288 | 1959 | 1.2 | 3.04 |
| 2000 | 1352 | 1972 | 1.1 | 3.04 |
| 2001 | 5523 | 2809 | .8 | 2.64 |
| 2002 | 7337 | 4101 | 9.3 | 2.8 |
| 2003 | 9757 | 5451 | 11.0 | 4.68 |

DI point to increases in winter-run Chinook at RBDD and in the Five Year Moving Average of Population to contend the species is in ascendency and the no jeopardy analysis fully justified.  NMFS AR 5791-93, 5933.


(3)   Status of Winter-Run.

Numerous factors contributed to the earlier decline of winter-run Chinook through degradation of spawning, rearing, and

27

1   migration habitats.  NMFS AR 5792.  The primary impacts include
2   blockage of historical habitat by Shasta and Keswick Dams, warm
3   water releases from Shasta Dam, juvenile and adult passage
4   constraints at RBDD, water exports in the southern Sacramento-San
5   Joaquin Delta, heavy metal contamination from Iron Mountain Mine,
6   high ocean harvest rates, and entrainment in large numbers of
7   unscreened or poorly screened water diversions.  *Id.*  Secondary
8   factors include smaller water manipulation facilities and dams;
9   loss of rearing habitat in the lower Sacramento River and
10  Sacramento-San Joaquin Delta from levee construction; marshland
11  reclamation; and interaction with and predation by introduced
12  species.  *Id.*

13       Since the January 4, 1994, listing of the winter-run Chinook
14  as endangered, several habitat problems that led to the species'
15  decline have been addressed and improved through restoration and
16  conservation actions.  NMFS AR 5792.  These actions include: (1)
17  ESA § 7 consultation reasonable and prudent alternatives for
18  temperature, flow, and modified operation of the CVP and SWP; (2)
19  State Water Resources Control Board decisions requiring
20  compliance with Sacramento River water temperature objectives,
21  which resulted in the installation of the Shasta Temperature
22  Control Device in 1998; (3) a 1992 amendment to the authority of
23  the CVP through the CVP, the CVPIA, which gave fish and wildlife
24  equal priority with other CVP objectives; and dedicates a finite
25  annual supply of 800,000 AF of CVP yield for fish and related
26  environmental protections; (4) fiscal support of habitat
27  improvement projects from the CALFED Bay-Delta Program
28  ("CALFED"); (5) establishment of the CALFED Environmental Water

28

1 Account; (6) EPA actions to control acid mine runoff from Iron
2 Mountain Mine; and (7) ocean harvest restrictions implemented in
3 1995.  *Id.*

4      The temperature compliance location for winter-run remained
5 at Bend Bridge in only one year out of ten years prior to the
6 2004 BiOp.  NMFS AR 5843.  The susceptibility of winter-run
7 Chinook to extinction remains linked to the elimination of access
8 to most of their historical spawning grounds and the reduction of
9 their population structure to a small population size.  NMFS AR
10 5792.  "Recent trends in winter-run Chinook salmon abundance and
11 cohort replacement are positive and may indicate some recovery
12 since the [1994] listing."  *Id.*  NOAA Fisheries has proposed
13 upgrading the species from endangered to threatened.  NMFS AR
14 5792, USBR AR 1819.  The population, however, remains below the
15 recovery goals established for the winter-run Chinook.  *Id.*  The
16 recovery criteria for winter-run Chinook includes a mean annual
17 spawning abundance over any thirteen consecutive years to be
18 10,000 females.  *Id.*  This has not been met.

19

20                    c.   Spring-run Chinook.

21                    (1)  Habitat.

22      The spring-run was listed as threatened on September 16,
23 1999.  NMFS AR 5785.  The Central Valley ESU includes the
24 Sacramento River Basin and its tributaries.  NMFS AR 5785, 5934.
25 The majority of the spring-run population is, as of the 2004
26 BiOp, located in Deer Mill, and Butte Creeks, with population
27 expansions into Clear Creek.  NMFS AR 5935.  No spring-run
28 critical habitat had been designated as of the 2004 BiOp.  No

                              29

1  explanation is provided why spring-run critical habitat
2  designation was not made until September 2, 2005.

3       Historically, spring-run Chinook were predominant throughout
4  the Central Valley occupying the upper and middle reaches of the
5  San Joaquin, American, Yuba, Feather, Sacramento, McCloud, and
6  Pit Rivers, with smaller populations in most tributaries with
7  sufficient habitat for over-summering adults.  NMFS AR 5793.  The
8  Central Valley drainage as a whole is estimated to have supported
9  spring-run Chinook runs as large as 600,000 fish between the late
10 1880s and 1940s.  Before construction of Friant Dam, nearly
11 50,000 adults were counted in the San Joaquin River.  *Id.*
12 Following completion of the Friant Dam, the native population
13 from the San Joaquin River and its tributaries was extirpated.
14 *Id.*  Spring-run Chinook no longer exist in the American River due
15 to the operation of the Folsom Dam.  *Id.*  Naturally-spawning
16 populations of spring-run Chinook are currently restricted to
17 accessible reaches of the upper Sacramento River, Antelope Creek,
18 Battle Creek, Beegum Creek, Big Chico Creek, Butte Creek, Clear
19 Creek, Deer Creek, Feather River, Mill Creek, and Yuba River.
20 *Id.*  This species is mainly comprised of three self-sustaining
21 wild populations, located at Mill, Deer, and Butte Creeks.  NMFS
22 AR 5785.

23

24                      (2)   Population.

25       Since 1969, the spring-run Chinook ESU (excluding Feather

26

27

28

30

1 River fish)[5] has displayed broad fluctuations in abundance
2 ranging from 25,890 in 1982 to 1,403 in 1993.  NMFS AR 5793.
3 Though the abundance of fish may increase from one year to the
4 next, the overall average population trend of the spring-run has
5 a negative slope during this time period.  *Id.*  The average
6 abundance for the spring-run is set forth in the following table.
7 *Id.*  NMFS AR 5793.

| Time Period | Average Abundance for Multiple Years or Total Run Size for Single Years |
|---|---|
| 1969 – 1979 | 12,499 |
| 1980 – 1990 | 12,981 |
| 1991 – 2001 | 6,542 |
| 2002 | 13,218 |
| 2003 | 8,775 |

15      Evaluating the spring-run ESU as a whole, however, masks
16 significant changes that are occurring among metapopulations.
17 NMFS AR 5794.  While the Sacramento River population has
18 undergone a significant decline to a nominal to nonexistent
19 population, the tributary populations have demonstrated a

---

21      [5] Because Chinook salmon are not temporally separated in the
22 Feather River Hatchery, spring-run Chinook and fall-run Chinook
   are spawned together.  This compromises the genetic integrity of
23 the spring-run Chinook.  NMFS AR 5793.  The genetic integrity of
24 this population is at question because there is significant
   temporal and spatial overlap (superimposition) between spawning
25 spring-run Chinook and fall-run hatchery salmon, causing spring-
   run to become genetically similar to fall-run.  NMFS AR 5935.
26 *Id.*  The number of naturally spawning spring-run Chinook in the
27 Feather River has been estimated only periodically since the
   1960s, with estimates ranging from 2,908 in 1964 to 2 in 1978.
28 *Id.*

1   substantial increase. *Id.* Average abundance of Sacramento River
2   mainstream spring-run Chinook has recently declined from a high
3   of 12,107 for the period 1980 through 1990, to a low of 609 for
4   the period 1991 through 2001, while the average abundance for
5   tributary populations increased from a low of 1,227 to a high of
6   5,925 over the same time period. *Id.*

7      Although tributaries such as Mill and Deer Creeks have shown
8   positive escapement trends since 1991, recent escapements to
9   Butte Creek, including 20,259 in 1998, 9,605 in 2001, and 8,785
10  in 2002, are responsible for the overall increase in tributary
11  abundance. NMFS AR 5794. The Butte Creek estimates, which
12  account for the majority of the spring-run Chinook ESU do not
13  include prespawning mortality. *Id.* As the Butte Creek
14  population has increased over the last several years, mortality
15  of adult spawners has increased from 21% in 2002 to 60% in 2003
16  due to over-crowding and disease associated with higher water
17  temperatures. *Id.* This trend may indicate that the population
18  in Butte Creek may have reached its carrying capacity or are near
19  historical population levels. *Id.*

20     The extent of spring-run Chinook spawning in the mainstream
21  of the upper Sacramento River is unclear. NMFS AR 5794. Few
22  spring-run Chinook salmon redds (less than 15 per year) were
23  observed from 1989 through 1993, and none in 1994, during aerial
24  redd counts. *Id.* Recently, the number of redds in September has
25  varied from 29 to 1005 during 2001 through 2003 depending on the
26  number of survey flights. *Id.* In 2002, based on RBDD ladder
27  counts, 485 spring-run Chinook adults may have spawned in the
28  mainstream Sacramento River or entered upstream tributaries such

1 as Clear or Battle Creeks.  NMFS AR 5934.  In 2003, no adult

2 spring-run Chinook were estimated to spawn in the mainstream

3 river.  *Id.*  Due to geographic overlap of ESUs and resultant

4 hybridization since the construction of Shasta Dam, Chinook

5 salmon that spawn in the mainstream Sacramento River during

6 September are more likely to be identified as early fall-run

7 Chinook rather than spring-run Chinook.  *Id.*

8      NMFS opined proposed OCAP operations will not impact the

9 majority of the juvenile spring-run population because they are

10 in tributaries outside the Project area.  NMFS AR 5934.

11

12                    (3)  <u>Status</u>.

13      The initial factors that led to the decline of spring-run

14 Chinook were related to the loss of upstream habitat behind

15 impassable dams.  NMFS AR 5794.  Since this initial loss of

16 habitat, other factors have contributed to the instability of the

17 spring-run Chinook population and affected its ability to

18 recover.  *Id.*  These factors include a combination of physical,

19 biological, and management factors such as climatic variation,

20 water management activities, hybridization with fall-run Chinook,

21 predation, and harvest.  *Id.*  Spring-run Chinook adults are much

22 more susceptible to the effects of high water temperatures

23 because they must hold over for months in small tributaries

24 before spawning.  *Id.*

25      The RBDD affects spring-run migration.  Operational changes

26 are not expected in the future.  NMFS 5851.  RBDD delays some

27 7.2% of the spring-run.  NMFS 5921.  Only 1% of this population

28 is considered vulnerable to predation.  NMFS 5852.  Migration is

1  impacted by direct salvage at the pumps; future operations will
2  allegedly only slightly increase spring-run salvage.  NMFS 5882-
3  83.  Migration can be affected by operation of the pumps,
4  indirectly causing straying into the Central Delta.  NMFS 5883.
5  The indirect effect of the pumps is estimated to cause 33%
6  mortality of spring-run juveniles under future operations.  NMFS
7  claims some indirect mortality would occur without the Project.
8  NMFS 5931.

9       At present, the Sacramento River mainstream supports 8% of
10 the Central Valley spring-run ESU.  NMFS 5846.  Project
11 operations will increase losses on the Sacramento River by 4%
12 increasing the maximum total mainstream loss to 25%.  NMFS 5935.
13 In normal, dry and critically dry years, mortality increases as
14 follows:

15                     Mortality Increases
16                      Water Year Type
17        Normal          Dry        Critically Dry
18         20%            22%             82%
19
20 NMFS 5921.

21      Several actions have been taken to improve habitat
22 conditions for spring-run Chinook including improved management
23 of Central Valley water through the use of the CALFED
24 Environmental Water Account ("EWA") and CVPIA (b)(2) water;
25 implementing new and improved screen and ladder designs at major
26 water diversions along the mainstream Sacramento River and
27 tributaries; and changes in ocean and inland fishing regulations
28 to minimize harvest.  NMFS AR 5795.  Although protective measures

                              34

1  have likely contributed to recent increases in spring-run
2  abundance, the ESU is still below levels observed from the 1960s
3  through 1990.  *Id.*  Threats persist from hatchery production
4  (including competition for food, run hybridization, and
5  homogenization), climatic variation, high temperatures,
6  predation, and water diversions.  *Id.*  Because the spring-run
7  population is confined to relatively few remaining streams and
8  continues to display broad fluctuations in abundance, the
9  population is at a moderate risk of extinction.  NMFS AR 5795.
10 This contradictory finding is not explained.

11

12               2.   CV Steelhead.

13               a.   General Life History.

14       CV steelhead were listed as threatened March 19, 1998.  50
15 C.F.R. § 223.102 (2006); 63 F.R. 13347.  CV Steelhead can be
16 divided into two life history types based on the state of their
17 sexual maturity at the time of river entry and the duration of
18 their spawning migration, stream-maturing and ocean-maturing.
19 NMFS AR 5799.  Stream-maturing steelhead enter freshwater in a
20 sexually immature condition and require several months to mature
21 and spawn.  *Id.*  Ocean-maturing steelhead enter freshwater with
22 well-developed gonads and spawn shortly after river entry.  *Id.*
23 The two life history forms are commonly referred to by their
24 season of freshwater entry.  *Id.*  Stream-maturing steelhead are
25 known as summer steelhead, and ocean-maturing steelhead are known
26 as winter steelhead.  *Id.*  Currently, only winter steelhead are
27 found in Central Valley rivers, although summer steelhead were
28 present in the Sacramento River system prior to the commencement

1 of large-scale dam construction in the 1940s.  *Id.*  Presently,
2 summer steelhead are only found in North Coast drainages, mostly
3 in tributaries of the Eel, Klammath, and Trinity River systems.
4 *Id.*

5      Steelhead are iteroparus, which means they are capable of
6 spawning more than once before death.  NMFS AR 5799.  It is rare
7 for steelhead, however, to spawn more than twice before dying;
8 most that do are females.  *Id.*  Although a great majority of
9 steelhead spawn once, research indicates that repeat spawners are
10 relatively numerous (approximately 17.2%) in California streams.
11 *Id.*

12      Steelhead spawn in cool, clear streams featuring suitable
13 gravel size, depth, and current velocity, and may also spawn in
14 intermittent streams.  NMFS AR 5799.  Most steelhead spawning
15 takes place from late December through April, with peaks from
16 January through March.  *Id.*  Winter steelhead generally leave the
17 ocean from August through April and spawn between December and
18 May.  *Id.*  Timing of upstream migration is correlated with higher
19 flow events, such as freshets or sand bar breaches, and
20 associated lower water temperatures.  *Id.*  The preferred water
21 temperature for adult steelhead migration is 46˚F to 52˚F.  *Id.*
22 Thermal stress may occur at temperatures beginning at 66˚F, and
23 mortality is demonstrated at 70˚F.  *Id.*  The preferred water
24 temperature for steelhead spawning is 39˚F to 52˚F.  *Id.*  The
25 preferred water temperature for steelhead egg incubation is 48˚F
26 to 52˚F.  *Id.*  The minimum stream depth necessary for successful
27 upstream migration is 13 cm.  The preferred water velocity for
28 upstream migration is in the range of 40 to 90 cm/s, with a

1  maximum velocity, beyond which upstream migration is not likely
2  to occur, of 240 cm/s.  *Id.*

3       The length of the incubation period for steelhead eggs is
4  dependent on water temperature, dissolved oxygen concentration,
5  and substrate composition.  NMFS AR 5800.  In late spring and
6  following sac absorption, fry emerge from the gravel and actively
7  begin feeding in shallow water along stream banks.  *Id.*
8  Steelhead rearing during the summer takes place primarily in
9  higher velocity area pools, although some are also abundant in
10 glides and riffles.  *Id.*  Winter rearing occurs more uniformly at
11 lower densities across a wide range of fast and slow habitat
12 types.  *Id.*  Some older juveniles move downstream to rear in
13 large tributaries and mainstream rivers.  *Id.*

14      Steelhead generally spend two years in freshwater before
15 emigrating downstream.  NMFS AR 5800.  Rearing juveniles prefer
16 water temperatures of 45°F to 58°F, and have an upper lethal
17 limit of 75°F.  *Id.*  Juveniles can survive up to 81°F with
18 saturated dissolved oxygen conditions and a plentiful food
19 supply.  *Id.*  It is recommended that dissolved oxygen
20 concentrations remain at or near saturation levels with temporary
21 reductions of no lower than 5.0 mg/l for successful juvenile
22 rearing.  *Id.*

23      Juvenile steelhead emigrate episodically from natal streams
24 during fall, winter, and high spring flows.  NMFS AR 5800.
25 Emigrating CV steelhead use the lower reaches of the Sacramento
26 River and the Delta for rearing and as a migration corridor to
27 the ocean.  *Id.*  Juvenile steelhead in the Sacramento Basin
28 migrate downstream during most months of the year, but the peak

1  period of emigration occurred in the spring, with a much smaller

2  peak in the fall.  *Id.*

3

4          b.   Habitat.

5      NMFS had not defined habitat or critical habitat for the CV

6  steelhead as of October 22, 2004.  Critical habitat was

7  designated for CV steelhead in September 2, 2005.

8

9          c.   Population.

10     Historically, steelhead were well-distributed throughout the

11  Sacramento and San Joaquin Rivers.  NMFS AR 5800.  They were

12  found from the upper Sacramento and Pit River systems, which are

13  now inaccessible due to Shasta and Keswick Dams, south to the

14  Kings and possibly the Kern River systems, also now inaccessible

15  due to extensive alteration from water diversion projects.  *Id.*

16  The present distribution of steelhead has been greatly reduced.

17  *Id.*  The California Advisory Committee on Salmon and Steelhead

18  reported a reduction of steelhead habitat from 6,000 miles to 300

19  miles.  *Id.* at 5800-01. Historically, steelhead probably ascended

20  Clear Creek past the French Gulch area, but access was blocked by

21  Whiskeytown Dam in 1964.  *Id.* at 5801.

22     The historic CV steelhead run size is difficult to estimate

23  given the scarcity of data, but it may have approached one to two

24  million adults annually.  NMFS AR 5801.  By the early 1960s, the

25  steelhead run size had declined to approximately 40,000 adults.

26  *Id.*  Over the past thirty years, the naturally-spawned steelhead

27  populations in the upper Sacramento River have declined

28  substantially.  *Id.*  The estimated average adult steelhead

38

1 population through the 1960s was 20,540 in the Sacramento River
2 upstream of Feather River.  *Id.*  Steelhead counts at RBDD
3 declined from an average of 11,187 for the period spanning 1967
4 through 1977, to an average of approximately 2,000 through the
5 early 1990s, with an estimated annual run size for the entire
6 Sacramento-San Joaquin system, based on RBDD counts, to be no
7 more than 10,000 adults.  *Id.*  Steelhead escapement surveys at
8 RBDD ended in 1993 due to changes in dam operations.  *Id.*

9      Around 2003 a comparison was made between tagged and
10 untagged steelhead smolt catch ratios at Chipps Island trawl from
11 1998 through 2001, which produced an estimate that about 100,000
12 to 300,000 steelhead juveniles are produced naturally each year
13 in the Central Valley.  NMFS AR 5801.  The Biological Review Team
14 reached the following conclusion based on the Chipps Island data:

15      If we make the fairly generous assumptions (in the
       sense of generating large estimates of spawners) that
16      average fecundity is 5,000 eggs per female, 1 percent
       of eggs survive to reach Chipps Island, and 181,000
17      smolts are produced (the 1998-2000), about 3,628 female
       steelhead spawn naturally in the entire Central Valley.
18      This can be compared with McEwan's (2001) estimate of 1
       million to 2 million spawners before 1850, and 40,000
19      spawners in the 1960s.

20 *Id.*  In the San Joaquin River basin, data from the California
21 Department of Fish and Game trawl surveys indicate a decline in
22 steelhead numbers in the early 1990s, with a total of twelve
23 steelhead smolts collected at Mossdale in 2003.  *Id.*

24      Existing wild steelhead stocks in the Central Valley are
25 mostly confined to the upper Sacramento River and its
26 tributaries, including Antelope, Deer, and Mill Creeks and the
27 Yuba River.  NMFS AR 5801.  Populations may exist in Big Chico
28 and Butte Creeks, and a few wild steelhead are produced in the

1  American and Feather Rivers.  *Id.*  Recent snorkel surveys (1999
2  through 2002) indicate steelhead are present in Clear Creek.  *Id.*
3  Because of the large resident *O. mykiss* population in Clear
4  Creek, steelhead spawner abundance has not been estimated.  *Id.*
5  at 5801-02.

6      Until recently, steelhead were thought to be extirpated from
7  the San Joaquin River system.  NMFS AR 5802.  Recent monitoring
8  has detected small self-sustaining populations of steelhead in
9  the Stanislaus, Mokelumne, Calaveras, and other streams
10 previously thought to be void of steelhead.  *Id.*  It is possible
11 that naturally spawning populations exist in many other streams
12 but are undetected due to lack of monitoring programs.  *Id.*

13

14              d.   <u>Status</u>.

15     Both the Biological Review Team and the Artificial
16 Propagation Workshop concluded that the CV steelhead ESU is
17 presently in danger of extinction.  NMFS AR 5802.  In the
18 proposed status review, however, NOAA Fisheries concluded that
19 the ESU in-total is not in danger of extinction, but is likely to
20 become endangered within the foreseeable future, citing unknown
21 benefits of restoration efforts and a yet to be funded monitoring
22 program.  *Id.*  Steelhead already have been extirpated from most
23 of their historical range in this region.  *Id.*  Habitat concerns
24 for the CV steelhead ESU focus on the widespread degradation,
25 destruction, blockage of freshwater habitat, and water allocation
26 problems.  *Id.*  Widespread hatchery steelhead production within
27 the ESU also raises concerns about the potential ecological
28 interactions between introduced stocks and native stocks.  *Id.*

**40**

1 Because the CV steelhead population has been fragmented into

2 smaller isolated tributaries without any large source population

3 and the remaining habitat continues to be degraded by water

4 diversions, the population is at high risk of extinction. *Id.*

5 This evidence is materially inconsistent with the no jeopardy

6 finding.

7

8                 **IV.**   **Legal Standards Of Review**.

9       **A.**   **Summary Judgment Generally**.

10       Summary judgment is appropriate where there are no genuine

11 issues of material fact and the moving party is entitled to

12 judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine

13 issue of fact exists when the non-moving party produces evidence

14 on which a reasonable trier of fact could find in its favor

15 viewing the record as a whole in light of the evidentiary burden

16 the law places on that party. *See Triton Energy Corp. v. Square*

17 *D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Facts are "material"

18 if they "might affect the outcome of the suit under the governing

19 law." *California v. Campbell*, 138 F.3d 772, 782 (quoting

20 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A

21 court's role on summary judgment is not to weigh the evidence or

22 resolve disputed issues of fact; rather, it is to determine

23 whether there are any genuine issues of material fact for trial.

24 *Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407, 410 (9th Cir.

25 1996).

26

27       **B.**   **Summary Judgment Under The Administrative Procedure**

           **Act**.

28

1    Courts reviewing agency decisions are limited to the

2  administrative record. *Florida Power & Light Co. v. Lorion*, 470

3  U.S. 729, 743-44 (1985). "Judicial review of an agency decision

4  typically focuses on the administrative record in existence at

5  the time of the decision and does not encompass any part of the

6  record that is made initially in the reviewing court." *Southwest*

7  *Ctr. for Biological Diversity v. United States Forest Serv.*, 100

8  F.3d 1443, 1450 (9th Cir. 1996). Since judicial review under the

9  APA is generally limited to the administrative record, summary

10 judgment is an appropriate procedure. *See, e.g., Friends of*

11 *Endangered Species v. Jantzen*, 589 F. Supp. 113, 118 (N.D. Cal.

12 1984), *aff'd*, 760 F.2d 976 (9th Cir. 1985).

13    This is a challenge to the lawfulness of a biological

14 opinion brought under the ESA and the APA. Agency decisions made

15 under the ESA are governed by the APA, which requires that the

16 agency action be upheld unless it is found to be "arbitrary,

17 capricious, an abuse of discretion, or otherwise not in

18 accordance with law," or "without observance of procedure

19 required by law." 5 U.S.C. § 706(2)(A), (D); *Pacific Coast Fed'n*

20 *of Fishermen's Ass'ns v. NMFS*, 265 F.3d 1028, 1034 (9th Cir.

21 2001). "This deferential standard is designed to ensure that the

22 agency considered all of the relevant factors and that its

23 decision contained no clear error of judgment." *PCFFA*, 265 F.3d

24 at 1034. (quoting *Arizona v. Thomas*, 824 F.2d 745, 748 (9th Cir.

25 1987)). Agency action should only be overturned if the agency

26 has "relied on factors which Congress has not intended it to

27 consider, entirely failed to consider an important aspect of the

28 problem, offered an explanation for its decision that runs

**42**

1  counter to the evidence before the agency, or is so implausible
2  that it could not be ascribed to a difference in view or the
3  product of agency expertise." *National Ass'n of Home Builders v.*
4  *Defenders of Wildlife*, 127 S.Ct. 2518, 2529 (2007) (quoting *Motor*
5  *Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S.
6  29, 43 (1983)).  Essentially, a court must ask "whether the
7  agency considered the relevant factors and articulated a rational
8  connection between the facts found and the choice made." *PCFFA*,
9  265 F.3d at 1034 (quoting *Natural Res. Def. Council v. United*
10 *States Dep't of the Interior*, 113 F.3d 1121, 1124 (9th Cir.
11 1997)).  "A biological opinion is arbitrary and capricious and
12 will be set aside when it has failed to articulate a satisfactory
13 explanation for its conclusions or when it has entirely failed to
14 consider an important aspect of the problem." *Greenpeace v.*
15 *NMFS*, 80 F. Supp. 2d 1137, 1147 (W.D. Wash. 2000).
16 Alternatively, a biological opinion may also be invalid if it
17 fails to use the best available scientific information as
18 required by 16 U.S.C. § 1536(a)(2).  *Id.* at 1150.

19      As a general rule, a court must defer to the agency on
20 matters within its expertise.  See *National Wildlife Federation*
21 *v. National Marine Fisheries Service*, 422 F.3d 782, 798 (9th
22 Cir. 2005).  "Deference to the informed discretion of the
23 responsible federal agencies is especially important, where, as
24 here, the agency's decision involves a high level of technical
25 expertise." *Id.*  However, "[t]he deference accorded an agency's
26 scientific or technical expertise is not unlimited." *Id.*
27 "Deference is not owed when the agency has completely failed to
28 address some factor consideration of which was essential to

43

1 [making an] informed decision." *Id.* (internal citations and
2 quotations omitted).  Nevertheless, a court should "uphold a
3 decision of less than ideal clarity if the agency's path may
4 reasonably be discerned." *Home Builders*, 127 S. Ct. at 2530.

5      A biological opinion is a final agency action for judicial
6 review purposes under the APA.  *See PCFFA*, 265 F.3d at 1033-34
7 (holding that a no jeopardy biological opinion is an agency's
8 final decision).

9

10  V.  Summary of Parties' Cross-Motions for Summary Judgment.
11      A.  Plaintiffs' Motion for Summary Judgment.
12      Plaintiffs assert four major grounds in their motion for
13 summary judgment:

14      First, the BiOp is arbitrary and capricious under the ESA
15 because NMFS failed to establish any reasonable connection
16 between the identified (adverse) impacts to the species and its
17 "no jeopardy" to species and "no adverse modification" of
18 critical habitat conclusions.  Within this argument, Plaintiffs
19 maintain NMFS's factual findings in the BiOp directly contradict
20 its "no jeopardy" and "no adverse modification" conclusions
21 because NMFS failed to: (1) conduct an analysis of Project
22 impacts in context of the listed species life cycles and
23 population dynamics; (2) focus on incremental project impacts
24 while arbitrarily ignoring significant adverse effects associated
25 with baseline conditions, which is unsupported by the BiOp's
26 findings; and (3) conduct a comprehensive analysis of impacts
27 associated with the entire federal action during formal
28 consultation.

44

1    **Second**, NMFS failed to use the best available science, which
2    demonstrated that global climate change would significantly
3    change the hydrology of Northern California's river systems over
4    foreseeable future OCAP operations.

5    **Third**, NMFS impermissibly relied on an unenforceable and
6    uncertain adaptive management process, which assumes that
7    unspecified adaptive management measures will reduce Project
8    impacts to the listed salmon and steelhead species despite the
9    BiOp's determination that such measures have shown little benefit
10   for the species.

11   **Fourth**, the Bureau's reliance on the purportedly flawed BiOp
12   violates its independent and ongoing duty under the ESA to ensure
13   that its actions do not harm listed species or their critical
14   habitat.  Plaintiffs advance two sub-arguments: First, the Bureau
15   has failed and is failing to ensure that its actions do not harm
16   listed species or their critical habitats.  More specifically,
17   the Bureau is acting arbitrarily and capriciously in relying on
18   the NMFS BiOp, which was fatally flawed upon issuance.
19   Additionally, the Bureau's reliance on the BiOp is arbitrary and
20   capricious in light of new information that emerged after its
21   issuance, which demonstrated that the BiOp's conclusions were
22   seriously flawed from the outset.  Second, the Bureau is making
23   irreversible and irretrievable commitments of resources in
24   violation of ESA § 7(d) without lawfully completing consultation
25   under ESA § 7(a)(2).

26

27        **B.    Federal Defendants' Motion for Summary Judgment**.
28        Federal Defendants' cross-motion for summary judgment has

**45**

1 two parts:  The first addresses claims against NMFS; the second
2 addresses claims against the Bureau.

3        As to NMFS, and consistent with recent judicial decisions in
4 *National Wildlife Fed'n v. National Marine Fisheries Serv.*, 481
5 F.3d 1224 (9th Cir. 2007), and *NRDC v. Kempthorne*, 506 F.2d 322
6 (E.D. Cal. 2007), Federal Defendants acknowledge the need for
7 further explanation of its "no jeopardy" analysis, particularly
8 to address recovery implications for the winter-run Chinook,
9 spring-run Chinook, and CV steelhead.  Second, NMFS admits the
10 need for further explanation of its critical habitat analysis for
11 winter-run Chinook, particularly to address the impacts of
12 primary constituent elements and whether an adverse modification
13 of the winter-run Chinook's critical habitat occurred.

14        There is no critical habitat designated for spring-run and
15 CV steelhead and no adverse modification of habitat analysis for
16 these species because such designations occurred post-record.
17 NMFS acknowledges that the analysis of salmonid life cycles and
18 baseline conditions in the BiOp needs further explanation,
19 particularly with respect to any effect of CVP operations on
20 critical habitat and the "no jeopardy" conclusion.  NMFS
21 acknowledges that an explanation of its conclusions on global
22 climate change should be included in the forthcoming biological
23 opinion.  Despite these admissions, NMFS maintains that the
24 listed species are not jeopardized, and their critical habitats
25 have not been adversely modified and that summary adjudication
26 should be granted in its favor on the remaining issues presented
27 by the NMFS BiOp.  NMFS also insists operation of the CVP or SWP
28 is not a "per se" or "patent" violation of the ESA.

**46**

1    Federal Defendants maintain Plaintiffs's claims against the

2  Bureau should be denied in their entirety and summary

3  adjudication granted for the Bureau for three reasons.  First,

4  the Bureau properly and substantively considered all evidence

5  cited by Plaintiffs during the ESA § 7(a)(2) consultation

6  process.  Second, the Bureau properly considered information that

7  emerged after the ESA § 7 consultation process concluded.  Third,

8  the Bureau has made no irreversible or irretrievable commitment

9  of resources in contravention of ESA § 7(d) and has implemented

10  additional protective measures.

11    DIs' opposition to Plaintiffs' summary judgment motion as to

12  the NMFS BiOp opposed is on all grounds, except the absence of

13  Global Climate Change analysis and the failure to define critical

14  habitat for CV steelhead and Project effects on such habitat.

15  DIs oppose Plaintiffs' motion for summary judgment as to the

16  Bureau on all grounds.

17

18                   VI.  __Law And Analysis__.

19    A.    __Standing__.

20    The parties' briefs do not discuss standing.  Plaintiffs'

21  counsel requested at the motions hearing that the court expressly

22  find all Plaintiffs have standing to bring this lawsuit, which

23  Federal Defendants and DI have not challenged.  It is incumbent

24  upon the court to determine on its own if Plaintiffs have

25  standing.  *See United States v. Hays*, 515 U.S. 737, 742 (1995)

26  (stating "[t]he question of standing is not subject to waiver . .

27  . [w]e are required to address the issue even if . . . the

28  parties fail to raise the issue before us.  The federal courts

47

1 are under an independent obligation to examine their own
2 jurisdiction . . . .").

3      Standing is a threshold inquiry.  "The rules of standing,
4 whether as aspects of the Art. III case-or-controversy
5 requirement or as reflections of prudential considerations
6 defining and limiting the role of the courts, are threshold
7 determinants of the propriety of judicial intervention."  *Warth*
8 *v. Seldin*, 422 U.S. 490, 517-518 (1975).  The question of
9 standing typically involves two inquiries "both constitutional
10 limitations on federal-court jurisdiction and prudential
11 limitations on its exercise."  *Id.* at 498.  The Article III case
12 or controversy doctrine sets limits on the federal court to
13 adjudicate only actual cases and controversies.  U.S. Const. art.
14 III, § 2, cl. 1.

15      "To satisfy the 'case' or 'controversy' requirement of
16 Article III, which is the 'irreducible constitutional minimum' of
17 standing, a plaintiff must, generally speaking, demonstrate that
18 [1] he has suffered 'injury in fact,' [2] that the injury is
19 'fairly traceable' to the actions of the defendant, and [3] that
20 the injury will likely be redressed by a favorable decision."
21 *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (quoting *Lujan v.*
22 *Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  To have
23 standing, a litigant is required to have a concrete
24 particularized injury, as opposed to a generalized grievance.
25 *United States v. Hays*, 515 U.S. 737, 742-743 (1995).

26      Plaintiffs in this case are the Pacific Coast Federation of
27 Fishermen's Associations/Institute for Fisheries Resources
28 ("PCFFA"); The Bay Institute ("BI"); Baykeeper and its

48

1  Deltakeeper Chapter (collectively "Baykeeper"); California Trout;
2  Friends of the River ("FOR"); Natural Resources Defense Council
3  ("NRDC"); Northern California Council of the Federation of Fly
4  Fishers ("the Council"); Sacramento Preservation Trust ("the
5  Trust"); and the Winnemem Wintu Tribe ("the Tribe").
6
7          1.   **PCFFA**.
8       PCFFA's members represent approximately 2,000 commercial
9  fishing families in California, Oregon and Washington, most of
10 whom are small and mid-sized commercial fishing boat owners and
11 operators.  Most of PCFFA's members derive all or part of their
12 income from the harvesting of Pacific salmon, a valuable business
13 enterprise for the West Coast and particularly for California
14 economies.  The decline of California's salmon species in recent
15 years has severely impacted PCFFA members in California by
16 limiting commercial salmon harvest opportunities, both through
17 lost production of impaired stocks and because of additional
18 restrictions imposed on the fishing fleet to protect impaired
19 salmon populations.  PCFFA and its sister organization, the
20 Institute for Fisheries Resources ("IFR"), have been vocal
21 advocates for sustainable aquatic resource use and the protection
22 and recovery of salmon throughout Northern California and the
23 Pacific Northwest.  Much of PCFFA's and IFR's advocacy work is in
24 the area of protecting the fisheries PCFFA members depend on for
25 their livelihoods.
26      Salmon spawning and rearing habitat losses have cost the
27 west coast salmon fishing industry approximately 72,000 salmon-
28 produced family wage jobs over the past thirty years.  These

49

1  losses are directly related to widespread inland salmon habitat
2  destruction, including that resulting from the construction of
3  dams and diversions of water as part of the CVP and SWP.  As a
4  fishing industry trade association PCFFA has been active for
5  nearly thirty years in efforts to rebuild salmon populations in
6  California's Central Valley streams and rivers.  These facts
7  sufficiently demonstrate IFR and PCFFA and its members may be
8  actually injured by alleged damages to the species resulting from
9  the 2004 OCAP, the BiOp, and the Federal Defendants' operation of
10  the CVP.  PCFFA and IFR have standing to bring this lawsuit.
11
12              2.   Bay Institute.

13       The Bay Institute is a non-profit conservation organization
14  incorporated under the laws of California and dedicated to the
15  preservation, protection and restoration of the Sacramento-San
16  Joaquin River Delta and its fish and wildlife resources.  The Bay
17  Institute and its over 2,500 members have a direct interest in
18  the survival and perpetuation of fish species and other aquatic
19  resources, including the salmon and steelhead species at issue in
20  this case, that are affected by the CVP and SWP.  Most of The Bay
21  Institute's members live on or near the water resources affected
22  by the CVP and SWP, and many rely on this region for their
23  livelihood in the commercial and sports fishing and boating
24  industries.  In addition, many of The Bay Institute's members
25  regularly visit and use the water bodies affected by the CVP and
26  SWP for recreational experiences and aesthetic enjoyment.  The
27  Bay Institute regularly participates in administrative and
28  judicial proceedings on behalf of its members to protect, enhance

1  and restore declining populations of native California fishes,
2  including the five salmon and steelhead ESUs, throughout the area
3  affected by Project operations.  Since its founding in 1981, The
4  Bay Institute has applied a science, education, and advocacy
5  approach to Sacramento-San Joaquin River Delta issues.  This
6  approach naturally encompasses the Delta, but also considers the
7  entire region, from the headwaters of the Sacramento and San
8  Joaquin River systems in the Sierra Nevada to the Golden Gate, as
9  a single, interdependent watershed.

10        The Bay Institute works collaboratively with government
11  agencies, independent experts, water users and land owners to
12  design and implement large-scale ecological restoration programs
13  through the CALFED Bay-Delta Program, the CVPIA, the Anadromous
14  Fish Restoration Program, and other initiatives.  The Bay
15  Institute commented on the original environmental impact
16  statement and environmental impact report for the 1986 CVP/SWP
17  Coordinated Operating Agreement.  In July 2003, The Bay Institute
18  submitted formal comments and scientific information to the
19  Bureau regarding the impacts of its then-proposed OCAP on the
20  five salmon and steelhead ESUs.  These uncontested alleged facts
21  sufficiently demonstrate The Bay Institute and its members may be
22  actually injured by the 2004 OCAP, the BiOp, and the Federal
23  Defendants' operation of the CVP.  The Bay Institute has
24  standing.

25

26           3.    Baykeeper.

27        Baykeeper and its Deltakeeper Chapter ("Baykeeper") is a
28  regional non-profit public benefit corporation organized under

51

1  the laws of the State of California, with its principal place of
2  business in San Francisco, California.  Baykeeper's mission is to
3  protect and enhance the water quality of the San Francisco
4  Bay-Delta estuary and its watershed for the benefit of its
5  ecosystems and human communities.  Through its three chapters,
6  Baykeeper patrols thousands of miles of waterways throughout San
7  Francisco Bay, the Sacramento-San Joaquin River Delta and the
8  Petaluma River, investigating pollution problems and bringing
9  enforcement actions directly against polluters when necessary.
10 Founded in 1989, Baykeeper is a legal and policy advocate for the
11 San Francisco Bay and Delta and their vast watershed, from the
12 high Sierra to the Golden Gate.  Using targeted administrative
13 and legal advocacy before federal, state and regional regulators,
14 Baykeeper plays a lead role in developing sound legal standards,
15 permits, and regulations.  A key area of Baykeeper's focus is
16 ensuring that state and federal environmental laws are properly
17 implemented and enforced.  Where necessary, Baykeeper initiates
18 enforcement actions on behalf of the organization and its
19 members.

20      The Deltakeeper Chapter of Baykeeper, located in Stockton,
21 California, carries out the Baykeeper mission on the Delta and
22 its tributaries in California's Central Valley.  Baykeeper has
23 approximately 1,200 members who reside in the San Francisco
24 Bay-Delta watershed, of whom approximately 150 belong to the
25 Deltakeeper Chapter.  Deltakeeper Chapter staff regularly comment
26 on measures required to protect salmonids, including the five
27 salmon and steelhead ESUs, under a variety of permits and
28 regulatory programs.  For example, the Deltakeeper Chapter

1  commented on: the Port of Stockton Clean Water Act dredging and
2  wastewater permits; the development of various Total Maximum
3  Daily Load limits on the San Joaquin and Sacramento Rivers and
4  Cache Creek; and the proposed South Delta Improvement Project.

5         The Deltakeeper Chapter staff and members maintain frequent
6  contact with staff from the California Department of Fish and
7  Game, NMFS and FWS regarding various OCAP issues and the BiOp,
8  and have attended numerous public meetings held by the Bureau and
9  other agencies regarding the 2004 OCAP.  Deltakeeper Chapter
10 staff and members also participate regularly in technical forums
11 and workgroups concerning salmonids and implementation of the
12 2004 OCAP, including for example, the Bureau's Tracy Technical
13 Action Team; CALFED's South Delta Fish Facility Forum, North
14 Delta Fish Facilities and Predation Symposium meetings; the
15 Central Valley Fish Facilities Review Team; and the Collection
16 Handling Transportation and Release Team meetings.  Deltakeeper
17 Chapter staff serve on the Calaveras River Fish Group Technical
18 Advisory Committee, which is endeavoring to restore the salmon
19 and steelhead fisheries of the Calaveras River.  These undisputed
20 facts sufficiently demonstrate Baykeeper and its members may be
21 actually injured by the 2004 OCAP, the BiOp, and the Federal
22 Defendants' operation of the CVP.  Baykeeper has standing.

23
24              4.   California Trout.

25      California Trout ("CalTrout") is a non-profit conservation
26 corporation organized in 1971 under the laws of the State of
27 California with its principal place of business in San Francisco,
28 California.  CalTrout's mission is to protect and restore wild

1  trout, steelhead, and other native fish species such as the five
2  salmon and steelhead ESUs, to protect the waters that nurture
3  these fish species throughout the State of California, including
4  specifically the Sacramento River and San Joaquin River and the
5  Bay-Delta, and to create high quality angling opportunities for
6  the public to enjoy.  CalTrout fulfills its mission by working to
7  protect wild trout and steelhead habitat throughout California,
8  and the native biodiversity associated with this riparian
9  habitat, including related salmonid species.

10      In pursuing its mission to protect freshwater habitat for
11  native fish, CalTrout has participated in stream restoration
12  efforts that include (1) establishing the Wild Trout Program,
13  which today protects 1,000 miles of wild trout streams and
14  represents the state's most successful wildlife management
15  program; (2) ensuring that habitat protections were included in
16  the Pit River Relicensing process by negotiating, through the
17  California Hydropower Reform Coalition, a new hydropower dam
18  license agreement for important reaches of the Pit River that
19  establishes springtime flushing flows that better mimic the
20  natural cycle of free-flowing rivers and provides for increased
21  base flows throughout the summer months; and (3) protecting the
22  golden trout, California's state fish and a state-listed
23  sensitive species, by gathering essential data to complete
24  genetics studies, habitat assessments and restoration work.
25  CalTrout represents 4,000 recreational anglers, of whom more than
26  1,000 live near and within areas affected by Project operations
27  and regularly use these areas for fishing, photography, and
28  hiking and to seek aesthetic relief from the urban environments

1   of the Bay Area.

2       CalTrout members support the conservation of entire
3   watersheds and all of their associated biodiversity, as well as
4   the effective implementation and enforcement by government
5   regulatory agencies of planning and conservation laws, like the
6   ESA, that relate to the protection of these watersheds and their
7   native biodiversity. CalTrout commented on the original EIS/EIR
8   for the CVP/SWP Coordinated Operating Agreement in 1986.  In
9   September of 2004, CalTrout provided comments to the Governor,
10  urging him to sign California Assembly Bill 2121, which would
11  require the state to produce guidelines for maintaining instream
12  flows for fish in coastal streams from the Mattole River south to
13  San Francisco Bay and in streams entering northern San Pablo Bay.

14      CalTrout takes an active role in protecting the five salmon
15  and steelhead ESUs through its membership in the Coho Recovery
16  Team, a stakeholder advisory group that provided input to the
17  California Department of Fish and Game that led to the listing of
18  SONCC coho salmon under the California Endangered Species Act,
19  and in the California Advisory Committee on Salmon and Steelhead
20  Trout, a stakeholder group that provides recommendations to the
21  Director of the DFG on appropriating funding for proposals to
22  restore salmon and steelhead habitat across the state.  These
23  undisputed facts sufficiently demonstrate CalTrout and its
24  members may be actually injured by the 2004 OCAP, the BiOp, and
25  the Federal Defendants' operation of the CVP.  CalTrout has
26  standing.

27

28          5.    FOR.

1        Friends of the River was founded in 1973 to preserve,
2   protect, and restore free flowing streams and watersheds
3   throughout California.  FOR accomplishes these goals through
4   public education and the promotion of sound environmental policy.
5   Most of FOR's 5,400 members live in the greater Bay-Delta region
6   and rely upon the delta for recreational purposes.  FOR members
7   take more than 2,000 people on rafting trips on rivers that flow
8   into the delta.  FOR also conducts public rafting trips on the
9   Sacramento River to view spawning salmon and other wildlife.  FOR
10  also advocates for policies to protect the Sacramento River's
11  salmon and steelhead populations.  FOR members and staff
12  supported the federal and state endangered species listings of
13  the spring-run Chinook, winter-run Chinook, and CV steelhead.
14  FOR also submitted extensive comments in support of the Red Bluff
15  Diversion Dam Fish Improvement Project to raise the gates of the
16  dam to facilitate year-round fish passage.  According to FOR,
17  this proposal was nullified by the 2004 OCAP.

18       Representatives of FOR attended public meetings held by the
19  Bureau concerning the 2004 OCAP and submitted comments on the
20  2004 OCAP's potential impact on listed salmon and steelhead
21  species, including the continued operation of the RBDD, the
22  elimination of cold water storage behind Shasta Dam, and the
23  reduction of the temperature standard for salmon in the
24  Sacramento River.  These undisputed facts sufficiently
25  demonstrate FOR and its members may be actually injured by the
26  2004 OCAP, the BiOp, and the Federal Defendants' operation of the
27  CVP.  FOR has standing.

28

1          6.   <u>NRDC</u>.

2          NRDC is a non-profit environmental organization with more

3     than 550,000 members nationwide, including more than 100,000

4     members in California and thousands of members in Alameda, Contra

5     Costa, Del Norte, Humboldt, Lake, Mendocino and Napa Counties.

6     NRDC maintains an office in San Francisco, California.  NRDC's

7     purpose is to safeguard the Earth: its people, its plants and

8     animals and the natural systems on which all life depends.  The

9     organization works to restore the integrity of the elements that

10    sustain life—air, land and water—and to defend imperiled natural

11    places.  NRDC seeks to establish sustainability and good

12    stewardship of the Earth as central ethical imperatives of human

13    society and strives to protect nature in ways that advance the

14    long-term welfare of present and future generations.  For more

15    than two decades, NRDC has advocated extensively for the

16    protection of the nation's waterways and wildlife, including the

17    salmon and steelhead species at issue here.

18         For example, in July 2003, NRDC submitted formal comments

19    and scientific information to the Bureau raising concerns about

20    the impacts of the Bureau's then-proposed 2004 OCAP on salmon and

21    steelhead ESUs, and in August 2004, NRDC submitted formal

22    comments and scientific information to NMFS regarding the impacts

23    of the 2004 OCAP on the five salmon and steelhead ESUs, during

24    the ESA consultation that resulted in the Biological Opinion

25    challenged here.  In addition, NRDC has long worked to protect

26    the water resources affected by the CVP and SWP, including the

27    five salmon and steelhead ESUs and their habitat, in

28    non-litigation settings.  For example, NRDC was involved in the

1 development of, and actively supported the enactment of, the
2 CVPIA; participated actively in the negotiation of the record of
3 decision for the CALFED Bay-Delta Program, the mission of which
4 is to develop and implement a long-term comprehensive plan that
5 will restore ecological health and improve water management for
6 beneficial uses of the Bay-Delta estuary; and currently sits on
7 the CALFED public advisory committee.  NRDC commented on the
8 original EIS/EIR for the CVP/SWP Coordinated Operating Agreement
9 in 1986.  These undisputed facts sufficiently demonstrate NRDC
10 and its members may be actually injured by the 2004 OCAP, the
11 BiOp, and the Federal Defendants' operation of the CVP.  NRDC has
12 standing.

13

14          7.   The Council.

15          The Council is part of the Federation of Fly Fishers, an
16 international non-profit conservation organization dedicated to
17 the promotion of fly fishing through education and conservation.
18 The Council works on behalf of both fish and fly fishers in
19 Northern California.  The Council has approximately 3,000 members
20 who live in Northen California and enjoy recreational fishing
21 throughout the Sacramento River and San Joaquin River watersheds.
22 The general purposes of the Council include the protection and
23 restoration of aquatic habitat for anadromous fish, including the
24 five ESA listed salmon and steelhead species affected by this
25 lawsuit.

26          The Council has consistently advocated the protection of the
27 five salmon and steelhead species with respect to CVP operation,
28 CVP contracts, and the 2004 OCAP.  The Council commented on the

1  BiOp pointing out that FWS had used inappropriate modeling

2  inputs.  The Council has continuously opposed the South Delta

3  Improvement Project, a future component of the 2004 OCAP, and the

4  increased export of water from the state pumps.  These undisputed

5  facts sufficiently demonstrate the Council and its members may be

6  actually injured by the 2004 OCAP, the BiOp, and the Federal

7  Defendants' operation of the CVP.  The Council has standing.

8

9                8.   The Tribe.

10       The Tribe are a historical California Native Tribe

11  recognized by the California Native American Heritage Commission.

12  The Winnemem's historical territory included the east side of the

13  Sacramento River watershed, the McCloud River watershed from

14  origination to termination, the Squaw Creek watershed from

15  origination to termination, and approximately twenty miles of the

16  Pit River from the confluence of the McCloud River, Squaw Creek

17  and Pit River up to Big Bend.  The Winnemem has tribal members

18  living and tribal concerns in many parts of the area impacted by

19  operations of the CVP and SWP, including Clear Creek from

20  Whiskeytown Dam to the Sacramento River, the Sacramento River

21  from Shasta Dam to the Delta, and Spring Creek from the Debris

22  Dam to Keswick Dam.

23       For centuries, the Winnemem have had a deep cultural and

24  spiritual relationship with the salmon that use these rivers.

25  The Winnemem sing to the salmon and the waters that sustain them.

26  The Winnemem's history, traditions, ceremonies, and culture are

27  filled with respect, reverence, appreciation, and dependence on

28  the salmon and these waters.  Salmon are also the staple of the

                              **59**

1  Winnemem.  Salmon is also the food necessary to complete and
2  fulfill many of the Winnemem's special and sacred ceremonies.
3  The Winnemem are also involved in advocacy work in the area of
4  protecting the natural resources upon which the Winnemem depend
5  for their cultural and religious existence.  As far back as 1872,
6  the Winnemem opposed the United States Fish Commission's (now the
7  United States Fish and Wildlife Service) building of a salmon
8  fish hatchery on the McCloud River due to the threat it would
9  pose to the existing wild salmon.  In 1937, the Winnemem opposed
10 the Bureau's construction of Shasta Dam because it blocked salmon
11 migration.  The Winnemem have also testified at numerous hearings
12 before the Bureau, the United States Senate, and the CALFED Bay
13 Delta Authority, in attempts to achieve protection for the
14 Sacramento River salmon and steelhead.  These undisputed facts
15 sufficiently demonstrate that the Winnemem may be actually
16 injured by the 2004 OCAP, the BiOp, and the Federal Defendants'
17 operation of the CVP, all of which have allegedly had adverse
18 impacts on the salmon.  The Winnemem have standing.

19

20          9.   The Trust.

21      The Trust, based in Chico, California, is a non-profit
22 corporation organized under the laws of the State of California.
23 Formed in 1984, the Trust's purpose is to protect, preserve, and
24 restore the natural values of the Sacramento River ecosystem from
25 its headwaters to the San Francisco Bay/Sacramento-San Joaquin
26 River Delta ("Bay-Delta") and the wildlife it supports, including
27 the five salmon and steelhead ESUs.  Many of the Trust's more
28 than 1,000 members regularly use the Sacramento River and Bay-

1  Delta for recreational and educational purposes including

2  fishing, swimming, boating, aesthetic appreciation, and nature

3  study.   These members intend to continue doing so on an on-going

4  basis in the future.   Additionally, many of the Trust's members

5  live and work in the counties that surround the Sacramento River

6  and Bay-Delta.

7       The Trust has worked continuously, through all legal means,

8  to protect native salmon and steelhead species in the Sacramento

9  River watershed and to restore the Sacramento River to its former

10  richness.   For years, the Trust has actively sought legislative

11  reform of the CVP and SWP to make those projects more responsive

12  to the needs of fish and wildlife species in the Sacramento River

13  and Bay-Delta, especially the Sacramento River winter-run salmon.

14  As a member of the "Share The Water" coalition, the Trust and its

15  members lobbied and sent letters to Congress advocating the

16  passage of the CVPIA.   Particularly important to the Trust was

17  the CVPIA's revision of the CVP's purpose to include protection

18  of fish and wildlife as a co-equal CVP goal.   Water set aside for

19  fish protection purposes under the CVPIA is now an important

20  baseline of the CALFED Bay-Delta Program.

21       The Trust has a long history of actions on behalf of

22  Sacramento River winter-run Chinook salmon. In 2002, for example,

23  the Trust intervened in a lawsuit on behalf of the federal

24  government to defend water management practices aimed at

25  protecting winter-run Chinook salmon and delta smelt.   The Trust

26  has opposed efforts to weaken the CALFED Bay-Delta Program's

27  habitat and ecosystem restoration provisions, and most recently

28  has asked CALFED to investigate the effects of rollbacks of

1  environmental protections included in the CALFED Record of
2  Decision on Delta fisheries.  The Trust has long participated in
3  matters specifically related to the CVP, SWP and OCAP.  The Trust
4  commented on the original CVP/SWP Coordinated Operating Agreement
5  EIS/EIR in 1986 and, in October 2004, submitted comments on the
6  2004 OCAP.  These undisputed facts sufficiently demonstrate the
7  Trust may be actually injured by the 2004 OCAP, the BiOp, and the
8  Federal Defendants' operation of the CVP.  The Trust has
9  standing.

10

11       **B.   Plaintiffs' Request for Judicial Notice.**

12       Plaintiffs request that the court take judicial notice of
13  the following three documents: (1) the Declaration of Ronald
14  Milligan, the Manager of the Central Valley Operations Office of
15  the Bureau, (2) the Declaration of Bruce Oppenheim, a Fishery
16  Biologist in the Sacramento office of NMFS, and (3) the
17  Declaration of Cay Collette Goude, an Assistant Field Supervisor
18  in the Sacramento office of the United States Fish and Wildlife
19  Service.  (Doc. 170)  These documents are declarations from
20  representatives of the Federal Defendants that were submitted in
21  the related Delta smelt case, *NRDC v. Kempthorne*, 1:05-cv-01207-
22  OWW-GSA.  The Federal Defendants submitted the Declarations of
23  Ronald Milligan and Bruce Oppenheim with their opposition to the
24  plaintiff's motion for a temporary restraining order and
25  preliminary injunction in June 2007.  The Federal Defendants
26  submitted the Declaration of Cay Collette Goude with their notice
27  regarding a status conference on June 1, 2007.

28       Plaintiffs offer these declarations to demonstrate the

**62**

1 authorized publically stated views of the federal agency
2 representatives regarding implementation and operation of the
3 2004 OCAP and challenged biological opinions, not for the truth
4 of the matters asserted therein.  Plaintiffs assert that these
5 declarations will assist the court in assessing the Bureau's
6 compliance with its ongoing duties under the ESA to ensure that
7 its actions do not jeopardize listed species or adversely modify
8 critical habitat.

9     The Federal Defendants do not object to Plaintiffs' request
10 for judicial notice because these were declarations filed by the
11 Bureau in the companion case which directly involves the OCAP.
12 DI San Luis & Delta Mendota Water Authority objects to any
13 consideration of these declarations because they are post-
14 decisional documents.

15     "A judicially noticed fact must be one not subject to
16 reasonable dispute in that it is either (1) generally known
17 within the territorial jurisdiction of the trial court or
18 (2) capable of accurate and ready determination by resort to
19 sources whose accuracy cannot reasonably be questioned."  Fed. R.
20 Evid. 201(b).  "A court shall take judicial notice if requested
21 by a party and supplied with the necessary information."  Fed. R.
22 Evid. 201(d).  Judicially noticed facts often consist of matters
23 of public record, such as prior court proceedings, *see, e.g.,*
24 *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1198 (9th Cir. 1988).
25 A court may take judicial notice of court records in another
26 case.  *United States v. Howard*, 381 F.3d 873, 876 fn. 1 (9th Cir.
27 2004) (citing *United States v. Wilson*, 631 F.2d 118, 119 (9th
28 Cir. 1980)).

1     To the extent the declarations refer to a different case and
2 species, they are not directly relevant.  Unless the declarations
3 contain relevant admissions, they were prepared for use in
4 litigation, and are hearsay.  The DI object to the contents of
5 these declarations as disputed both as to content and purpose.
6 Under Federal Rule of Evidence 201(b), a court may take judicial
7 notice of facts "not subject to reasonable dispute. . . ."  Rule
8 201(b) is not satisfied here by reason of the dispute over the
9 contents of the declarations.  Plaintiffs' request for judicial
10 notice is DENIED WITHOUT PREJUDICE.  Judicial notice is taken of
11 the fact that each of the three declarations was filed on behalf
12 of the Federal Defendants to express views in related ESA
13 litigation over the 2004 OCAP and the Delta smelt.  The documents
14 are post-record, offered to show Agency bad faith and may be
15 considered for that limited purpose.

16

17     C.   <u>The Endangered Species Act</u>.

18     The Ninth Circuit has succinctly summarized relevant
19 provisions of the ESA:

20     The ESA requires federal agencies to "insure that any
       action authorized, funded, or carried out by such
21     agency . . . is not likely to jeopardize the continued
       existence of any endangered species or threatened
22     species or result in the destruction or adverse
       modification of [designated critical] habitat . . . . "
23     15 U.S.C. § 1536(a)(2).  The ESA imposes a procedural
       consultation duty whenever a federal action may affect
24     an ESA-listed species.  *Thomas v. Peterson*, 753 F.2d
       754, 763 (9th Cir. 1985).  To that end, the agency
25     planning the action, usually known as the "action
       agency," must consult with the consulting agency.  This
26     process is known as a "Section 7" consultation.  The
       process is usually initiated by a formal written
27     request by the action agency to the consulting agency.
       After consultation, investigation, and analysis, the
28     consulting agency then prepares a biological opinion.

                              64

*See generally Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1239 (9th Cir. 2001).

The consulting agency evaluates the effects of the proposed action on the survival of species and any potential destruction or adverse modification of critical habitat in a biological opinion, 16 U.S.C. § 1536(b), based on "the best scientific and commercial data available." *Id.* § 1536(a)(2).  The biological opinion includes a summary of the information upon which the opinion is based, a discussion of the effects of the action on listed species or critical habitat, and the consulting agency's opinion on "whether the action is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat. . . ." 50 C.F.R. § 402.14(h)(3).  In making its jeopardy determination, the consulting agency evaluates "the current status of the listed species or critical habitat," the "effects of the action," and "cumulative effects." *Id.* § 402.14(g)(2)-(3). "Effects of the action" include both direct and indirect effects of an action "that will be added to the environmental baseline."  *Id.* § 402.02.  The environmental baseline includes "the past and present impacts of all Federal, State or private actions and other human activities in the action area" and "the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation."  *Id.*  If the biological opinion concludes that jeopardy is not likely and that there will not be adverse modification of critical habitat, or that there is a "reasonable and prudent alternative[ ]" to the agency action that avoids jeopardy and adverse modification and that the incidental taking of endangered or threatened species will not violate section 7(a)(2), the consulting agency can issue an "Incidental Take Statement" which, if followed, exempts the action agency from the prohibition on takings found in Section 9 of the ESA.  16 U.S.C. § 1536(b)(4); *ALCOA v. BPA*, 175 F.3d 1156, 1159 (9th Cir. 1999).

. . . .

The issuance of a biological opinion is considered a final agency action, and therefore subject to judicial review.  *Bennett v. Spear*, 520 U.S. 154, 178, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997); *Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1235.

*National Wildlife Federation v. National Marine Fisheries Service*, 481 F.3d 1224 (9th Cir. 2007) (*NWF v. NMFS*).

The questions presented here are whether the NMFS BiOp:

1       1.    relies on factors not intended by Congress to be

2  considered;

3       2.    entirely failed to consider an important aspect of

4  the problem;

5       3.    offered an explanation for the BiOp that runs

6  counter to the evidence before NMFS;

7       4.    is so implausible that it cannot be ascribed to a

8  difference in view or the product of agency expertise;

9       5.    makes a clear error of judgment.

10  *National Ass'n of Homebuilders v. Defenders of Wildlife*, 129

11  S.Ct. 2518, 2529 (2007) *PCFFA v. NMFS*, 265 F.3d at 1034.

12

13     D.    <u>NMFS Claims</u>.

14          1.    <u>Whether NMFS Failed to Establish Any Reasonable
                  Connection Between the Impacts It Identified and</u>
15                <u>the BiOp's "No Jeopardy" and "No Adverse
                  Modification" Conclusions</u>.
16

17  Plaintiffs contend the BiOp falls short of meeting any of

18  the requirements of ESA § 7(a)(2) and its implementing

19  regulations, which require, among other things, that: (1) NMFS

20  use the best scientific and commercial data available to evaluate

21  the current status of the listed species and its critical

22  habitat; (2) that NMFS evaluate the effects of the action and

23  cumulative effects on the listed species and critical habitat;

24  and (3) that NMFS formulate its biological opinion as to whether

25  the action, taken together with cumulative effects, is likely to

26  jeopardize the continued existence of listed species or result in

27  the destruction or adverse modification of critical habitat.

28       Specifically, Plaintiffs argue NMFS failed to establish a

1  reasonable connection between the impacts it identified in the
2  BiOp and its no jeopardy and no adverse modification of critical
3  habitat conclusions.  Plaintiffs maintain: (1) the BiOp
4  establishes no link between the significant adverse Project
5  effects it identifies and its "no jeopardy" and "no adverse
6  modification" conclusions, and that the BiOp's findings
7  contradict its conclusions; (2) NMFS failed to conduct an
8  analysis of the Projects' impacts in the context of the species'
9  life cycles and population dynamics; (3) NMFS's focus on
10  incremental impacts arbitrarily ignored significant adverse
11  effects associated with baseline conditions and is unsupported by
12  the BiOp's factual findings; and (4) NMFS failed to conduct a
13  comprehensive analysis of impacts associated with the entire
14  federal action during formal consultation with the Bureau.

15      In light of rulings made in *NRDC v. Kempthorne*, and the
16  Ninth Circuit's recent decision in *NWF v. NMFS*, Federal
17  Defendants acknowledge the following of Plaintiffs' claims are
18  valid:

19      (1)  The need for further explanation of its "no jeopardy"
20           analysis to address recovery implications for winter-
21           run Chinook, spring-run Chinook, and CV steelhead.
22      (2)  The need for further explanation of its critical
23           habitat analysis for winter-run Chinook to address the
24           impacts to the primary constituent elements and whether
25           an adverse modification of critical habitat occurred.
26      (3)  The need for further explanation of the analysis of
27           salmonid life cycles and baseline conditions with
28           respect to effects of CVP operations on critical

67

1        habitat and no jeopardy conclusion.

2        Despite these admissions, Federal Defendants do not concede

3   the validity of Plaintiffs' ultimate contentions that any of the

4   species is "jeopardized;" that critical habitat is "adversely

5   modified;" or that combined operations of the Projects under the

6   2004 OCAP effect a *per se* or patent violation of the ESA.  In the

7   Federal Defendants' view, these issues should not be resolved on

8   the presently "incomplete" AR, and the Court should find there is

9   insufficient information in the AR to explain the "no jeopardy"

10  and "no adverse modification" conclusions in the BiOp.  The

11  Federal Defendants argue that the BiOp should be remanded so NMFS

12  can issue a new biological opinion which explains in further

13  detail, whether continued Project operations will, or will not,

14  jeopardize the continued existence of salmonid species or

15  adversely modify designated critical habitat.

16       The DI contend NMFS articulated a rational connection

17  between its factual findings and no jeopardy and no adverse

18  modification conclusions except as to the CV steelhead.  As a

19  practical matter, this position is untenable in view of the

20  Federal Defendants' above-identified admissions that those

21  specified BiOp findings are incomplete or unsupported.

22       NMFS and the United States Fish and Wildlife Service ("FWS")

23  have issued joint regulations interpreting the ESA.  Under the

24  regulations, NMFS and FWS have defined the terms "jeopardize the

25  continued existence of," "destruction or adverse modification,"

26  and "critical habitat."  "Jeopardize the continued existence of"

27  means "to engage in an action that reasonably would be expected,

28  directly or indirectly, to reduce appreciably the likelihood of

68

1 both survival and recovery of a listed species in the wild by

2 reducing the reproduction, numbers, or distribution of that

3 species."  50 C.F.R. § 402.02.  "Destruction or adverse

4 modification" means:

5     a direct or indirect alteration that appreciably
    diminishes the value of critical habitat for both the

6     survival and recovery of a listed species. Such
    alterations include, but are not limited to,

7     alterations adversely modifying any of those physical
    or biological features that were the basis for

8     determining the habitat to be critical.

9 *Id.*  "Critical habitat refers to an area designated as critical

10 habitat listed in 50 CFR parts 17 or 226."  *Id.*

11     No critical habitat was designated for spring-run or CV

12 steelhead as of the time the BiOp issued.  As a matter of law,

13 NMFS could not have made a no adverse modification of an

14 undesignated critical habitat, because it is undeniable both

15 species then had critical habitats, despite that NMFS chose not

16 to designate it.  The post-record September 2, 2005, designation

17 of critical habitat for these two species raises substantial

18 question whether the NMFS and the Bureau nonetheless knew of such

19 critical habitat in 2004 in spite of its non-designation.  This

20 abdication on the issue of critical habitat for two of the

21 species is an entire failure to consider an important aspect of

22 the problem and/or so implausible that it cannot be ascribed to a

23 difference in view or the product of agency expertise.

24

25         a.   Whether NMFS's Factual Findings Directly
              Contradict the No Jeopardy and No Adverse

26               Modification Conclusions in the BiOp.

27     Review under the arbitrary and capricious standard is

28 deferential to the agency.  *National Ass'n of Homebuilders v.*

1 *Defenders of Wildlife*, 127 S.Ct. at 2529.  A reviewing court

2 should not vacate an agency's decision unless the agency:

3   has relied on factors which Congress had not intended
    it to consider, entirely failed to consider an

4   important aspect of the problem, offered an explanation
    for its decision that runs counter to the evidence

5   before the agency, or is so implausible that it could
    not be ascribed to a difference in view or the product

6   of agency expertise.

7 *Id.* (citing *Motor Vehicle Mfrs. Ass'n of United States, Inc. v.*

8 *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  A court

9 should "uphold a decision of less than ideal clarity if the

10 agency's path may be reasonably discerned."  *Id.* at 2530.

11 Essentially, a court "must ask whether the agency considered the

12 relevant factors and articulated a rational connection between

13 the facts found and the choice made."  *Pacific Coast Fed'n of*

14 *Fishermen's Ass'ns, Inc. v. National Marine Fisheries Service*,

15 265 F.3d 1028, 1034 (9th Cir. 2001).

16   Plaintiffs maintain the BiOp does not establish the required

17 path from the adverse project impacts NMFS identified in the

18 record and the no jeopardy and no adverse modification

19 conclusions.  Plaintiffs painstakingly argue that the BiOp's

20 factual findings are irreconcilable with and contradict its

21 conclusions.  Each species is addressed separately, as the

22 findings regarding each species differ.

23

24           **(1)   Winter-run Chinook**.

25   The BiOp reached the following conclusion regarding the

26 winter-run Chinook:

27   After reviewing the best scientific and commercial
    information available, the current status of the

28   species, the environmental baseline for the action

70

area, the effects of the proposed action, and cumulative effects, it is NOAA Fisheries biological opinion that the action, as proposed, is not likely to jeopardize the continued existence of Sacramento River winter-run Chinook Salmon.  In addition, NOAA Fisheries has determined that the action, as proposed, is not likely to adversely modify critical habitat for Sacramento River winter-run Chinook salmon.

NMFS AR 5940.

Plaintiffs argue the BiOp's "no jeopardy" and "no adverse modification" conclusions starkly contrast with NMFS's concerns about the species raised in the actual text of the BiOp; in NMFS's draft biological opinion[6] issued a few weeks prior to the BiOp; and in the administrative record.  According to Plaintiffs, NMFS identified adverse impacts to the winter-run Chinook and its habitat from the Projects' in-Delta operations and upstream river operations.  In addition to other impacts to the winter-run Chinook, two particular Project operations that evoked the greatest concern were the Bureau's proposal to move the Sacramento River temperature compliance point ("TCP") nineteen (19) miles upstream from Bend Bridge to Balls Ferry, and to modify the 1.9 million acre-foot ("MAF") end-of-water-year

---

[6] NMFS's draft biological opinion is not binding or determinative whether the final BiOp is arbitrary and capricious. *See National Ass'n of Homebuilders*, 127 S. Ct. at 2530 (stating "federal courts ordinarily are empowered to review only an agency's *final* action, see 5 U.S.C. § 704, and the fact that a preliminary determination by a local agency representative is later overruled at a higher level within the agency does not render the decisionmaking [sic] process arbitrary and capricious.") (emphasis in original).  Federal agencies are entitled to change their minds, so long as the proper procedures were followed.  *Id.*  The draft may raise questions the Agency needs to address, however, a draft is not the definitive opinion by which the BiOp is judged.

71

1  carryover storage requirement ("COS") at Shasta Reservoir from a
2  requirement to a target.

3

4              (a)   Impacts Relating to the Movement of
                     the TCP and Elimination of the COS
5                    Requirement.

6                    i)   Background of the TCP and COS
                          Requirement.
7

8       The Shasta Division[7] of the CVP includes facilities that
9  conserve water on the Sacramento River for flood control,
10 navigation maintenance, conservation of fish in the Sacramento
11 River, protection of the Delta from intrusion of saline ocean
12 water, agricultural water supplies, municipal and industrial
13 water supplies, and hydroelectric generation.  NMFS AR 5754.  The
14 Shasta Division includes Shasta Dam, Lake, and Powerplant;
15 Keswick Dam, Reservoir, and Powerplant; and the Toyon Pipeline.
16 NMFS AR 5754.

17      Shasta Dam and Lake is the largest storage reservoir on the
18 Sacramento River with a 4.55 MAF capacity.  NMFS AR 5754.
19 Completed in 1945, Shasta Dam controls flood water and stores
20 winter runoff for various uses in the Sacramento and San Joaquin
21 valleys.  NMFS AR 5754.  Keswick Dam, located approximately 9
22 miles downstream from Shasta Dam, creates an afterbay with a 23
23 thousand acre-foot ("TAF") capacity for Shasta Lake and Trinity
24 River diversions.  NMFS 5754.

25      Water temperature in the upper Sacramento River has been
26

27 _____
        [7] The Bureau uses the term "Unit" interchangeably with CVP
28 "Divisions."

72

1  recognized as a key factor for the habitat needs for Chinook
2  salmon stocks inhabiting the river.  USBR AR 4937.  The 56°F
3  temperature control point is the benchmark above which the
4  winter-runs' survival is put in jeopardy.  Water temperature on
5  the Sacramento River system is influenced by several factors,
6  including the relative water temperatures and ratios of releases
7  from Shasta Dam and from the Spring Creek Powerplant.  USBR AR
8  4937.  The temperature of water released from Shasta Dam and the
9  Spring Creek Powerplant is a function of: (1) the reservoir
10 temperature profiles at the discharge points at Shasta and
11 Whiskeytown; (2) the reservoir depths from which releases are
12 made; (3) the seasonal management of the deep cold water
13 reserves; (4) ambient seasonal air temperatures and other
14 climatic conditions; (5) tributary accretions and water
15 temperatures; and (6) residence time in Keswick, Whiskeytown and
16 Lewiston Reservoirs, and in the Sacramento River.  USBR AR 4937.

17      The Bureau operates the Shasta, Sacramento River, and
18 Trinity River Divisions of the CVP to meet, to the extent
19 possible, the provisions of SWRCB Order 90-05 and the 1993
20 winter-run Chinook biological opinion ("1993 BiOp").  NMFS AR
21 5754, USBR AR 4935.  In 1990 and 1991, the SWRCB issued Water
22 Rights Orders 90-05 and 91-01 modifying Reclamation's water
23 rights for the Sacramento River.  NMFS AR 5754.  These SWRCB
24 orders include temperature objectives for the Sacramento River
25 including a daily average water temperature of 56˙F at RBDD
26 during periods when higher temperatures would be harmful to
27 fisheries.  NMFS AR 5754.  Under the Orders, the compliance point
28 may be changed when the objective cannot be met at RBDD.  NMFS AR

1  5754, USBR AR 4937.  DI assert the temperature objective has
2  never been met at RBDD.

3       The SWRCB orders also required the Bureau to establish the
4  Sacramento River Temperature Task Group ("SRTTG") to formulate,
5  monitor, and coordinate temperature control plans for the upper
6  Sacramento and Trinity Rivers.  USBR AR 4937-38.  This group
7  consists of representatives from the Bureau, SWRCB, NOAA
8  Fisheries, FWS, California Department of Fish and Game, Western,
9  California Department of Water Resources, and the Hoopa Valley
10 Indian Tribe.  USBR AR 4938.  Each year, with finite cold water
11 resources and competing demands usually an issue, the SRTTG has
12 devised operation plans with the flexibility to provide the best
13 protection consistent with the CVP's temperature control
14 capabilities and considering the annual needs and seasonal
15 spawning distribution monitoring information for winter-run and
16 fall-run Chinook salmon.  USBR AR 4938.  In every year that the
17 SRTTG has operated, its temperature plans have included modifying
18 the RBDD compliance point to make best use of the cold water
19 resources based on the location of spawning Chinook salmon.  USBR
20 AR 4938.

21      The SWRCB water rights orders also recommended the
22 construction of the Shasta Temperature Control Device ("Shasta
23 TCD") to improve the management of limited cold water resources.
24 USBR AR 4937.  Construction of the Shasta TCD at Shasta Dam was
25 completed in 1997.  USBR AR 4938.  This device is designed for
26 greater flexibility in managing the cold water reserves in Shasta
27 Lake while enabling hydroelectric power generation to occur and
28 to improve salmon habitat conditions in the upper Sacramento

74

1   River.  USBR AR 4938.  The Shasta TCD is also designed to enable
2   selective release of water from varying lake levels through the
3   power plant in order to manage and maintain adequate water
4   temperatures in the Sacramento River downstream of Keswick Dam.
5   USBR AR 4938.

6        Prior to construction of the Shasta TCD, the Bureau released
7   water from Shasta Dam's low-level river outlets to alleviate high
8   water temperatures during critical periods of the spawning and
9   incubation life stages of the winter-run Chinook stock.  USBR AR
10  4938.  Releases through the low-level outlets bypass the power
11  plant and result in a loss of hydroelectric generation at the
12  Shasta Powerplant.  USBR AR 4938.  The release of water through
13  the low-level river outlets was a major facet of Reclamation's
14  efforts to control upper Sacramento River temperatures from 1987
15  through 1996.  USBR AR 4938.

16       The seasonal operation of the Shasta TCD is generally as
17  follows: during mid-winter and early spring the highest elevation
18  gates possible are utilized to draw from the upper portions of
19  the lake to conserve deeper colder water resources.  USBR AR
20  4938.  During late spring and summer, the operators begin the
21  seasonal progression of opening deeper gates as Shasta Lake
22  elevation decreases and cold water resources are utilized.  USBR
23  AR 4938.  In late summer and fall, the Shasta TCD side gates are
24  opened to utilize the remaining cold water resource below the
25  Shasta Powerplant elevation in Shasta Lake.  USBR AR 4938.

26       The Shasta TCD gives the Bureau flexibility in managing cold
27  water resources, but not without some problems.  The  seasonal
28  progression of the Shasta TCD operation is designed to maximize

1  the conservation of cold water resources deep in Shasta Lake,
2  until the time the resource is of greatest management value for
3  fishery management purposes.  USBR AR 4939.  Recent operational
4  experience with the Shasta TCD has demonstrated significant
5  operational flexibility improvement for cold water conservation
6  and upper Sacramento River water temperature and fishery habitat
7  management purposes.  USBR AR 4939.  This operational experience
8  has also demonstrated the Shasta TCD has significant leaks that
9  are inherent in its design.  USBR AR 4939.  Also, operational
10 uncertainties cumulatively impair the seasonal performance of the
11 Shasta TCD to a greater degree than was anticipated in previous
12 analysis and modeling used to describe long-term Shasta TCD
13 benefits.  USBR AR 4939.

14      NOAA Fisheries issued the 1993 BiOp in February 1993.  USBR
15 AR 4939.  The 1993 BiOp includes a reasonable and prudent
16 alternative ("RPA") addressing CVP operations criteria for
17 temperature control objectives.  USBR AR 4939.  Under this RPA,
18 the Bureau must make its February 15 forecast of deliverable
19 water based on an estimate of precipitation and runoff at least
20 as conservatively as 90 percent probability of exceedance.[8]  USBR
21 AR 4939.  The use of this conservatively based forecasting
22 approach reduces the risk of over committing potential annual
23 cold water reserves by limiting the Central Valley water supply
24 estimates to a one in ten chance of the remaining annual
25 hydrologic conditions being drier than the estimate.  USBR AR
26 4939.  This forecasting strategy places an allocation emphasis on

27 _____

28      [8] This requirement continues in effect.  NMFS AR 5955-56.

76

1  reserving sufficient cold water resources during the winter-run
2  Chinook salmon incubation and spawning seasons.  USBR AR 4939.

3       In seven of ten years preceding the BiOp, NMFS moved the
4  temperature compliance point upstream from Bend Bridge to Jelly's
5  Ferry, and sometimes as the year progressed, to Balls Ferry.
6  USBR 3142, 3162-63, 3200, 3271, 3310-11, 3319-24, 3394, 3435-36,
7  3438-39.  Two of these years were dry, and the compliance point
8  was at Jellys Ferry.  USBR 3354, 3397.  In those two years,
9  Project operations were modified to optimize limited cold water
10 resources for all salmon runs.  Moving the compliance point
11 upstream from Bend Bridge also conserved cold water resources.
12 NMFS 5920-21, USBR 3353-54, 3380-81, 3392.  This was required
13 because cold water resources must be shared between winter-run
14 and spring-run that spawn later in the year.  USBR 3351; NMFS
15 5956.

16      Releasing large quantities of comparatively warmer water
17 from higher elevations on Shasta Dam causes other impacts to the
18 fishery:

19           a.   Hastened depletion of the cold water pool in
20 Shasta Lake;

21           b.   Lower the Lake to a point where there was
22 potential to totally lose control over release temperatures, a
23 disastrous scenario for later spawning spring and fall-run.  USBR
24 3351.

25           c.   If spawning distribution is in downstream
26 locations, temperature protection could not be provided in a dry
27 year.  NMFS predicted additional early life stage mortality to be
28 a nominal increase, 0.54%.  NMFS 5920.

77

1          d.    NMFS also realized an adaptive management process
2   to reduce potential temperature related losses by moving
3   temperature compliance location downstream to protect redds.
4   NMFS 5845-56.

5

6                              a)    <u>Shasta COS Requirement</u>.
7         The 1993 BiOp contains an RPA requiring the Bureau to
8   maintain a minimum end-of-water-year (September 30) carryover
9   storage in Shasta Reservoir of 1.9 MAF.   USBR AR 4939.   This is
10  the COS requirement.   The 1.9 MAF COS Requirement is intended to
11  increase the probability of sufficient cold water resources to
12  maintain suitable water temperature conditions for the subsequent
13  water year winter-run incubation and spawning season needs.   USBR
14  AR 4939.   The 2004 BiOp changes the 1.9 MAF COS to a target, NMFS
15  AR 5956, which does not ensure that adequate cold water reserves
16  (and therefore, winter-run incubation and spawning habitat water
17  temperature) are available during the year the 1.9 MAF COS
18  requirement is required.   USBR AR 4939.

19        The 1993 BiOp recognized that it may not be possible to
20  maintain the minimum carryover of 1.9 MAF in the driest ten
21  percent of hydrologic circumstances.   USBR AR 4939.   Under the
22  1993 BiOp, if the Bureau forecasts end-of-water-year storage
23  levels in Shasta will drop below 1.9 MAF, re-initiation of
24  consultation was required prior to the first water allocation
25  announcement for that year.   USBR AR 4939.   NMFS offers a
26  reasonable explanation that new mitigation measures and water
27  management actions justify this flexibility in managing COS.
28

                                78

1                          b)    Sacramento River TCP.

2         Another RPA in the 1993 BiOp sets water temperature

3 compliance location(s) (TCP) from April 15 through October 31 for

4 winter-run needs based on a systematic set of Shasta carryover

5 and annual hydrologic conditions.  USBR AR 4939.  The 1993 BiOp

6 segregates annual Shasta Reservoir carryover and hydrologic

7 conditions in order to assess the potential cold water resources

8 available from Trinity and Shasta Reservoirs and to determine a

9 strategy for the water TCP.  USBR AR 4940.  Generally, the 1993

10 BiOp sets the TCP at Bend Bridge on the Sacramento River in

11 conditions of high carryover storage or above normal hydrologic

12 conditions.  USBR AR 4940.  For lower carryover storage

13 conditions and dry or critical hydrologic conditions, the 1993

14 BiOp sets the TCP farther upstream at Jelly's Ferry on the

15 Sacramento River.  USBR AR 4940.  For low carryover storage and

16 critical or very critical hydrologic conditions (generally

17 associated with extended drought conditions) the 1993 BiOp

18 requires re-initiation of consultation to determine the

19 TCP.  USBR AR 4940.

20         In almost every year since 1993, the Bureau has reconsulted

21 with NOAA Fisheries and modified the TCP or allowed short-term

22 fluctuation above the 56˚F objective because of insufficient cold

23 water resources, extreme ambient air temperature events, or high

24 downstream tributary flows of warm water.  USBR AR 4940.  The

25 reconsultation actions have been coordinated through the SRTTG to

26 the extent possible.  USBR AR 4940.

27

28                          c)    Management of the Upper

79

<u>Sacramento River
Temperature Objectives
Since the Issuance of the
1993 BiOp</u>.

Since the issuance of the temperature objectives contained in the 1993 BiOp, the long-term cold water management operation of the Trinity-Shasta reservoir system has been changed and influenced by several significant water management actions that have occurred during the intervening period.  USBR AR 4940. These water management actions include:

- • Implementation of CVPIA Section 3406 (b)(2)
- • Implementation of SWRCB Delta D-1641
- • Continuing implementation of the Trinity River ROD as ordered by the District Court
- • Installation and actual performance characteristics of the Shasta TCP.

USBR AR 4940.  Each of these water management actions has changed the availability and the management of cold water resources for the Upper Sacramento River.  USBR AR 4940.

ii) <u>Proposed Actions and Effects
Under the 2004 BiOp</u>.

One of the proposed actions in the BiOp moves the TCP nineteen miles upstream to Balls Ferry from Bend Bridge (the TCP location established in the 1993 BiOp).  As discussed, the 1.9 MAF COS requirement is now a "target" that the Bureau will attempt to meet at the end of each water year.

With respect to moving the TCP from Bend Bridge to Balls Ferry, the EFFECTS OF THE ACTION section of the BiOp (section V)

80

states:

> Higher water temperatures and an increase in frequency
> of very low storage conditions during dry and
> critically dry years in the mainstream spawning area
> are expected to reduce spawning success in certain
> areas through egg and larval mortality.  Based on the
> proposed temperature compliance point of Balls Ferry,
> approximately 20 miles (42 percent) of the available
> mainstream spawning habitat of Chinook salmon is
> expected to be rendered less suitable for egg and
> larval survival during these years for those fish that
> spawn in these lower areas.  On average, predicted
> temperatures over the 72 year modeled period at Balls
> Ferry will exceed 56˙F,  and exceed baseline predicted
> temperatures . . . in April (5 of 72 years), May (7
> years), July (8 years),  August (15 years),  September
> (26 years), and October (12 years over 60˙F).  In
> general the number of exceedances increases by 1 year
> over baseline conditions, although August, September,
> and October exceedances occur in 6, 7, and 2 more
> years, respectively.  Temperatures downstream of this
> point will also exceed baseline conditions, affecting
> the spawning success of any adults spawning below Balls
> Ferry.

NMFS AR 5844.

Since 1993, NMFS has recommended moving the TCP upstream to

conserve cold water in the Shasta Reservoir for August and

September when juveniles are most vulnerable to temperature

effects.  NMFS AR 5844.  The Bureau assumed moving the TCP from

Bend Bridge to Balls Ferry would be insignificant because the

majority of winter-run Chinook (99%) have spawned above Balls

Ferry based on aerial redd surveys in the years 2001 through

2003.  NMFS AR 5844-45.  NMFS made the following finding in the

EFFECTS OF THE ACTION section of the BiOp regarding the upstream

movement of the TCP:

> A review of the historical spawning distribution over
> the last ten years (i.e., 1993 to 2003) shows that on
> average 3.6 percent of the run spawned below Balls
> Ferry since RBDD gate operations  were modified . . . .
> NOAA Fisheries expects that as the population increases
> the spawning distribution may vary and a small

81

1
2
3
4
5
6
7

proportion of the run may be exposed to unsuitable
water temperatures below Balls Ferry.  This effect is
expected to be less than significant, unless large
numbers of adults spawn below Balls Ferry.  In the last
five years this has occurred only once during a wet
year (*i.e.*, in 2000, when 16 percent of the run spawned
below Balls Ferry).  Even in years when a portion of
the run spawns downstream of the compliance point not
all eggs would be killed, but a small amount of
increased mortality would be expected ranging from 8 to
15 percent based on a relationship between water
temperature and mortality of Chinook salmon eggs . . .
.

8
9

NMFS AR 5845.

10
11
12
13

NMFS also addressed "Habitat Availability and Suitability"

in the EFFECTS OF THE ACTION SECTION OF THE BIOP.  Regarding

moving the TCP from Bend Bride to Balls Ferry, NMFS made the

following findings:

14
15
16
17
18
19
20
21
22

Winter-run Chinook salmon spawning habitat is made less
suitable by approximately 19 miles (*i.e.*, 42 percent of
available spawning habitat currently available to Bend
Bridge) by defaulting to the more upstream temperature
compliance point at Balls Ferry compared to Bend Bride
under both operations today and in the future.  Even
though most of the current population is not
anticipated to be affected, since generally winter-run
Chinook salmon spawn upstream of Balls Ferry, planning
for future temperature control operations at the higher
compliance point could limit potential spawning
distribution.  NOAA Fisheries anticipates that the
spawning distribution routinely will be more contracted
(*i.e.*, reduced by 19 miles), therefore population
abundance could be capped as these fish seek out areas
of more suitable, cooler water for spawning and move
farther upstream than they otherwise would do in some
years.

23
24

NMFS AR 5846, 5939.

25
26

DI argue that increasing winter-run Chinook populations from

1993 to 2003 show that this strategy has not jeopardized, but has

benefitted the species.

27
28

On the change of the 1.9 MAF COS requirement to a "target,"

82

NMFS made the following findings in the EFFECTS OF THE ACTION section of the BiOp:

> The [1993 BiOp] established a minimum end-of-September carryover storage criteria for Shasta Reservoir of 1.9 MAF, which in combination with storage reserves in Trinity Reservoir, minimum instream flows during the winter, and D-1485 Delta standards produced a following year May Shasta Reservoir storage in the 3.0 to 3.5 MAF range, with a reasonable amount of cold water available in the second year.  Average end-of-September carryover storage in Shasta Reservoir is reduced by 130 TAF under future conditions compared to today's . . . .  Under a 50 percent probability of exceedance, future operations reduce end-of-September carryover storage by about 230 TAF from operations today. . . .  Reductions in September carryover storage are due to releases for SWP in-basin requirements, compliance with Trinity River requirements, and extra pumping capacity for Joint Point of Diversion.  The result will be a reduced ability to control water temperatures in the upper Sacramento River and an increase in frequency of very low storage conditions (as indicated by end-of-September storage below 1.9 MAF).  For example, low storage conditions occur in 11 out of 72 years (15 percent of the modeled period) under baseline conditions.  Under proposed formal consultation actions, low storage conditions increase to 14 out of 72 years (19 percent of the modeled period), a 26 percent increase in frequency over baseline conditions.  Further, one year is added to low storage conditions during two of the three periods of significant drought in the 72 year modeled period.  Decreased water availability also leads to decreases in deliveries.  During critically dry periods, water deliveries to agricultural users south of the Delta decrease significantly: under baseline conditions the Project might deliver 10 percent of the allocation to these users; under expected future conditions, these levels drop to 7 to 8 percent.

NMFS AR 5844.

Plaintiffs criticize this baseline analysis and observe that the "target" scenario results in an almost 20% lower storage condition which will reduce ability to control temperatures in the upper Sacramento River, directly jeopardizing the winter-run.

In the INTEGRATION AND SYNTHESIS OF THE EFFECTS section of

the BiOp (section VII), NMFS made the following findings

regarding the effects of moving the TCP upstream to Balls Ferry

and eliminating the Shasta COS Requirement on the winter-run

Chinook:

> Reclamation's Salmon Mortality Model estimates that the proposed operations will increase temperature-related losses of the early life stages of winter-run Chinook salmon on average 1-2 percent under both conditions today and in the future (*i.e.*, assuming 99 percent of adults spawn above Balls Ferry). Average mortality is less than 5 percent in most years except critically dry, as discussed below. Through the SRTTG, protective actions are anticipated to reduce this loss. Therefore, for most water years the increase in average egg and fry loss is not expected to be significant.

> Based on the spawning distribution since operations of the gate at [RBDD] changed in 1993, an average of 3.6 percent of the adult winter-run Chinook salmon population has spawned below Balls Ferry . . . . The impact of proposed temperature operations for those fish that spawn below Ball's Ferry equates to a 0.54 percent loss of the total juvenile production on average, based on 8-15 percent of the eggs being lost due to a 1-2 degree difference in water temperatures. Under future conditions, if the population increases or higher winter flows shift spawning downstream, adults would be expected to utilize habitat below Balls Ferry to a greater extent than today, thus the loss in the juvenile production would be expected to increase. In wet years there is likely to be sufficient cold water available to provide suitable water temperatures below Balls Ferry and to accommodate shifts in spawning distribution.

> Increases in water temperatures during critically dry years in the winter-run Chinook salmon spawning area are expected to result in high levels of egg and larval mortality. Under baseline conditions, the winter-run Chinook salmon population experienced an estimated 41 percent mortality in 15 percent of the modeled 72 year period. The proposed formal consultation actions are expected to increase both the amount and frequency of these high mortality levels to 44 percent and 19 percent, respectively.

> Through flexibility in real time operations and the adaptive management process (*i.e.*, SRTTG and B2IT) protective actions (*i.e.*, increased flows, warm water bypasses, use of the TCD, and low level outlets) would be taken early on to avoid temperature effects to early

1    life stages of winter-run Chinook salmon.

2   NMFS AR 5920.

3        This analysis is consistent with Defendants' projected
4   increases of 3% to 4% annual mortality for written-run when the
5   new regime is used.

6        In the "Population Impacts and Potential for Recovery"
7   subsection of the INTEGRATION AND SYNTHESIS OF THE EFFECTS
8   section of the BiOp, NMFS made the following findings.  "Current
9   operations result in the loss of 42 percent of the winter-run
10  Chinook salmon juvenile population . . . ."  NMFS AR 5931.  At
11  the same time, the effects of the BiOp's proposed actions are
12  that "[o]verall project effects are expected to result in the
13  loss of an additional 3 to 20 percent of the winter-run Chinook
14  salmon juvenile population . . . ."  NMFS AR 5930.  "Analysis of
15  population estimates taken at RBDD since 1986, indicates that the
16  population growth rate . . . for winter-run Chinook salmon is
17  0.97 (95 percent confidence intervals: 0.87 and 1.09), indicating
18  a population that may be declining at 3 percent per year,"
19  although the confidence intervals at 95 percent allow for a
20  population decreasing at a rate of 13 percent per year or
21  increasing at 9 percent per year.  NMFS AR 5933.

22       The "[e]stimated mean log growth rate indicates a population
23  that is generally declining, although confidence interval values
24  also indicate that the population may be generally increasing."
25  NMFS AR 5933.  Short-term productivity has been increasing.  NMFS
26  AR 5933.  "In the last three years, the population has been
27  increasing due to hatchery supplementation, restrictions on ocean
28

1  harvest, use of the TCD on Shasta Dam, and changes in Project

2  operations due to the 1993 BiOp." NMFS AR 5933.

3       While the pre-BiOp short-term population numbers for the

4  winter-run Chinook population are positive, NMFS made the

5  following findings:

6        Despite short-term increases in the population over the
         last three years, winter-run Chinook salmon remain
7        susceptible to extinction due to the elimination of
         access to most of their historical spawning grounds and
8        the reduction of their population structure to a single
         population dependent for its survival on cold water
9        releases from Shasta Dam.  Population abundance is low,
         with the average number of adults (males and females)
10       over the past five years at 50 percent of the recovery
         goal (*i.e.*, 10,000 females for 13 years) as identified
11       in the draft recovery plan . . . .

12       Combined Project impacts are likely to reduce the
         juvenile population by 3 to 20 percent over baseline
13       conditions in most years . . . . Early life-stage
         mortality in the upstream spawning areas will increase
14       by 3 percent over Today's condition to 44 percent in
         years with very low carryover storage (below 1.9 MAF).
15       Due to proposed operations, these conditions will occur
         more frequently, occurring 19 percent of the time in
16       the modeled period versus 15 percent under baseline
         conditions.  The likelihood that an individual year
17       class will be significantly reduced by drought
         conditions increases in two out of the three drought
18       year sequences modeled by CALSIM, adding one more year
         of sustained high mortality to the year class.
19       Proposed changes in temperature management could render
         approximately 42 percent of spawning habitat less
20       suitable, reducing adult spawning distribution and
         success.  Adaptive management based on actual spawning
21       distributions and operation conditions is expected to
         decrease effects, although we cannot quantify to what
22       extent.  Loss of juveniles at non-Project unscreened
         diversions will also continue to occur at various
23       locations along the mainstream Sacramento River and in
         the Delta.  Under baseline conditions, this annual
24       impact results in the loss of 33 percent of the winter-
         run Chinook salmon juvenile population.  Proposed
25       Project operations are expected to increase this loss
         between 34 and 49 percent.

26
         Given the positive indicators in the population
27       observed over the last 8 years, it would appear that
         the winter-run Chinook salmon population is recovering.
28       While it is concerning that future Project operations

86

1  are likely to result in the loss of more juveniles from
2  each year class, NOAA Fisheries expects that adaptive
   management processes will reduce these increased
3  impacts to low levels.  For example, the estimated 22
   percent loss includes both a 2.4 percent loss due to
4  decreased production for individuals spawning below
   Ball's Ferry and a 16 percent increase in indirect
5  mortality from increased pumping, based on mark-
   recapture data presented in salmon workshops . . . .
6  As these losses may not occur in every year, due to
   both ecological and operational conditions and
7  protective actions, Project effects in many years may
   be less than 5 percent.  NOAA Fisheries reasons that
8  these losses are not sufficient to reduce the
   likelihood of survival and recovery of the winter-run
9  Chinook salmon based on the observed and estimated
   recovery rates in the ESU.  Recent cohort replacement
10 rates in the population have been high enough that
   minor reductions due to a 5 percent loss of juveniles
11 would not cause the population to decline, however some
   reduction in the rate of ESU recovery may occur.

12 NMFS AR 5933-34.

13      The winter-run population will decline from 3% up to 20% in

14 juveniles and 3% up to 44% in early life stages from Project

15 operations and adverse climate and carryover storage conditions.

16 This will be offset by future adaptive management.  Non-Project

17 losses from diversion coupled with Project operations are 1% to

18 16%.  NMFS concludes the mortality risks will be offset by

19 adaptive management to prevent population loss, i.e., survival.

20 No other analysis is performed for recovery.

21

22              (b)  Adverse Impacts Not Relating to the
                     Movement of the TCP and Elimination
23                   of the COS Requirement.

24      Plaintiffs maintain NMFS failed to explain how its "no

25 jeopardy" and "no adverse modification" conclusions were

26 consistent with identified Project impacts to the winter-run

27 Chinook not related to the upstream movement of the TCP or

28 elimination of the COS requirement.  For example, in the

87

1   INTEGRATION AND SYNTHESIS OF THE EFFECTS section of the BiOp

2   (BiOp section VII) NMFS states, "[b]ased on the most current

3   population estimates . . . and our analysis, current operations

4   of the RBDD gates will block or delay approximately . . . 15

5   percent of the winter-run Chinook population (approximately 1,220

6   adults) . . . ." NMFS AR 5921. NMFS expects an increase in

7   passage delays in the future due to more frequent early gate

8   closures caused by increased demands for water in the upper

9   Sacramento River Basin. NMFS AR 5921. "Chinook salmon delayed at

10  [RBDD] can consume a greater amount of their energy stores than

11  if there been [sic] no obstacle in their path which may subject

12  them to: a greater chance of disease, . . . increased adult pre-

13  spawning mortality[,] . . . and decreased egg viability[,] . . .

14  all of which may result in the reduction in annual recruitment."

15  NMFS AR 5921.

16      In describing "Interior Delta Mortality" in the INTEGRATION

17  AND SYNTHESIS OF THE EFFECTS section NMFS states:

18          Those fish that are not lost to predation are
            susceptible to loss due to irrigation diversions in the
19          central and south Delta.  In addition, NOAA Fisheries
            anticipates that fish drawn into the central and south
20          Delta will be subjected to adverse water quality,
            pollution, pathogens, and delayed migration which may
21          lead to physiological stress, disease, disorientation,
            and overall decreased likelihood of successful
22          outmigration and survival.  The available data suggest
            that the increased mortality associated with the
23          indirect effects of moving water and fish across the
            interior of the Delta can range from 4 to 40 percent in
24          the baseline for the juvenile population entering the
            Delta (*i.e.*, using winter-run Chinook salmon
25          juveniles). [A] forty percent loss would occur when
            cross-Delta survival is very low (*e.g.*, at a 95 percent
26          mortality level) and the export salvage reaches 2
            percent of the winter-run Chinook JPE.  This would be a
27          worst case condition.  In the best case scenario, four
            percent of the winter-run Chinook JPE is lost crossing
28          the Delta (*e.g.*, at a 33 percent mortality level).

88

1 NMFS AR 5927.

2      This analysis concludes that minimum net mortality for fish

3 diverted by pumps and flows into the Delta is 4% to 40%.

4      In the EFFECTS OF THE ACTION section of the BiOp (BiOp

5 section V), NMFS analyzed the effects of "Delta Pumping Rates:"

6
        To satisfy the increased demand for water, additional
7       volumes of water will have to be diverted from the
        Delta by the SWP and CVP facilities in the South Delta.
8       This additional volume of water will be predominately
        obtained by periodically increasing the pumping rates
9       at the facilities.  The increases in the pumping rates
        are anticipated to increase the level of entrainment of
10      listed salmonids at the fish collection facilities in
        the south Delta.
11
NMFS AR 5877.
12
      The most that NMFS concludes is that survival is possible.
13
Recovery is not addressed.  This analysis is incomplete.  It
14
cannot be ascertained if recovery will be achieved.
15
      Plaintiffs contend the BiOp's no jeopardy and no adverse
16
modification of critical habitat findings contradict the text of
17
the BiOp, a draft copy of the BiOp, and the administrative
18
record.  In light of the Ninth Circuit's decision in *NWF v. NMFS*,
19
NMFS concedes it needs to further explain its no jeopardy
20
analysis to address recovery implications of the winter-run
21
Chinook arising from the BiOp's proposed actions.  NMFS also
22
acknowledges the need for further explanation of its critical
23
habitat analysis to address the impacts on the winter-run Chinook
24
and whether an adverse modification of critical habitat occurred.
25
      It is impossible to ascertain from the BiOp what the impact
26
on habitat will be as critical habitat, the Sacramento River
27
above Balls Ferry is only superficially mentioned as the area
28

1  where spawning will occur.  No other critical habitat analysis is
2  provided.  The DI maintain the BiOp provides a complete and well-
3  reasoned explanation of why the combined future effects of
4  Project operations will not jeopardize the survival or recovery
5  of the winter-run Chinook species, however, all record references
6  describe adverse effects from movement of the species by Project
7  operations.

8       *NWF v. NMFS* held that a jeopardy regulation issued jointly
9  by NMFS and FWS requires the agencies to consider both recovery
10 and survival impacts on listed species.  *NWF v. NMFS*, 481 F.3d at
11 1237.  The jeopardy regulation provides, "*Jeopardize the*
12 *continued existence of* means to engage in an action that
13 reasonably would be expected, directly or indirectly, to reduce
14 appreciably the likelihood of both the survival and recovery of a
15 listed species in the wild by reducing the reproduction, numbers,
16 or distribution of that species."  50 C.F.R. § 402.02.  NMFS had
17 interpreted this regulation in a manner that only considered the
18 effects of a species survival.  *Id.* at 1236-37.  The court found
19 that NMFS's interpretation of its own regulation was unreasonable
20 in light of NMFS's prior interpretation and application of the
21 jeopardy regulation.  *Id.* at 1237.  The court also observed that
22 NMFS had consistently interpreted the jeopardy regulation (50
23 C.F.R. § 402.02) as requiring a joint analysis of both survival
24 and recovery impacts until the issuance of the 2004 biological
25 opinion in that case.  *Id.*

26      Here, like the biological opinion at issue in *NWF v. NMFS*,
27 NMFS only considered the survival impacts on the winter-run
28 Chinook due to proposed Project operations and failed to analyze

1  recovery implications.   NMFS's failure to consider recovery
2  implications as required under its own regulations and NWF
3  necessarily renders the BiOp incomplete.   NMFS's failure to
4  follow its own regulation to address recovery implications to the
5  winter-run Chinook renders the BiOp arbitrary and capricious as
6  to this species.  *See National Ass'n of Homebuilders*, 127 S. Ct.
7  at 2529 (stating a reviewing court should not vacate an agency's
8  decision unless, among other things, the agency "entirely failed
9  to consider an important aspect of the problem . . . .").

10      Plaintiffs correctly point out that NMFS's findings about
11  the likely reduction in the species population resulting from
12  proposed Project operations set forth in the text of the BiOp
13  contradict its no jeopardy and no adverse modification
14  conclusions.   For example, in the EFFECTS OF THE ACTION section
15  of the BiOp, NMFS states spawning success will be reduced and 42
16  percent of spawning habitat is expected to be rendered less
17  suitable by moving the TCP upstream to Balls Ferry.   NMFS 5844-
18  46.   NMFS also found that on average 3.6 percent of the winter-
19  run Chinook spawn below Balls Ferry, and that a change in the TCP
20  at Balls Ferry will be less than significant unless large numbers
21  spawn below Balls Ferry (which occurred once in a wet year).
22  NMFS AR 5845.   Yet, NMFS found that current operations result in
23  the loss of 42 percent of the juvenile winter-run Chinook
24  population, and proposed project effects are expected to result
25  in an additional 3 to 20 percent loss of the juvenile population.
26  NMFS AR 5930-31.

27      NMFS also found that despite short-term increases in the
28  population over the last three years, winter-run Chinook remain

91

1  susceptible to extinction due to the elimination of most of their
2  historical spawning grounds and reduction of their population
3  structure.  NMFS AR 5933-34.  NMFS went on to find:  "[g]iven the
4  positive indicators in the population observed over the last 8
5  years, it would appear that the winter-run Chinook salmon
6  population is recovering[,]" yet in the same discussion NMFS
7  stated the population may be declining at 3 percent per year and
8  the log growth rate indicates a population that is generally
9  declining.  NMFS AR 5933-34.

10      A reviewing court should "uphold a decision of less than
11  ideal clarity if the agency's path may be reasonably discerned."
12  *National Ass'n of Homebuilders v. Defenders of Wildlife*, 127 S.
13  Ct. at 2530.  Here, not only do NMFS's factual findings partly
14  contradict its no jeopardy and no adverse modification
15  conclusions, the factual findings are themselves internally
16  contradictory.  When an agency's factual findings and analyses
17  are contradictory, or when such findings and analyses contradict
18  the BiOp's conclusion, the agency's path cannot reasonably be
19  discerned.  See, *Homebuilders*, 127 S.Ct. at 2530.

20      In their briefs supporting their motion for summary judgment
21  (and opposing Plaintiffs' motion for summary judgment) and at the
22  hearing on the parties' motions, the Federal Defendants
23  painstakingly explained the rationale for changing the 1.9 MAF
24  Shasta COS Requirement from a hard-wired requirement to a
25  "target," and moving the TCP upstream from Bend Bridge to Balls
26  Ferry.  The primary reason offered for these proposed changes is
27  that the 1993 BiOp was outdated, because new methods of
28  conserving and managing cold water resources came into play,

1  including, construction of the TCD, implementation of CVPIA
2  (b)(2) water, SWRCB D-1641, and implementation of the Trinity
3  River ROD, as well as the listing of new species.  In the BiOp's
4  present incomplete state, since none of these new actions have
5  been analyzed, it cannot be ascertained whether they will or will
6  not jeopardize the winter-run Chinook salmon or adversely modify
7  its critical habitat.

8       The Bureau is charged with operating this overwhelmingly
9  complex Project, and NMFS must ensure the Bureau's actions comply
10 with the ESA.  The Bureau remains free to implement its proposed
11 actions of changing the 1.9 MAF Shasta COS Requirement from a
12 requirement to a target, and moving the TCP from Bend Bridge to
13 Balls Ferry.  However, the forthcoming biological opinion must
14 accurately and completely analyze whether these proposed actions
15 will or will not jeopardize the continued existence and recovery
16 of the winter-run Chinook and adversely modify its critical
17 habitat.

18      For all these reasons, NMFS's findings and analysis
19 regarding the winter-run Chinook are incomplete, arbitrary and
20 capricious because (1) NMFS failed to consider recovery of the
21 species as required by the regulations and *NWF v. NMFS*; and (2)
22 NMFS's factual findings and analyses are themselves contradictory
23 as to the survival of the species, and these findings and
24 analyses contradict its no jeopardy conclusions.  There is no
25 analysis of adverse effect on critical habitat.  On this issue,
26 Plaintiffs' motion for summary judgment is GRANTED.  Federal
27 Defendants' motion for summary judgment is DENIED.

28

93

1                          (2)  <u>Spring-run Chinook</u>.

2          After formal consultation, NMFS reached the following

3    conclusion regarding the spring-run Chinook in the BiOp:

4          After reviewing the best scientific and commercial
           information available, the current status of the listed
5          species, the environmental baseline for the action
           area, the effects of the proposed action, and
6          cumulative effects, it is NOAA Fisheries biological
           opinion that the action, as proposed, is not likely to
7          jeopardize the continued existence of Central Valley
           spring-run Chinook salmon.  Critical habitat for
8          Central Valley spring-run Chinook salmon has not been
           designated, therefore, none will be affected.
9
     NMFS AR 5941.

10
           Plaintiffs assert that the BiOp's no jeopardy conclusion for
11
     the spring-run is contradicted by NMFS's BiOp's factual findings.
12
     Plaintiffs assert the following project operations threaten the
13
     mainstream population of the spring-run Chinook.  First, changing
14
     the 1.9 MAF Shasta dam COS requirement to a target and the
15
     upstream shift of the 56˙F Sacramento River temperature
16
     compliance point.  Second, the RBDD blocks or delays adult
17
     spring-run from reestablishing their population in the only
18
     available habitat for recovery, notwithstanding the tributaries
19
     population.
20
           Spring-run Chinook migrate above RBDD towards Keswick dam
21
     from April to July as they seek cooler water (less than 56˙F) for
22
     spawning.  NMFS AR 5843.  Spawning occurs in September and
23
     October, and fry begin to emerge in December and January.  NMFS
24
     AR 5843.  However, very few spring-run Chinook spawn in the
25
     mainstream Sacramento River because of the effects of Shasta Dam
26
     and past Project operations.  NMFS AR 5843.
27
           In the INTEGRATION AND SYNTHESIS OF THE EFFECTS section of
28

                                     94

1  the BiOp (BiOp section VII), NMFS made the following factual
2  findings: the overall abundance of the spring-run Chinook ESU is
3  low, but has increased since 1992 due to a large population
4  increase in the Deer, Mill, and Butte Creek stream tributaries.
5  NMFS AR 5934.  However, the increase in population abundance in
6  these tributaries masks the significant decline in the portions
7  of the population residing in the mainstream Sacramento River and
8  the Feather River.  NMFS AR 5934.  These two rivers were home to
9  significant portions of the spring-run Chinook ESU.  NMFS AR
10 5934.  Additionally, the Butte Creek population may be at or near
11 carrying capacity levels, which supports the inference that
12 further recovery cannot occur in that area.  NMFS AR 5934.

13      The mainstream Sacramento River and Feather River spring-run
14 Chinook populations probably represent 20 to 30 percent of the
15 current total population.  NMFS AR 5934.  This finding is
16 directly contradicted by the California Department of Fish and
17 Game biologists' belief that the spring-run Chinook population
18 has nearly disappeared from the mainstream Sacramento River.
19 NMFS AR 5935.  The spatial structure of the spring-run Chinook
20 ESU is very limited.  NMFS AR 5935.  In the upper Sacramento
21 River, RBDD blocks or delays adults' passage and prevents them
22 from re-establishing populations in the only available habitat
23 for recovery.  NMFS AR 5935.

24      In its analysis of Project impacts on the spring-run
25 Chinook, NMFS states "proposed Project operation impacts in the
26 upstream areas of the Sacramento River are likely to reduce the
27 mainstream Sacramento River juvenile spring-run Chinook salmon
28 population by 4 percent over current conditions in most years,

95

1 increasing total loss to 25 percent of the mainstream juvenile
2 population . . . ."  NMFS AR 5935.  Project related losses are
3 expected to continue into the future under formal and early
4 consultation and prevent the species from expanding its
5 distribution unless new areas can be restored.  NMFS AR 5935
6 NMFS then goes on to state "[w]e expect that proposed operations
7 will continue the decline of the mainstream (Sacramento River)
8 population and *likely lead to its extirpation*."  NMFS AR 5935
9 (emphasis added).  This morbid projection is inconsistent, if not
10 irreconcilable, with "no jeopardy," which is expected to result
11 from reduction of mainstream juvenile population by 25%.
12 Recovery is not addressed.  In practical terms this forecasts
13 elimination of spring run salmon from the Sacramento River, a
14 total loss of habitat, despite the NMFS conclusion there will be
15 no adverse impact or jeopardy to the species or its nonexistent
16 "critical" habitat, as to which NMFS nonetheless concluded "none
17 will be affected."  It is unexplained why NMFS concludes in
18 October 2004, the spring-run have no critical habitat, but
19 designate critical habitat in September, 2005.  This omission to
20 address critical habitat for spring-run under the ESA is equally
21 applicable to CV steelhead.

23                    (a)  Critical Habitat.

24      "Critical habitat" consists of those areas which have
25 "physical or biological features (I) essential to the
26 conservation of the species and (II) which may require special
27 management considerations or protection."  16 U.S.C.
28 § 1532(5)(A).

96

1     The failure to designate critical habitat for the spring-
2 run, must be evaluated under 16 U.S.C. § 1536(a)(2) which
3 requires that the adverse modification inquiry examine a given
4 Project's effect on critical habitat, that is, the land
5 specifically designated by the Secretary of Interior for that
6 purpose.  *Gifford Pinchot Task Force v. U.S. Fish & Wildlife*
7 *Service*, 378 F.3d 1059, 1075 (9th Cir. 2004).

8     The purpose of designating "critical habitat" is to set
9 aside certain areas as "essential" for the survival and recovery
10 of the threatened species.  16 U.S.C. § 1532(5).  Critical
11 habitat is designated after extensive study, detailed analysis,
12 and, ultimately, notice and comment rule-making that designates
13 critical habitat.  Once designated, critical habitat receives its
14 legal protection because it is subject to the § 7 consultations
15 and analysis required by law.  Section 1533(a)(3)(a) requires the
16 Secretary of the Interior, by promulgated regulation,
17 concurrently with the listing of an endangered or threatened
18 species, to designate any habitat of such species which is then
19 considered to be critical habitat.  Section 1533(b)(B)(2)
20 requires the Secretary to designate critical habitat on the basis
21 of the best scientific data available and after taking into
22 consideration the economic impact, impact on national security,
23 and any other relevant impact of specifying any particular area
24 as critical habitat.  The Secretary may exclude any area from
25 critical habitat if it is determined that the benefits of such an
26 exclusion outweigh the benefits of designation, specifying such
27 areas as part of the critical habitat, unless it is determined,
28 based on the best scientific and commercial data available, that

97

1  the failure to designate such area as critical habitat will
2  result in the extinction of the species concerned.

3      *Center for Biological Diversity v. U.S. Fish & Wildlife*
4  *Service*, 450 F.3d 930, 935 (9th Cir. 2006) characterizes critical
5  habitat designations as mandatory except where not prudent or not
6  determinable.  16 U.S.C. § 1533(a)(3); Title 50 C.F.R.
7  § 424.12(a)(2) defines "not determinable," as an excuse from
8  completing a designation of critical habitat when information
9  sufficient to perform requirements and analyses of the impacts of
10  designation is lacking or the biological needs of the species are
11  not sufficiently well known to permit identification of an area
12  as critical habitat.  It is "not prudent" to complete a
13  designation of critical habitat where it would be detrimental to
14  the species.  50 C.F.R. § 424.12(a)(1).  Arguably, these
15  provisions apply once the decision to designate critical habitat
16  has been made.  Here, NMFS has succeeded in avoiding any critical
17  habitat analysis required by the ESA for two species by simply
18  concluding, without explanation or findings that it is not
19  determinable or prudent to designate critical habitat, that there
20  is no critical habitat for two of the species.  Under ESA
21  § 1533(b)(2) the Secretary may only exclude portions of habitat
22  from critical habitat designation "if he determines that the
23  benefits of such exclusion outweigh the benefits of specifying
24  such area as part of the critical habitat."  It cannot reasonably
25  be suggested that the spring-run does not have critical habitat.
26  No evidence is provided why NMFS could not designate or analyze
27  critical habitat, particularly in view of the changing spawning
28  and migration patterns of the spring-run.  See also *Natural*

1 *Resources Defense Council v. U.S. Dept. of the Interior*, 113 F.3d
2 1121, 1125 (9th Cir. 1997).

3

4                           (b)   <u>Feather River</u>.

5        As to the Feather River, NMFS states that "project
6 operations are expected to provide generally adequate flows and
7 temperatures for spring-run Chinook salmon spawning, incubation,
8 and rearing."  NMFS AR 5935.  Additionally, "Project operations
9 in the Feather River are not expected to increase the primary
10 threat to spring-run Chinook salmon in that river: redd super-
11 imposition by fall-run Chinook salmon and hybridization with
12 hatchery fish."  NMFS AR 5935.  "Nor are project operations
13 expected to reduce these threats."  NMFS AR 5935.  These
14 conclusions that Project operations will have no adverse effect
15 on the Feather River population are directly contradicted by
16 NMFS's next conclusion which states, "[o]verall, Feather River
17 operations are expected to result in an increase of the
18 population's vulnerability to extinction due to chronic losses of
19 juveniles due to flow fluctuations."  NMFS AR 5936.  The BiOp
20 goes on to state, "[h]arm to the Feather River population and
21 loss of the mainstream Sacramento River population due to the
22 direct and indirect effects of Project operations, are expected
23 to reduce the ESU's numbers, reproduction, and distribution."
24 NMFS AR 5936.  "Continuation of and, in some cases, increases in
25 the adverse direct and indirect effects of Project operations are
26 expected to increase the probability of extinction of the Feather
27 River and Sacramento River populations with little chance of
28 recovery or re-establishment without implementation of other

                                99

1  recovery measures."   NMFS AR 5936.

2      NMFS has not explained or reconciled this contradictory

3  record evidence with the no jeopardy finding for spring run in

4  the Feather River.   NMFS's conclusion is that these two rivers

5  (non-habitat) containing up to 30% of the spring run population,

6  will lose 30% of the species directly to OCAP operations.

7      NMFS conclusory mentions but does not analyze the effects of

8  Project actions on the recovery of the spring-run Chinook

9  species.  *See NWF v. NMFS*, 481 F.3d at 1237 (holding that "the

10 jeopardy regulation requires NMFS to consider both recovery and

11 survival impacts.").

12     The text of the BiOp speaks not of jeopardy as defined by

13 regulation 50 C.F.R. § 402.02, but of extinction of the spring-

14 run Chinook in the Sacramento and Feather Rivers.   How

15 extirpation of approaching one-third of the species affected by

16 Project operations does not constitute jeopardy is not explained.

17 NMFS's no jeopardy conclusion for the Project operations' effects

18 on the spring-run Chinook is expressly contradicted by underlying

19 data and opinions of the BiOp.

20     NMFS's inability to specifically define the spring-run's

21 critical habitat, yet reach the conclusion that Project

22 operations will have no adverse effect on such undefined habitat

23 "because there is none" is a non-sequitur.   The BiOp as to

24 spring-run is incomplete, contradictory, and violates the ESA and

25 APA because it has: (1) failed to define and consider effects on

26 spring-run critical habitat, an important aspect of a no jeopardy

27 § 7 BiOp; (2) failed to explain why the no jeopardy findings are

28 contradicted by record evidence developed by the agency; and (3)

100

1    failed to adequately analyze recovery of the spring-run.

2          Plaintiffs' motion for summary judgment on this issue is

3    GRANTED.   Federal Defendants' cross-motion for summary judgment

4    is DENIED.

5

6                      (3)   CV Steelhead.

7          After formal consultation, NMFS's BiOp reached the following

8    conclusion regarding the CV steelhead:

9          After reviewing the best scientific and commercial
           information available, the current status of the
10         species, the environmental baseline for the action
           area, the effects of the proposed action, and
11         cumulative effects, it is NOAA Fisheries biological
           opinion that the action, as proposed, is not likely to
12         jeopardize the continued existence of Central Valley
           steelhead.   Critical habitat for Central Valley
13         steelhead has not been designated, therefore, none will
           be affected.
14
     NMFS AR 5941.

15
           Plaintiffs correctly assert that the text of the BiOp offers
16
     a "bleak prognosis" for the CV steelhead, yet it arrives at a
17
     contradictory "no jeopardy" conclusion.   For example, the BiOp's
18
     summary of the environmental baseline states: "For steelhead, the
19
     limited habitat below project dams has declined to a point where
20
     it can only support low population levels."   NMFS AR 5826.   In
21
     the same paragraph the BiOp states "the availability of habitat
22
     is so reduced for steelhead within the action area that remaining
23
     habitat likely cannot support a recoverable population."   NMFS AR
24
     5826.   The BiOp further states:
25
           Abundance estimates for steelhead in three of the five
26         project rivers in the action area (*i.e.*, the
           Stanislaus, Feather, and American Rivers) presently are
27         so low that continued viability of the populations is
           questionable (McElhany *et al.* 2000).   The resilience of
28         these populations to any further adverse impacts to

                                  101

1    individuals or habitat is likely to be impaired.

2  NMFS AR 5826.

3    When describing the effects of the Projects on the

4  population impacts and potential for recovery of the CV steelhead

5  the BiOp states:

6      Overall Project impacts are likely to reduce the
       juvenile population by 12 to 27 percent over current
7      conditions . . . in most years, resulting in an average
       total of 51 to 66 percent juvenile mortality when added
8      to the effects of current operations.  Mortality in the
       upstream spawning areas is likely to increase on the
9      American and Feather Rivers due to flow fluctuations,
       higher temperatures, and low flows.

10

11  NMFS AR 5938.

12    The BiOp goes on to state that the CV steelhead ESU "has

13  been reduced to small, remnant populations both inside and

14  outside the Project action area, and the most recent available

15  data indicate that the natural population is continuing to

16  decline . . . ."  NMFS AR 5936.  Additionally, the limited

17  habitat below Project dams has declined in quality to a point

18  where it can only support low population levels.  NMFS AR 5936.

19  The "[s]patial structure for [CV] steelhead is fragmented and

20  reduced by elimination or significant reduction of the major core

21  populations . . . that provided a source for the numerous smaller

22  tributary and intermittent stream populations . . . ."  NMFS AR

23  5937.  "Tributary populations can likely never achieve the size

24  and variability of the core populations in the long-term,

25  generally due to the size and available resources of the

26  tributaries."  NMFS AR 5937.

27    The final paragraph discussing the population impacts and

28  potential for recovery states:

102

1
2
3
4
5
6
7
8
9
10
11

> Given the trends observed in the [CV] steelhead
> populations throughout the action area, continuation of
> past project impacts and expected increases in losses
> of juveniles due to both future demands and early
> consultation actions, NOAA Fisheries expects that the
> proposed project operations under both formal and early
> consultation will increase the likelihood of steelhead
> population extinction in most Project Rivers.  As a
> result, the ESU would be rendered more vulnerable to
> demographic and other stochastic extinction processes
> by reductions in the number of populations, population
> abundances, ESU diversity, and spatial distribution.
> Based on recent status and trends, the current ESU is
> comprised of several populations all with high
> probabilities of extinction.  Minor increases in the
> likelihood of extinction of one or more populations
> within such a species could have measurable impacts on
> the regional probability of extinction, based on the
> proportional relationship between local and regional
> probabilities of persistence in species.

12  NMFS AR 5938-39.

13      This BiOp analysis paints a dark picture and anticipates

14  regional extinction of CV steelhead populations resulting from

15  project operations and cumulative effects in most Project rivers.

16  Contrary to this materially negative evidence, NMFS's conclusion

17  that no jeopardy to the species will occur and there will be no

18  adverse effect on critical habitat because there is none, is the

19  diametric opposite of the AR evidence.

20      The BiOp is also legally incomplete as it does not address

21  the impacts to recovery of the CV steelhead species.  *NWF v.*

22  *NMFS*, 481 F.3d at 1236-38 ("the jeopardy regulation requires NMFS

23  to consider both recovery and survival impacts.").  The Federal

24  Defendants and DI concede that "further explanation" is needed

25  regarding NMFS's no jeopardy conclusion for the CV steelhead

26  species.

27      As to critical habitat, Federal Defendants and DI admit the

28  BiOp fails to define or analyze the CV steelhead habitat, an

103

1    abdication of this ESA responsibility.  Where, as here, critical
2    habitat is unidentified and unanalyzed because there is "none,"
3    NMFS has no basis to opine on the Projects' effects on such non-
4    existent "habitat."  It is telling that critical habitat was
5    designated for the CV steelhead by September, 2005.  For these
6    reasons, the BiOp's conclusion that Project operations under the
7    2004 OCAP will not jeopardize the CV steelhead survival and
8    recovery is arbitrary, capricious, and not in accordance with the
9    law, because it is irreconcilably inconsistent with the AR
10   evidence and not explained.   The complete failure to perform
11   critical habitat analysis is a further violation of the ESA.

12        Plaintiffs' motion for summary judgment is GRANTED.  Federal
13   Defendants' cross-motion is DENIED.

14

15                b.   Whether NMFS Failed to Conduct Any Analysis
                       of Project Impacts in the Context of the
16                     Species' Life Cycles and Population Dynamics.

17        Plaintiffs contend that NMFS failed to analyze the Projects'
18   impacts on winter-run Chinook, spring-run Chinook, and CV
19   steelhead life cycles.  NMFS admits that the analysis of salmonid
20   life cycles requires additional explanation.  Specifically, NMFS
21   asserts it thoroughly discussed the species lifecycles, but
22   additional explanation is appropriate to ensure conformity with
23   the Ninth Circuit's decision in *NWF v. NMFS*, 481 F.3d at 1236 and
24   *NRDC v. Kempthorne*, 506 F. Supp. 2d 322.  The DI contend NMFS
25   properly considered Project impacts on the species life cycles
26   and concluded that Project operations would not jeopardize the
27   species.

28        In *NWF v. NMFS*, the court affirmed the district court's

104

1  rejection of a biological opinion that failed to "consider near-
2  term habitat loss to populations with short life cycles." *NWF v.*
3  *NMFS*, 481 F.3d at 1224. "NMFS must consider near-term habitat
4  loss to [species] with short life cycles." In that case, the
5  biological opinion found that the proposed operations would have
6  significant negative impacts on each of the species' (sockeye
7  salmon) critical habitat in the short term, despite planned
8  mitigation efforts. *Id.* at 1240. The court found that NMFS "did
9  not adequately demonstrate that these impacts would not affect
10 the fishes' survival and recovery, in light of their short life-
11 cycles and current extremely poor habitat conditions." *Id.* The
12 NWF Project resulted in degraded habitat conditions for five
13 years before improvement in the sixth year. No sufficient
14 provision was made for the sockeye species that had a two year
15 life cycle.

16      Here, Plaintiffs argue NMFS failed to analyze Project
17 impacts on the species' prospect for survival and recovery. The
18 AR finds that winter-run Chinook spawn after three years. In
19 most cases, this defines the life cycle of spawning winter-run,
20 estimated to be between 56% and 87% of the species. NMFS AR
21 5789. NMFS admits as much by its undertaking to provide analysis
22 in light of the recent case law. The BiOp does discuss in great
23 detail species life history and population dynamics of chinook
24 salmon, *see*, NMFS AR at 5787-95, and steelhead, *see*, NMFS AR at
25 5799-5803. However, the BiOp does not analyze proposed project
26 impacts on these species in relation to their actual life
27 expectancy. For example, the BiOp found that proposed operations
28 will increase temperature-related losses to eggs and fry of

1  winter-run Chinook by moving the TCP to Balls Ferry and estimated
2  early life stage mortality will increase from 41 percent to 44
3  percent in critically dry years.   NMFS AR 5845.

4        The BiOp does not make estimates of temperature-related
5  mortality or sublethal effects on adult salmon from relocation
6  upriver of the temperature control point, nor flow diversions to
7  the Central Delta, or predation, although, it does acknowledge
8  these effects will occur.   NMFS AR 5834-52, 5834, 5876-5901,
9  5923-34.   The BiOp provides estimates of juvenile mortality due
10 to entrainment at the pumps and indirect effects such as poor
11 water quality and predation without relating and analyzing these
12 effects to the decreased number of fish that make it to the
13 juvenile stage as a result of egg and larval mortality or
14 decreased number of spawning adults.   NMFS AR 5896-97, 5923-28,
15 and 5930-31.   DI rejoin that each life stage is discussed in
16 terms of temperature management as a whole. With respect to the
17 winter-run Chinook, the BiOp also recognizes an increased
18 likelihood that an individual class year may be significantly
19 reduced by drought conditions.

20       While NMFS identified impacts on the species due to proposed
21 changes in Project operations, it did not fully explain and
22 analyze the impacts on most life stages of the salmon and
23 steelhead species' in view of chances for survival and recovery,
24 except to conclude that one to two years of critically dry
25 conditions would not be problematic," although winter-run
26 spawners have a three year life cycle.   NMFS AR 5933-34.   DI
27 ignore the Ninth Circuit's command that NMFS "must consider near-
28 term habitat loss to populations with short life cycles," as it

1 specifically applies to this case.  *NWF v. NMFS*, 481 F.3d 1224.

2 The law is evolving.  However, where, as here, NMFS has reviewed

3 but not analyzed the effects on life-cycles and population

4 dynamics of the species, the BiOp fails to comply with the law.

5 NMFS has agreed to complete the additional analysis and

6 explanation of effects on the species.

7      Plaintiffs' motion for summary judgment is GRANTED.  NMFS

8 shall complete the required ESA analysis on the three species'

9 life cycles and population dynamics in its forthcoming biological

10 opinion as informed by continuing changes in the law.  Federal

11 Defendants' cross-motion is DENIED.

12

13              c.   <u>Whether NMFS's Focus on Incremental Project
                      Impacts Arbitrarily Ignored Significant
                      Adverse Effects Associated With Baseline
14                    Conditions and is Unsupported by the BiOp's
                      Findings</u>.

15

16      Plaintiffs contend NMFS impermissibly based its no jeopardy

17 and no adverse modification conclusions on the incremental

18 effects of Project operations rather than analyzing Project

19 impacts "within the context of other existing human activities

20 that impact the listed species;" i.e., the entire agency action.

21 NMFS concedes that its analysis of baseline conditions needs

22 further explanation to ensure that this BiOp conforms with *NWF v.*

23 *NMFS*, 481 F.3d 1236, and *NRDC v. Kempthorne*, 506 F. Supp. 2d 322.

24 The DI again seek to overcome the Agency's admission by

25 contending NMFS properly considered baseline conditions and

26 analyzed the combined direct and indirect impacts of baseline

27 Project operations in combination with the additional impacts

28 caused by proposed future operations.  This contention requires

1  no further discussion in view of Federal Defendants' concession.

2       The Interagency Cooperation regulations promulgated under

3  the ESA assign NMFS the following responsibilities during formal

4  consultation:

> (1)  Review all relevant information provided by the
>       Federal agency or otherwise available.  Such
>       review may include an on-site inspection of the
>       action area with representatives of the Federal
>       agency and the applicant.
>
> (2)  Evaluate the current status of the listed species
>       or critical habitat.
>
> (3)  Evaluate the effects of the action and cumulative
>       effects on the listed species or critical habitat.
>
> (4)  Formulate its biological opinion as to whether the
>       action, taken together with cumulative effects, is
>       likely to jeopardize the continued existence of
>       listed species or result in the destruction or
>       adverse modification of critical habitat.

15  50 C.F.R. § 402.14(g)(1)-(4).

16      In *NWF v. NMFS*, the Ninth Circuit affirmed a district

17  court's conclusion that the disputed biological opinion in that

18  case impermissibly failed to incorporate degraded baseline

19  conditions into its jeopardy analysis.  *NWF v. NMFS*, 481 F.3d at

20  1235.  The NWF biological opinion "evaluated the effects of the

21  proposed action as compared to the reference operation, rather

22  than focusing its analysis on whether the action effects, when

23  added to the underlying baseline conditions, would tip the

24  species into jeopardy."  *Id.*  The court rejected NMFS's

25  interpretation of the jeopardy regulation that NMFS may satisfy

26  the ESA by comparing the effects of proposed operations on listed

27  species to the risk posed by baseline conditions, and only if

28  those effects are "appreciably" worse than baseline conditions

1  must a full jeopardy analysis be made.  *Id.*  Under this approach,
2  the court noted, a listed species could be gradually destroyed,
3  so long as each step on the path to destruction was sufficiently
4  modest.  *Id.*  The court concluded "[t]his type of slow slide into
5  oblivion is one of the very ills the ESA seeks to prevent."

6      "[W]here baseline conditions already jeopardize a species,
7  an agency may not take action that deepens the jeopardy by
8  causing additional harm."  *Id.* at 1236.  The approach enunciated
9  by the court in *NWF v. NMFS* "does not require NMFS to include the
10 entire environmental baseline in the 'agency action' subject to
11 review."  *Id.*  "It simply requires that NMFS appropriately
12 consider the effects of its actions 'within the context of other
13 existing human activities that impact the listed species."  *Id.*
14 "[T]he proper baseline analysis is not the proportional share of
15 responsibility the federal agency bears for the decline in the
16 species, but what jeopardy might result from the agency's
17 proposed actions *in the present and future human and natural*
18 *contexts*."  *Id.* (emphasis in original).

19     NMFS included in the BiOp a 10-page description and summary
20 of the environmental baseline for the winter-run Chinook, spring-
21 run Chinook, and CV steelhead species.  NMFS AR 5817-5826.  The
22 ENVIRONMENTAL BASELINE section of the BiOp (section IV) begins
23 with a description of the status of each species.  NMFS AR 5817-
24 18.  Next, the BiOp lists and describes factors affecting the
25 species in the action area.  NMFS AR 5819-5824.  These factors
26 include habitat blockage, which include Project dams, NMFS AR
27 5819-20; water development activities, which include constraints
28 such as the CVPIA, SWRCB water quality control plans, the 1993

1  BiOp, the 1995 Delta Smelt Opinion, the Coordinated Operating

2  Agreement, and other agreements, NMFS AR 5820-21; invasive

3  species that impact the growth and survival of juvenile salmonids

4  including striped bass, largemouth bass, sunfish, Asian clams,

5  and the water hyacinth plant species, NMFS AR 5821; sportfishing,

6  NMFS AR 5821-22; ecosystem restoration, NMFS AR 5822-24; and ESA

7  § 10 permits covering research, NMFS AR 5824.  The ENVIRONMENTAL

8  BASELINE sections conclude with a summary of the environmental

9  baseline, although no mortality numbers are included.  NMFS AR

10 5824-26.

11      In the INTEGRATION AND SYNTHESIS OF THE EFFECTS section of

12 the BiOp (section VII), NMFS used the following methodology to

13 measure and analyze the effects of proposed Projects on the

14 listed species:

15      [This section of the BiOP] summarizes the physical,
        chemical, and biotic effects of the proposed operation
16      of the Central Valley Project and State Water Project
        and their interrelated and interdependent actions to
17      determine (a) if those effects can be expected to
        reduce the reproduction, numbers, or distribution of
18      threatened or endangered species in the action area,
        (b) determine if any reductions in reproduction,
19      numbers, or distribution would be expected to
        appreciably reduce the affected population's likelihood
20      of surviving and recovering in the wild, and (c) if
        appreciable reductions in the population's likelihood
21      of surviving and recovering in the wild would cause
        appreciable reductions in the ESU's likelihood of
22      surviving and recovering in the wild.

23 NMFS AR 5917-18.

24      The BiOp compares CV steelhead fry and egg mortality caused

25 by the Projects with baseline mortality, compares average loss at

26 the pumps with baseline loss to determine impacts, and discusses

27 incremental differences in fish mortality due to project

28 operations in the Delta.  NMFS AR 5921-31.  The "Population

110

1  Impacts and Potential for Recovery" subsection of the INTEGRATION
2  AND SYNTHESIS OF THE EFFECTS section contains two tables
3  summarizing (1) the expected effects of the proposed actions, and
4  (2) the expected effects of current operations on the winter-run
5  Chinook, spring-run Chinook, and CV steelhead species.  NMFS AR
6  5930-31 (Tables 9 and 10).

7       Table 9 includes a summary of the direct and indirect
8  impacts of the proposed actions and interrelated and
9  interdependent actions, where quantification was possible.  NMFS
10 concluded "[o]verall Project effects are expected to result in
11 the loss of an additional 3 to 20 percent of the winter-run
12 Chinook salmon juvenile population, 5 to 20 percent of the
13 spring-run Chinook salmon juvenile population, and 12.5 to 27.5
14 percent of the steelhead juvenile population over baseline
15 conditions."  NMFS AR 5930-31.

16      Table 10 includes a summary of the expected effects of
17 current operations on the winter-run Chinook, spring-run Chinook,
18 and CV steelhead species in terms of the percentage loss to
19 juvenile and adult life stages.  NMFS concluded "[c]urrent
20 operations result in the loss of 42 percent of the winter-run
21 Chinook salmon juvenile population, 37 percent of the spring-run
22 Chinook salmon juvenile population, and 39 percent of the
23 steelhead juvenile population assuming that 33% of the population
24 dies in the delta due to indirect effects of the project."  NMFS
25 did acknowledge some of this mortality may occur with or without
26 the Projects, but without quantification.

27      Extrapolating the numbers provided by NMFS in tables 9 and
28 10, yields the following overall effects of proposed Project

111

operations when added to the baseline conditions.

| EFFECTS | WINTER-RUN CHINOOK | SPRING-RUN CHINOOK | STEELHEAD |
|---|---|---|---|
| Baseline juvenile mortality due to <u>current Project operations</u> | 42% | 37% | 39% |
| Additional juvenile mortality due to <u>proposed Project operations</u> | 3% — 20% | 5% — 20% | 12.5% — 27.5% |
| TOTAL JUVENILE MORTALITY | 45% — 62% | 42% — 57% | 51.5% — 66.5% |

NMFS AR 5930-32.  The extrapolated totals, when proposed effects from Project operations are added to baseline conditions, results in total increases in juvenile mortality for winter-run Chinook from 42% to a minimum of 45% and as high as 62%.  Juvenile mortality increases from 37% to a minimum of 42% and as high as 57% for spring-run Chinook salmon.  Juvenile mortality increases from 39% to a minimum of 51.5% and as high as 66.5% for CV steelhead.

NMFS reached its no jeopardy conclusion based on whether incremental impacts, *i.e.*, impacts resulting from proposed operations, limiting the analysis to only proposed Projects that have come or are coming on-line, would jeopardize the listed species; rather than basing its conclusion on an analysis of the overall effects of proposed Project operations added to baseline conditions.  The ESA requires NMFS's focus and analysis to

112

1 address all the combined effects on the listed species of losing
2 between 45% to 62% of winter-run Chinook juveniles, 42% to 57% of
3 spring-run Chinook juveniles, and 51.5% to 66.5% of steelhead
4 juveniles, rather than limiting the "effects" to incremental
5 losses due to proposed operations of 3% to 20% (winter-run
6 Chinook), 5% to 20% (spring-run Chinook), and 12.5% to 27.5%
7 (steelhead).  NMFS has undertaken to remedy any shortcoming or
8 ambiguity in this area of concern.[9]  Such compliance should bring
9 the BiOp into conformity with the evolving law.

10     Plaintiffs' motion for summary judgment is GRANTED.  NMFS
11 shall complete the required ESA analysis on incremental Project
12 impacts in relation to baseline conditions in its forthcoming
13 biological opinion.  Federal Defendants' cross-motion is DENIED
14 based on their acknowledgment remand for compliance is necessary.

15

16          d.   Whether NMFS Failed to Conduct a
               Comprehensive Analysis of Impacts Associated
17             With the Entire Federal Action During Formal
               Consultation.
18
19     Citing *Conner v. Burford*, 848 F.2d 1441, 1457-58 (9th Cir.
20 1988), Plaintiffs contend NMFS has not prepared a biological
21 opinion assessing the effects of the "entire agency action" (in
22 this case the actions contained in the 2004 OCAP) rather than
23 bifurcating or phasing discrete parts of the entire agency action

24
_____

25     [9] This BiOp suffers from the same defects as the biological
26 opinion at issue in *NWF v. NMFS*, although *NWF v. NMFS* was decided
approximately two and one-half years after issuance of the BiOp
27 and approximately one year before the Bureau reinitiated
consultation on the BiOp.  On remand, NMFS must ensure its
28 forthcoming biological opinion is consistent with *NWF v. NMFS*.

113

1 into formal and early consultation.  Plaintiffs also contend NMFS
2 cannot avoid considering the impacts of certain "interrelated or
3 interdependent project components" by deferring such
4 consideration to future, site-specific consultations.

5      Plaintiffs contend NMFS improperly bifurcated its analysis
6 of project impacts resulting in an incomplete analysis under
7 formal consultation, the BiOp ignored impacts associated with
8 construction of the facilities necessary to carry out long-term
9 CVP and SWP operations, and the BiOp only considered a fraction
10 of the total amount of water service contract deliveries it
11 authorizes.  The Federal Defendants and DI contend this court
12 rejected the same arguments in *NRDC v. Kempthorne*, 506 F. Supp.
13 2d at 382-87, and should do the same here.

14      The ESA requires NMFS to address impacts associated with the
15 entire agency action.  *See Conner*, 848 F.2d at 1453-54 (holding
16 that agency violated the ESA by choosing not to analyze the
17 effects of all stages of oil and gas activity on federal lands).
18 According to ESA regulations, the effects of an agency action
19 include "direct and indirect effects of an action on the species
20 or critical habitat, together with the effects of other
21 activities that are interrelated or interdependent with that
22 action, that will be added to the environmental baseline."  50
23 C.F.R. § 402.02.  "[T]he meaning of 'agency action' is determined
24 as a matter of law by the Court, not by the agency."  *Greenpeace*
25 *v. NMFS*, 80 F. Supp. 2d 1137, 1146 (W.D. Wash. 2000) (citing
26 *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1054 (9th Cir.
27 1994)).

28      NMFS describes its approach and scope to consultation on

1  future actions as follows:

2       The purpose of the proposed action is to continue to
        operate the CVP and SWP in a coordinated manner to
3       divert, store, and convey Project water consistent with
        applicable law.  In addition to current day operations,
4       several future facilities and actions are to be
        included in this consultation.  These actions are: (1)
5       increased flows in the Trinity River, (2) an intertie
        between the California Aqueduct (CA) and the Delta-
6       Mendota Canal (DMC), (3) the Freeport Regional Water
        Project (FRWP), (4) water transfers, and (5) renewal of
7       long term CVP water service contracts.  *Early
        consultation* will address: (1) increased pumping at the
8       SWP Banks Pumping Plant (referred to as 8500 Banks),
        (2) permanent barriers operated in the South Delta
9       (*i.e.*, proposed as part of the SDIP) and water
        transfers, (3) a long-term EWA, and (4) various
10      operational changes identified as CVP/SWP project
        integration.  The purpose of the SDIP is to increase
11      water supply south of the Delta, ensure water quality
        and quantity to agricultural diverters within the south
12      Delta, and to reduce straying of Central Valley fall-
        run Chinook salmon (*O. tshawytscha*) in the south Delta
13      (SDIP 2003).  These proposed actions will come online
        at various times in the future.  Thus, the proposed
14      action is a) continued operation of the CVP/SWP without
        these actions, and b) operations as they come online.

15
        The future actions listed in the preceding paragraph
16      are not being implemented at present (except for
        increased flows in the Trinity River); however, they
17      are part of the future proposed action on which [the
        Bureau] requested *early consultation*.  Only the water
18      operations associated with the proposed activities are
        addressed in this consultation (*i.e.*, Project
19      activities do not include construction of any
        facilities to implement the actions).  All site-
20      specific/localized activities of the actions such as
        construction/screening and any other site-specific
21      effects will be addressed in separate action-specific
        section 7 consultations.

22

23 NMFS AR 5743.

24      NMFS offered the following explanation for dividing

25 consultation into formal consultation and early consultation:

26      After much discussion between [the Bureau] and DWR
        regarding which facilities and actions to be included
27      in the consultation, such as operation and schedule of
        the permanent barriers (which are a part of the South
28      Delta Improvement Program [SDIP]), it was agreed upon

                              115

1
2
3
4

by all agencies involved in the OCAP consultation to divide the project description into two components consisting of *formal consultation* on the effects of on-going operations and facilities mentioned above[10], combined with an *early consultation*[11] on the effects of future operations in the south Delta region.

5   NMFS AR 5739.

6       Only the aspects of the 2004 OCAP that will actually be

7   implemented without further approval were the subject of formal

8   consultation.  Other changes that may occur in the future were

9   the subject of early consultation, but the BiOp defers future

10  site-specific and localized activities, including construction,

11  to be addressed in new separate § 7 consultations.

12      Plaintiffs contend NMFS bifurcated its analysis of Project

13  impacts resulting in an incomplete analysis under the BiOp's

14  formal consultation.  Plaintiffs assert the BiOp defines the

15

16  _____

17      **[10]** These operations and facilities with respect to the
18  Bureau's facilities and actions to be addressed in the
    consultation, include: "ongoing operations at all CVP divisions
19  including the Tracy Pumping Plant and Fish Collection Facility
    (TFCF), the CVP/SWP Intertie, implementation of the Trinity River
20  Record of Decision (ROD) flows, and operations of the proposed
    Freeport Regional Water Project."  NMFS AR 5739.  DWR's
21  facilities and operations addressed in the consultation "include
    ongoing operations of the following: the Oroville-Thermalito
22  Complex, Harvey O. Banks Delta Pumping Plant (Banks), Clifton
    Court Forebay (CCF), Skinner Fish Protective Facility (SFPF),
23  Northbay Aqueduct, and the Suisun Marsh Salinity Control Gates
24  (SMSCG)."  NMFS AR 5739.

25      **[11]** "The purpose of early consultation is to reduce the
26  potential for conflicts between listed species or critical
    habitat and proposed actions which usually occur before an
27  applicant files an application for a Federal permit or license,
    in this case a permit to increase pumping at Banks."  NMFS AR
28  5739.

1  proposed actions as including existing CVP and SWP operations and
2  future operations "as they come online."  Plaintiffs' main
3  complaint is that NMFS only analyzed a subset of Project impacts
4  under formal consultation and deferred for early consultation,
5  impacts associated with SDIP and integration activities.
6  Plaintiffs maintain Project components relegated to early
7  consultation are part of a long-term management plan, and NMFS
8  had sufficient information before it to include all proposed
9  actions in its formal consultation analysis.  According to
10  Plaintiffs, NMFS analyzed early consultation actions at a level
11  of detail similar to those performed under formal consultation.

12      Plaintiffs also contend the BiOp failed to consider
13  interrelated and interdependent Project impacts associated with
14  construction of new CVP and SWP facilities.  Plaintiffs contend
15  the construction of CVP and SWP facilities necessary to carry out
16  the operations set forth in the 2004 OCAP are interrelated or
17  interdependent with long-term CVP and SWP operations, and that
18  construction of these facilities has no function apart from the
19  implementation of changes to CVP and SWP operations.  These
20  actions include: (1) construction of permanent barriers
21  associated with SDIP; (2) construction of the Intertie; (3)
22  construction activities associated with increased diversion of
23  water from the Sacramento River to the Freeport Regional Water
24  Authority; and (4) increasing the effective storage capacity in
25  the San Luis Reservoir.

26      All of what Plaintiffs argue may be assumed to be true,
27  *arguendo*, but such future Project enhancements are not now being
28  implemented nor is any finite date set for future implementation

1  of any of them.  Without formal action pursuant to authorization
2  and funding, all the future measures are conditional and not
3  certain.  The Plaintiffs in *NRDC v. Kempthorne* made the same
4  arguments regarding construction of the Intertie, SDIP, and the
5  Freeport Diversion, asserting these projects are interrelated and
6  interdependent with the 2004 OCAP.  Plaintiffs present nothing
7  new to change that analysis that these future actions will not
8  occur "but for" the approved actions, because they are
9  independent actions that may or may not be implemented in the
10 future.  *NRDC v. Kempthorne* applied the "but for" test derived
11 from the Endangered Species Consultation Handbook to determine
12 whether these proposed actions are interrelated or interdependent
13 so as to be considered part of the action.  Using the "but for"
14 test, "[t]he biologist should ask whether another activity in
15 question would occur "but for" the proposed action under
16 consultation.  506 F. Supp. 2d at 384.  "If the answer is no,
17 that the activity in question would not occur but for the
18 proposed action, then the activity is interrelated or
19 interdependent and need should be analyzed with the effects of
20 the action."  *Id.*  "If the answer is 'yes,' that the activity in
21 question would occur regardless of the proposed action under
22 consultation, then the activity is not interrelated or
23 interdependent and would not be analyzed with the effects of the
24 action under consultation."  *Id.*  The question in *NRDC v.*
25 *Kempthorne* is the same as it is here: whether construction and
26 operation of SDIP, Freeport, and the Intertie are interrelated
27 and interdependent with the proposed action subject to formal
28 consultation?

1    As DI correctly note, that the South Delta Improvement

2  Project and the Intertie would "comprise substantial changes in

3  the facilities and long-term operations" does not make the

4  proposed actions "interrelated or independent."  There continues

5  to be no evidence in the record that construction of the Freeport

6  Diversion or the Intertie is dependent in any way upon the pre-

7  approval of delivery of water to the Project or the Project's

8  current operations.  Future construction and operation of the

9  South Delta Improvement Project are independent of the OCAP

10  Project operations.  The SDIP may or may not ever be constructed.

11  Project operations under the 2004 OCAP do not depend upon the

12  SDIP.

13    The formal consultation at issue here, covers delivery of

14  CVP water to the proposed Freeport Regional Water Project and

15  operation of the Intertie.  However, the BiOp expressly excludes

16  impacts of construction associated with these projects.  With

17  respect to future actions, only "water operations" as opposed to

18  "construction activities" are addressed in the consultation that

19  produced the BiOp.

20        The future actions listed in the preceding paragraph
          [increased flows in the Trinity, the Intertie, the
21        Freeport Regional Water Project, water transfers,
          renewal of long-term CVP water service contracts,
22        increased pumping at Banks, SDIP, and the long-term
          Environmental Water Account] are not being implemented
23        at present (except for increased flows in the Trinity
          River); however, they are part of the future proposed
24        action on which [the Bureau] requested *early
          consultation*.  Only the water operations associated
25        with the proposed activities are addressed in this
          consultation (*i.e.*, Project activities do not include
26        construction of any facilities to implement the
          actions).  All site-specific/localized activities of
27        the actions such as construction/screening and any
          other site-specific effects will be addressed in
28        separate action-specific section 7 consultations.

119

1  NMFS AR 5743.

2      The Freeport Regional Water Project and the Intertie are
3  designed to more effectively distribute CVP and SWP water.  There
4  is no record evidence that construction of either project is tied
5  in any way to the preapproval of delivery of water to the
6  Project.  Flow operations could be approved after or
7  simultaneously with the approval of new construction.  Under the
8  Handbook test, the future construction projects are not
9  interrelated or interdependent with the proposed actions subject
10  to formal consultation (Project water operations).  With respect
11  to the SDIP, the BiOp excludes its construction and operation
12  under the 2004 formal consultation.  NMFS AR 5743.  Applying the
13  Handbook analysis, the construction and operation of SDIP will
14  not occur "but for" the approval of CVP and SWP operations in the
15  2004 OCAP; each action is independent of the OCAP.  The SDIP is a
16  separate addition that may or may not be constructed, and in no
17  way do current Project operations depend on or relate to the
18  SDIP.  There is no ESA prohibition to addressing future operation
19  and construction of these facilities in a separate § 7
20  consultation at the time these projects or operations are
21  authorized, funded and actually "come online."

22      With respect to water contract deliveries, the BiOp explains
23  that "renewal of long term CVP water service contracts" is one of
24  five future actions specifically included in the 2004 OCAP
25  consultation.  Citing *NRDC v. Rodgers*, 381 F. Supp. 2d 1212,
26  1237-40 (E.D. Cal. 2005), Plaintiffs argue ESA § 7's mandate to
27  consult on the entire agency action means that NMFS was required
28  to analyze the biological effects of delivering the full amount

1  (100%) of water that the Bureau intended to authorize for

2  delivery under the long-term water service contracts.  Instead,

3  Plaintiffs assert that NMFS only analyzed the effects of

4  delivering between 10% to 89% of the full amounts authorized

5  under the long-term CVP contracts and as a result NMFS

6  significantly underestimated the impacts of CVP deliveries.

7       "A biological opinion must consider the effects of the

8  entire agency action, meaning 'all activities or programs of any

9  kind authorized, funded or carried out,' including 'the granting

10  of . . . contracts.'" *NRDC v. Kempthorne*, 506 F. Supp. 2d at 386

11  (citing 50 C.F.R. § 402.02).  The Bureau delivers water to

12  numerous contractors through long-term CVP contracts.  NMFS AR

13  5747.  The long-term CVP contracts are interrelated and are

14  considered part of the proposed project.  NMFS AR 5747.

15       The CALSIM II studies that incorporated water deliveries

16  into its flow scenarios did not analyze 100% CVP contract

17  deliveries.  Rather, the analysis is based on the effects of

18  delivering between 11% and 89% of the full CVP contract

19  allocations.  *NRDC v. Kempthorne* determined *Rodgers* was

20  distinguishable on the grounds that it addressed the government

21  authorization of CVP water users' long-term water service

22  contracts, not Project operations under the 2004 OCAP.  *NRDC v.*

23  *Kempthorne*, 506 F. Supp. 2d at 387.  Here, however, the agency

24  action subject to consultation is not the authorization or merits

25  of new water service contracts, rather, it is the operation of

26  the CVP and SWP under the 2004 OCAP and whether those operations

27  will cause jeopardy to the survival or recovery of the winter-run

28  Chinook, spring-run Chinook, and CV steelhead.  "The government

121

1  is entitled to make reasonable assumptions about the operational

2  volume of water flows, water levels, temperature, and quality

3  based on the historical and projected data contained in the

4  administrative record."  *Id.*  NMFS was not required to analyze

5  the effects of full contract deliveries as Plaintiffs contend.

6      The agency model for the worst case scenario is
   indispensable.  Analysis of a "best of the best" case

7      in a wet water year is not indispensable, as such "wet"
   water year conditions do not present any reasonable

8      likelihood of jeopardy, absent an additional showing.
   However, because such a scenario could eventuate, it is

9      not unlawful for the agency to analyze the effects on
   the smelt of 100% water contract deliveries.  However,

10     the 100% delivery analysis is not required.  This is a
   matter committed to the agency's expertise and

11     discretion.

12  *Id.*

13        No analysis of the effects of 100% Project water to be

14  delivered under future water contracts can now be made, as the

15  form and substance of such renewed water contracts is totally in

16  flux.  Existing renewal and any new water service contracts have

17  already been challenged in this litigation.  In separate

18  litigation, other water service agreements have been challenged.

19  Plaintiffs have objected to any new water service contracts and

20  the Bureau has agreed to a moratorium for existing, renewal, and

21  new water service contracts pending the outcome of this

22  litigation.  Interim water service contract renewals are limited

23  to two years with the possibility of extension for no more than

24  five years.

25        The analysis in the *NRDC v. Kempthorne* decision that 100%

26  contract deliveries representing a "best of the best" case for

27  wet water year conditions, which present no reasonable likelihood

28  of jeopardy to the species or their critical habitat, applies to

1  obviate the need to treat 100% of water deliveries in the BiOp.

2      Plaintiffs' motion for summary adjudication on the failure
3  to address "Entire Agency Action" is DENIED.  Federal Defendants'
4  motion on this issue is GRANTED.

5

6              2.  Global Climate Change and the Effects on the
                   Hydrology of Northern California Rivers.
7

8      Plaintiffs' contend at the time the BiOp was being
9  formulated, the best available science demonstrated that global
10 climate change would significantly change the hydrology of
11 Northern California's river systems.  According to Plaintiffs,
12 the BiOp's analysis relies on temperature and hydrology models
13 that assume the same monthly temperature, hydrologic, and
14 climatic conditions experienced in the Project area from 1922
15 through 1994 will continue for the future twenty-five year
16 duration of the 2004 OCAP operations.

17     NMFS admits that an explanation of its conclusions on the
18 effects of global climate change should have been included in the
19 BiOp.  NMFS states it will address global climate change in its
20 ongoing, reinitiated ESA § 7 consultation consistent with *NRDC v.*
21 *Kempthorne*.  The DI also concede further explanation of the
22 effects of global climate change is needed.

23     The § 7 formal consultation process is designed to "insure"
24 that any agency action "is not likely to jeopardize the continued
25 existence of any endangered species or threatened species or
26 result in the destruction or adverse modification of habitat of
27 such species which is determined . . . to be critical . . . ."
28 16 U.S.C. § 1536(a)(2).  "In fulfilling the requirements of [§

1  1536(a)(2)] each agency shall use the best scientific and

2  commercial data available." *Id.*

3      An agency has wide discretion to determine what is "the best

4  scientific and commercial data available." *San Luis & Delta-*

5  *Mendota Water Auth. v. Badgley*, 136 F. Supp. 2d 1136, 1151 (E.D.

6  Cal. 2000) (citing *Southwest Ctr. for Biological Diversity v.*

7  *United States Bureau of Reclamation*, 143 F.3d 515, 523 n.5 (9th

8  Cir. 1998). "The ESA does not explicitly limit the Secretary's

9  analysis to apolitical considerations." *Southwest*, 143 F.3d at

10 523 n.5.  An agency must make its decision about jeopardy based

11 on the best science available at the time of the decision, and

12 may not defer that jeopardy analysis by promising future studies

13 to assess whether jeopardy is occurring.  *Center for Biological*

14 *Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1156 (D. Ariz.

15 2002).  While uncertainty is not necessarily fatal to an agency

16 decision, *e.g. Greenpeace Action v. Franklin*, 14 F.3d 1324, 1337

17 (9th Cir. 1992) (upholding agency decision even though there was

18 uncertainty about the effectiveness of management measures

19 because agency premised its decision on a reasonable evaluation

20 of all data), an agency may not entirely fail to develop

21 appropriate projections where data "was available but [was]

22 simply not analyzed." *Greenpeace v. National Marine Fisheries*

23 *Service*, 80 F. Supp. 2d 1137, 1149-50 (W.D. Wash. 2000).

24      *NRDC v. Kempthorne* addressed 2004 OCAP and Project impacts

25 on the Delta smelt and determined that the FWS acted arbitrarily

26 and capriciously by failing to address the issue of global

27 climate change in that Biological Opinion, finding, "the absence

28 of any discussion in the BiOp of how to deal with any climate

1  change is a failure to analyze a potentially important aspect of
2  the problem." *Kempthorne*, 506 F. Supp 2d. at 370.

3       During the time period when NMFS was formulating this BiOp,
4  readily available scientific data existed regarding the potential
5  effects of global climate change on the hydrology of the Project
6  area river systems including:

7       (1)  Studies showing that radiative forcing (warming) had
8            begun to increase steeply around 1970 and is expected
9            to continue into the foreseeable future.  USBR SAR
10           79697-99.  Scientists predicted this warming would
11           produce less snowfall, more rainfall, and earlier
12           snowmelt, leading to major reductions in the Sierra
13           snowpack and decreases in summer stream flow.  USBR SAR
14           79701-02, 79704-05.

15      (2)  Plaintiffs NRDC and The Bay Institute expressed their
16           concern to the Bureau in July 2003 that the Draft OCAP
17           and Draft OCAP Biological Assessment failed to consider
18           climate change effects and provided references for
19           several studies and reports on climate change effects
20           on water availability in the Western United States.
21           NMFS AR 1662-64.  These concerns were ignored.

22      The BiOp does not discuss this global climate change data or
23  mention that NMFS, at a minimum, considered this data.  Instead,
24  the BiOp relies on past hydrology and temperature models that
25  assume the historical monthly temperature, hydrologic, and
26  climatic conditions experienced from 1922 through 1994 will
27  continue for 25 years through the duration of the 2004 OCAP
28  operations.  These assumptions were challenged as without basis

1   in then-available science.  NMFS AR 5828-31.

2       Plaintiff's motion for summary adjudication is GRANTED as to
3   the climate change claim issue based on NMFS's total failure to
4   address, adequately explain, and analyze the effects of global
5   climate change on the species.  Federal Defendants' cross-motion
6   is DENIED.

7

8           3.   <u>Sufficiency of Adaptive Management Plan and</u>
            <u>Mitigation Measures</u>.
9

10      Plaintiffs dispute that the adaptive management plan and all
11  formulated action and mitigation measures are sufficient,
12  certain, or enforceable.

13      The principal action measures are: (1) movement of the
14  Sacramento River temperature compliance point (TCP) upstream from
15  Bend Bridge to Balls Ferry; (2) changing the 1.9 MAF COS
16  requirement for Shasta Reservoir to a target; and (3) the
17  operation of the RBDD.  Plaintiffs further complain about future
18  use of Environmental Water Account assets to reduce Project
19  effects and the potential for increased exports resulting from
20  the South Delta Improvement Project.

21      As Federal Defendants and DI correctly observe, the action-
22  mitigation measures described in the Population Impacts section
23  of the BiOp (NMFS 5930-40), are made part of the "Terms and
24  Conditions" of the BiOp, each of which is a specific part of the
25  Incidental Take Statement ("ITS"), enforceable under civil and
26  criminal law, the ITS provides take coverage for Project
27  operations.  NMFS AR 5953-68.  The ITS characterizes the "Terms
28  and Conditions" as "non-discretionary" and that Reclamation and

1  DWR must comply or ensure compliance by their contractor(s) "with
2  the following terms and conditions, which implement the
3  reasonable and prudent measures described above."  NMFS 5953.

4       Each of the operational concerns Plaintiffs advance,
5  Sacramento River temperature controls, Shasta Reservoir COS and
6  RBDD passage and operations are specifically prescribed by the
7  BiOp's Terms and Conditions and are subject to enforceable
8  definite and certain requirements as specifically analyzed below.
9  It is well established that any biological opinion's ITS
10  constitutes a permit authorizing the agency action to "take" the
11  endangered or threatened species so long as the agency respects
12  those terms and conditions.  *Bennett v. Spear*, 520 U.S. 154 at
13  169-70 (1997).

14       By contrast, the Delta Smelt BiOp in the *NRDC v. Kempthorne*
15  case, prescribed mitigation measures in a Delta Smelt Risk
16  Assessment Matrix that had no finite standards which were
17  enforceable through the ITS.  Adaptive management of mitigation
18  measures delineated by the ITS Terms and Conditions has been
19  employed for a number of years and DI argue, these measures are
20  working to increase winter-run population and returning adults
21  from a low of 186 in 1994 to nearly 10,000 in 2003.  NMFS AR
22  5791-92.  DI refer to returning adult spring-run from 1,403 fish
23  in 1993 to more than 8,500 in 2000 and 2003.  The efficacy of
24  this analysis has been discussed above.

25

26            a.    Temperature Control.

27       Project operations affect salmon which travel from their
28  spawning grounds to and from the ocean.  The BiOp contains the

1 following reasonable and prudent measure:

2          Reclamation shall manage the cold water supply within
           Shasta Reservoir and make cold water releases from
3          Shasta Reservoir to provide suitable habitat for
           Sacramento River winter-run Chinook salmon, Central
4          Valley spring-run Chinook salmon, and Central Valley
           Steelhead in the Sacramento River between Keswick Dam
5          and Bend Bridge.

6 NMFS AR 5950.  The Supreme Court has defined the word "shall"

7 used in a BiOp to generally indicate a command that admits of no

8 discretion on the part of the person instructed to carry out the

9 directive.  *National Ass'n of Home Builders, supra*, 127 S.Ct. at

10 2531.

11      The following temperature control obligation is non-

12 discretionary in the BiOp:

13          Reclamation shall target daily average water
           temperatures in the Sacramento River between
14          Keswick Dam and Bend Bridge as follows:

15              I.  Not in excess of 56°F at compliance
               locations between Balls Ferry and Bend Bridge
16             from April 15 through September 30 and not in
               excess of 60°F at the same compliance
17             locations between Balls Ferry and Bend Bridge
               from October 1 through October 31, provided
18             operations and temperature forecast
               demonstrate the capability to achieve and
19             sustain compliance.

20 NMFS AR 5956.

21      This 56°F requirement was established by State Water

22 Resources Control Board Order 90-5, issued May 2, 1990.

23 Consultation is required with the SWRCB if the Bureau seeks to

24 designate a temperature compliance point upstream of RBDD.  USBR

25 AR 06741.  Because hydrologic conditions can limit

26 controllability of upstream operations to an inopportune period

27 of time or upstream of Bend Bridge, the Bureau must maintain

28 daily average water temperature at 56°F at Bend Bridge or other

                              128

1 locations upstream, depending upon actual hydrology.  USBR AR
2 07859.  This is necessary because mortality of eggs and pre-
3 emergent fry commences at 57°F and reaches 100% at 62°F.  (Boles
4 1988) 1993 NMFS BiOp, USBR AR 7832.

5     In dry and critical years the Bureau must initiate
6 consultation with concerned agencies regarding temperature
7 control.  USBR AR 07860.  In fact, in all but two "wet" years
8 since 1993, the Bureau and NMFS have re-consulted to adjust the
9 temperature compliance point upstream of Bend Bridge toward Balls
10 Ferry in accordance with the fact that most salmon redds and
11 incubating eggs are located above Balls Ferry.  NMFS AR 5843.
12 Unlike the Delta Smelt Remedial Action Matrix, here, a finite
13 56°F enforceable temperature requirement is set between Balls
14 Ferry and Bend Bridge, with adaptive management only used where
15 compliance cannot be achieved, and actual reinitiation of
16 consultation with NMFS is required before the Bureau announces
17 annual CVP water delivery allocations.  NMFS AR 5956.

18     Recognizing that in lower storage years at Shasta, the
19 temperature compliance point has been adjusted using finite
20 criteria:

| May 1 Shasta Cold Water Volume Below 52°F | Compliance Target |
| --- | --- |
| <3.3 MAF | Balls Ferry |
| >3.3 MAF but < 3.6 MAF | Jellys Ferry |
| >3.6 MAF | Bend Bridge |

27 NMFS AR 5957.  This temperature control protocol requires
28 maintenance of the 56°F ceiling.  In the event of noncompliance,

129

1   consultation and alternative compliance is required and has

2   actually occurred and water allocation measures have been

3   implemented in 8 of 10 years prior to the 2004 BiOp.  No more is

4   required.

5

6                  b.   <u>Shasta Carryover Storage</u>.

7        For Shasta COS, the ITS non-discretionary Terms and

8   Conditions specify:

9           Reclamation shall target a minimum end-of-year
            (September 30) carryover storage in Shasta Reservoir of
10          1.9 MAF for improvement of cold water resources in the
            following water year.
11
    NMFS AR 5956.
12
         Plaintiffs maintain that the use of the term "target"
13
    eliminates a definite and enforceable requirement for Shasta
14
    Reservoir COS that was mandated by the 1993 BiOp.  DI rejoin that
15
    the record shows there was never a mandatory requirement for
16
    carryover at Shasta that applied in all years.  Although the 1.9
17
    MAF is a target, the Bureau must consult with NMFS before it
18
    announces water delivery allocations for any year that annual
19
    water conditions do not support temperature control compliance at
20
    Balls Ferry.  NMFS AR 5956.  NMFS may object to delivery
21
    allocations that reduce the ability to meet temperature control
22
    at the location which exists to protect spawning adults and
23
    incubating eggs.  The Bureau must still reinitiate consultation
24
    with NMFS before the first water allocation announcement in
25
    February if the Bureau's forecast projects carryover storage
26
    levels drop below 1.9 MAF at the end-of-water-year.  SWRCB Order
27
    90-5.
28

                                   130

1          c.   <u>SWRCB Order 90-5</u>.

2          As a practical matter this criteria is enforceable, as more

3    than two consecutive dry water years with rising temperatures at

4    TCP require reinitiation of consultation.   USBR AR 07857-58; NMFS

5    AR 5956.   Term and Condition No. 5 requires the Bureau to explain

6    to NMFS in an annual forecast, how the Bureau will comply with

7    the Order 90-5 temperature mandates.   NMFS AR 5955 (requiring

8    forecast of deliverable water).

9

10         d.   <u>Red Bluff Diversion Dam</u>.

11         To provide upstream and downstream passage at RBDD the BiOp

12   includes the following requirements:

13              Reclamation shall implement all measures practicable to
                provide unimpeded passage upstream and downstream at
14              the Red Bluff Diversion Dam during the period of
                September 1 through June 30 each year.
15
                A.   As a minimum, Reclamation shall provide unimpeded
16              upstream and downstream passage at the Red Bluff
                Diversion Dam from September 15 through May 14 each
17              year.

18              B.   NOAA Fisheries will review proposals for early gate
                closures (prior to May 15) of up to ten days, one time
19              per year, only in emergency situations where the
                alternative water supplies (i.e., new 4th Pump at Red
20              Bluff Pumping Plant and Stony Creek) are unable to meet
                TCCA demands.   Reclamation will reopen the gates for a
21              minimum of five consecutive days, prior to June 15 of
                the same year in a manner that will be least likely to
22              adversely affect water deliveries.

23              C.   Reclamation shall further investigate and implement
                all practicable opportunities, including improvement to
24              fish ladders, to improve or provide unimpeded upstream
                and downstream passage at Red Bluff Diversion Dam from
25              May 15 through June 30 and September 1 through
                September 15 each year.
26
                D.   Reclamation in coordination with FWS and DFG, shall
27              further investigate the results of blockage or delays
                in the migration of adult Sacramento winter-run Chinook
28              salmon and Central Valley spring-run Chinook salmon at

                                131

the RBDD as a result of gate closures between May 15
and June 30 and from September 1 through September 15.
Written reports shall be provided by to NOAA Fisheries
as investigations are completed.

NMFS AR 5959.

These enforceable Terms and Conditions are imposed with the
mandatory "shall" and impose a non-discretionary obligation
during specified time periods.  If early closure of the RBDD
gates is necessary, adaptive management may be implemented by
NMFS.

e.   The Environmental Water Account.

Plaintiffs raise again the argument that mitigation measures
cannot rely upon "environmental water" because there is no finite
certainty the environmental water account will be adequately
funded in the future.  The Court has previously ruled that:

The EWA is simply a means by which the SWP and the CVP
can obtain water by purchasing it from willing sellers.
EWA water may be used either to protect fish or to
compensate Project water users for reduced exports at
the Project pumps.  If money is unavailable to fund the
EWA, Defendants are nonetheless required to prevent
smelt take from exceeding permissible take limits.

There is a difference between the DSRAM's failure to
require mitigation actions in response to trigger
events, designed to assure the commitment of necessary
resources to smelt protection, and the duty to have
available or acquire those necessary resources.  A
court must leave to the agency the application of its
expertise and authority to manage the complex
hydrological, legal, financial, physical and logistical
aspects of protecting the Delta smelt.

*NRDC v. Kempthorne*, 506 F.Supp.2d at 358-59.  There is no reason
to disturb this ruling.

132

1          f.    South Delta Improvement Program.

2     This issue has also been decided in the Smelt BiOp Order:

3          The SDIP is a separate addition that may or may not be
           constructed.  Project operations under the 2004 OCAP in
4          no way depend upon the SDIP.  There is no prohibition
           to addressing future operations, if and when the
5          construction of the SDIP will occur, in a separate
           consultation.

6

7  506 F.Supp.2d at 386.  In this case the SDIP was treated in the

8  BiOp as a matter for early consultation.  NMFS AR 5739.  Early

9  consultation regarding salmonids does not result in incidental

10 take protection.  NMFS AR 5968.  The reasoning of the *Kempthorne*

11 decision has equal applicability.  There is no legal impediment

12 to address future operations of the SDIP, if and when it will be

13 constructed, a separate ESA § 7 consultation must then be

14 performed.

15      In this case, the BiOp's mitigation measures are included in

16 the Terms and Conditions of the Incidental Take Statement, are

17 declared to be "non-discretionary" by the BiOp, and are

18 enforceable.  For all the reasons described above, the mitigation

19 measures are definite, and sufficiently certain to be

20 enforceable.  Their prescription and implementation are within

21 the agency's reasonable discretion to which deference is owed.

22 These measures strike the appropriate balance between the needs

23 of certainty and flexibility prescribed by law.

24      Plaintiffs' motion for summary adjudication regarding

25 mitigation measures and adaptive management is DENIED.  Federal

26 Defendants' cross-motion for summary judgment is GRANTED.

27

28

1      E.    **Bureau Claims**.

2           1.    **The Bureau's § 7(a)(2) Obligations**.

3      Plaintiffs also move for summary judgment against the

4  Bureau, asserting that the Bureau has violated its ESA Section

5  7(a)(2) obligation to "insure" that its actions are not likely to

6  jeopardize the continued existence of an endangered or threatened

7  species or to destroy or adversely modify the species' critical

8  habitat.  16 U.S.C. 1536(a)(2).  Plaintiffs assert that the

9  Bureau violated 7(a)(2) in two respects.  First, Plaintiffs argue

10 that the Bureau acted arbitrarily and capriciously by relying on

11 the 2004 BiOp because it was fatally flawed at the time it was

12 issued.  Second, Plaintiffs maintain that the Bureau's "continued

13 reliance" on the BiOp is arbitrary and capricious in light of

14 information that emerged after the BiOp was issued.

15

16           a.    **The Bureau's Reliance on the 2004 BiOp at the
                   Time It Was Adopted.**

17

18      Plaintiffs' claim that the Bureau, as the action agency,

19 unjustifiably relied on and accepted the NMFS BiOp, which NMFS

20 produced as the expert consulting agency.  The relevant inquiry

21 is not whether the BiOp itself is flawed, but rather whether the

22 action agency's reliance on the BiOp was arbitrary and

23 capricious.  *City of Tacoma, Washington v. FERC*, 460 F.3d 53, 75–

24 76 (D.C. Cir. 2006).  While reliance on a "fatally flawed" BiOp

25 is likely to be found arbitrary and capricious, "the action

26 agency need not undertake a separate, independent analysis of the

27 issues addressed in the BiOp."  *Id.* (citing *Aluminum Co. of Am.*

28 *v. Adm'r Bonneville Power Admin.*  175 F.3d 1156, 1160 (9th Cir.

1999))(internal quotations omitted).

> ...[I]f the law required the action agency to undertake
> an independent analysis, then the expertise of the
> consultant agency would be seriously undermined.  Yet
> the action agency must not blindly adopt the
> conclusions of the consultant agency, citing that
> agency's expertise.  Rather, the ultimate
> responsibility for compliance with the ESA falls on the
> action agency.

*Id.* (internal citations omitted).

If the consultant agency's opinion is based on "admittedly weak" information, the action agency would only be found to have acted unlawfully in relying on that opinion if the challenging party can point "new information -- i.e., information the consultant agency did not take into account – which challenges the opinion's conclusions."  *Id.*  Plaintiffs do not assert that the Bureau was presented with nor do they identify new information before October 22, 2004, unavailable to NMFS, that gave the Bureau a basis for doubting the expert conclusions in the NMFS BiOp.  *See City of Tacoma*, 460 F.3d at 76.  Here, when the Bureau received new information, § 7 consultation was reinitiated.

Nevertheless, even if this "new information" standard is not satisfied, the action agency must, whether through the BiOp or some other document, "consider all the relevant factors," *Rumsfeld*, 198 F. Supp. 2d at 1157, and "offer[] an explanation for its decision that is both plausible and internally coherent," *Defenders of Wildlife v. EPA*, 420 F.3d 946, 959 (9th Cir. 2005)(rev'd on other grounds).  Plaintiffs raise a number of arguments that can be analyzed under this alternative standard.

(1)   **Political Bad Faith Contention**.

Plaintiffs argue that the Bureau had knowledge that NMFS scientists reached jeopardy opinions based on available evidence and data, but were "ultimately overridden" by their superiors. This political bad faith contention amounts to an assertion that the Bureau's decision to rely upon the BiOp was not "plausible." The Bureau's "political" role in the 2004 BiOp consultation was questioned by members of Congress, precipitating an investigation by the Department of the Interior's Office of the Inspector General ("OIG"). The resulting OIG report found: "No BOR employees or contractors tried to influence the consultation process," and that all changes to the 2004 NMFS BiOp could "accurately be described as the result of 'commonplace' collaboration." USBR CD #4a AR 80263-80269. There is no reason to second-guess this result.

Plaintiffs' motion for summary adjudication of this issue is DENIED. Federal Defendants' cross-motion on this issue is GRANTED.

(2)   **Allegedly "Obvious" Legal Errors**.

Plaintiffs, referencing all of the legal arguments made in their motion for summary judgment against NMFS, assert that the Bureau acted unlawfully in relying on a BiOp that was replete with "obvious legal errors." (Doc. 146 at 36.) These alleged errors, which amount arguments that the Bureau did not "consider all the relevant factors," and/or that the Bureau failed to "offer[] an explanation for its decision that [was] both plausible and internally coherent," are discussed in turn.

136

1          (a)   **Mitigation Measures.**

2     Plaintiffs' "uncertain and unenforceable mitigation

3 standards" claim has been resolved above.   The Bureau's OCAP BA,

4 Chapter 15, describes how mitigation measures implemented by the

5 agencies will "mitigate losses of salmon, Delta smelt, and

6 steelhead that cannot reasonably be avoided."   USBR AR 05550-

7 05561.   The Bureau discussed and analyzed a variety of mitigation

8 measures, including (1) temperature management to minimize salmon

9 mortality; (2) implementation of CVPIA § 3406(b)(2)(providing

10 800,000 AF of CVP yield for environmental and fish recovery

11 purposes); (3) the Delta Pumping Plant Fish Protection Agreement

12 (Four Pumps Agreement); (4) the Tracy Fish Collection Facility

13 Direct Loss Mitigation Agreement; (5) the California Bay-Delta

14 Authority; (6) the EWA Program; (7) Trinity River releases at

15 Lewiston Dam; (8) regulation of flows and protection of salmonid

16 migration; (9) spawning and incubation in Clear Creek, Sacramento

17 River and American River; and (10) drought management measures.

18 USBR AR 05152-05153, 05218-05225.   The Bureau thereby employed

19 its own expertise and performed its own independent analysis of

20 how mitigation and minimization efforts would ensure compliance

21 with ESA § 7.   Plaintiffs' criticisms of the environmental water

22 account; CVPIA (b)(2) water implementation; and related flow

23 measures were rejected in the *NRDC v. Kempthorne* smelt decision.

24 This analysis has not changed.   Reasonable experts differ on

25 these issues.   Deference is owed to the Agency.   The Bureau

26 performed its § 7(a)(2) responsibilities as to the BiOp for

27 mitigation measures.

28

1        Plaintiffs' motion for summary adjudication of this issue is

2   DENIED.   Federal Defendants' cross-motion on this issue is

3   GRANTED.

4

5                        (b)   Internal Contradictions.

6        As earlier analyzed, NMFS's factual findings and analyses

7   with respect to jeopardy and recovery are internally

8   contradictory and incoherent.   The Bureau provided no

9   justification for accepting this obviously contradictory

10  evidence.

11       Plaintiffs' motion for summary judgment on this issue is

12  GRANTED.   Federal Defendants' cross-motion on the issue of BiOp

13  inconsistencies is DENIED.

14

15                        (c)   Recovery & Critical Habitat
                               Analysis.
16

17       Also as discussed earlier, the BiOp failed to adequately

18  consider recovery of the species and completely failed to

19  consider impacts to critical habitat.   The Bureau's reliance upon

20  a BiOp with such obvious flaws amounts to a failure by the Bureau

21  to "consider all the relevant factors."

22       Plaintiffs' motion for summary judgment on these issue is

23  GRANTED.   Federal Defendants' cross-motion on these issues is

24  DENIED.

25

26                        (d)   Global Climate Change.

27       Neither the BiOp nor the Bureau's OCAP BA addressed climate

28

change.[12]  Federal Defendants, including the Bureau, acknowledge that the BiOp must be remanded to remedy this failure.  However, this facial inadequacy was arguably not required by established law at the time the BiOp was adopted by the Bureau.  For that reason alone, Plaintiffs' motion for summary adjudication on this ground is DENIED.  Federal Defendants' cross-motion is GRANTED on this ground.  Nevertheless, the Bureau shall complete a legally sufficient BA that considers Global Climate Change.

                    (e)  <u>Temperature Control Point</u>.

     The TCP was a subject of substantial debate between NMFS and the Bureau.  There was disagreement and the matter was extensively considered.  The Bureau relied on SWRCB Order 90-05 and Water Rights Order 91-01 authorizing modification of the water temperature compliance point when temperature objectives cannot be met at RBDD.  USBR AR 04937-04938.

     The Bureau, in two separate sections of the OCAP BA, discussed its approval of a flexible TCP.  The OCAP BA at 0941 states:

_____

     [12]  Although the BA refers to several scientific articles on the subject, USBR AR 5564, 5591, they were not analyzed. Similarly, while the Bureau touched upon the issue of salinity changes, which affect Delta smelt, USBR AR 05135, this is not an analysis of the impacts of continuing climate change on salmonids.  The word "climate" only appears four times in the Bureau's OCAP BA, once in the text of the BA, three times within citations found in the reference section.  It is disingenuous to suggest based on the BA that the Bureau considered global climate change.  Neither the BA or the NMFS BiOp did so.

1    Locating the target temperature compliance at Balls
     Ferry (1) reduces the need to compensate for the
2    warming affects of Cottonwood Creek and Battle Creek
     during the spring runoff months with deeper cold water
3    releases and (2) improves the reliability of cold water
     resources through the fall months.   Reclamation
4    proposes this change in Sacramento River temperature
     control objective to be consistent with the capability
5    of the CVP to manage cold water resources and to use
     the process of annual planning and coordination with
6    the Sacramento River Temperature Task Group to arrive
     at the best use of that capability.

7        Second, OCAP BA Chapter 9, Table 9-8 and related text

8    confirms the Bureau reconsulted on winter-run and has recommended

9    moving the TCP nearly every year in the ten years following the

10   1993 NMFS BiOp.   *Id.* at 05227-8.

11       Although TCP as a target is a less definite and certain

12   standard, it is enforceable, and in practice has resulted in

13   action in every year a temperature issue arises.   The Bureau's

14   exercise of its expertise and discretion is reasonable and

15   adoption of the BiOp's TCP target methodology was not arbitrary

16   and capricious.

17       Plaintiffs' motions for summary adjudication on the TCP is

18   DENIED.   Federal Defendants' cross-motion for summary judgment is

19   GRANTED.

20

21                      (f)   Failure to Consider 100% of Water
                              Deliveries.
22

23       Plaintiffs' allegation the Bureau failed to consider "the

24   full extent of water deliveries" was rejected in *NRDC v.*

25   *Kempthorne*, May 25, 2007, Order at pp. 115-118 and above.   The

26   same analysis applies to the Bureau's BA.   Use of a CALSIM Model

27   to evaluate arranged water deliveries without the potential

28   impacts of 100% water deliveries, utilized by the FWS in its

                                   140

1  Delta smelt BiOp, was found to be an application of reasonable
2  science by the expert agency.  Such reliance was justified when
3  NMFS utilized CALSIM modeling.  For the same reasons, not
4  repeated here, set forth in *NRDC v. Kempthorne*, the Bureau did
5  not have to analyze a 100% water delivery scenario for the
6  salmonid species in the OCAP BA and NMFS BiOp.  This alleged
7  failure is not arbitrary or capricious.

8       Plaintiffs' motion for summary adjudication on considering
9  100% of water deliveries is DENIED.  Summary adjudication is
10 GRANTED for the Bureau on this issue.

11

12      In sum, the Bureau acted arbitrarily and capriciously by
13 relying upon a BiOp that contained numerous, obvious internal
14 contradictions and failed to consider key factors, namely
15 recovery and impacts to critical habitat.  This finding is
16 entirely distinct from any finding regarding vacatur of the BiOp,
17 which has yet to be made.

18

19            b.   The Bureau's "Continued Reliance" on the
                   BiOp.
20
21      Plaintiffs also argue that the Bureau's decision to
22 "continue to rely" on the 2004 BiOp in the face of new
23 information proving its "fatal flaws" is arbitrary, capricious,
24 and contrary to the agency's continuing duty to insure that its
25 actions do not jeopardize listed species or adversely affect
26 their critical habitat.

27      However, the record establishes that the Bureau considered
28 new information as it became available and in light of that

141

1  information, reinitiated consultation.  For example, Federal
2  Defendants point to a January 10, 2006, meeting between the
3  Bureau and NMFS in the Bureau Director's office to reinitiate
4  consultation on the 2004 NMFS BiOp.  The meeting agenda shows
5  new, emerging information was explicitly considered by both
6  agencies including: (1) global climate change; (2) variability in
7  ocean productivity; (3) uncertainty not explained or incorporated
8  into the analysis; (4) flawed models and analyses related to
9  temperature mortality; (5) new species listings and critical
10 habitat designations.  The Bureau acknowledged the need to
11 consider such new information covering all these subjects.  USBR
12 AR 05915-16.[13]

13      The Bureau further considered the fact that critical habitat
14 was designated for three newly-listed species.  The agencies
15 reinitiated consultation when the new information concerning
16 those three species emerged.  50 C.F.R. § 402.16(d) (requiring
17 reinitiation of consultation "if a new species is listed or
18 critical habitat designated that may be affected by the
19 identified action").  The Bureau, in the letter requesting
20 reinitiated consultation included the following analysis:

21          Reclamation has preliminarily determined that ongoing
            CVP and SWP operations through October 6, 2006, will
22          not destroy or adversely modify the critical habitats
            and thereby complies with our § 7(a)(2)
23          responsibilities under the Act.  We base this
            preliminary determination on the fact that both our
24          ongoing CVP and SWP operations in accordance with your
            October 22, 2004, biological opinion, and the wet water
25          year type will ensure that all the primary constituent

26 _____

27      [13]  These post-decisional peer review reports and related
   documents are offered and are received to disprove that the
28 Bureau acted in bad faith.

142

1    elements of the critical habitats are preserved.

2 Ronald Milligan letter February 14, 2007, USBR AR Supp. 05989-

3 05999 (offered to negate bad faith).

4    It is undisputed that on April 26, 2006, in light of this

5 new information, the Bureau requested the reinitiation of

6 consultation with NMFS.  That process is ongoing.  The law

7 requires no more.

8    Plaintiffs nevertheless complain that, even after

9 reinitiating consultation, the Bureau "expressed its intention to

10 rely on the...discredited [BiOp]...."  USBR AR 3106-07.  In

11 essence, Plaintiffs are making an argument for vacatur.  The

12 issue of the interim applicability of the BiOp pending completion

13 of reconsultation will be addressed in a separate proceeding.

14    Plaintiffs' motion for summary adjudication is DENIED on

15 this issue.  Federal Defendants' cross-motion is GRANTED.

16

17         2.   Violation of ESA § 7(d)

18    Because NMFS and the Bureau reinitiated consultation in

19 April 2006, ESA § 7(d) requires that the Bureau maintain the

20 status quo during the reinitiated consultation process to prevent

21 an irreversible or irretrievable commitment of resources that

22 would foreclose formulation or implementation of reasonable and

23 prudent alternatives.  The relevant inquiry is whether the

24 Bureau's actions permanently commit resources in a way that ties

25 its hands for future actions.

26    All parties concede that it would be inappropriate for the

27 Bureau to enter into any long-term water delivery contracts until

28 the new BiOp is issued.  The Bureau has also agreed to implement

143

1 the mitigation measures set forth in the BiOp.  Plaintiffs,
2 however, point out that the BiOp itself indicates that certain
3 key mitigation measures regarding temperature control will have
4 harmful effects on the species and their habitat.  Therefore,
5 Plaintiffs assert, continued implementation of mitigation
6 measures that will diminish the distribution of the species, and
7 may perhaps even exterpate entire populations, constitutes an
8 irreversible or irretrievable commitment of resources in so far
9 as it may make it impossible for the Bureau to implement
10 reasonable and prudent alternatives that would avoid jeopardy and
11 adverse modification to habitat.

12      Plaintiffs attempt to classify the ongoing implementation of
13 temperature control measures in this manner is not particularly
14 helpful.  Plaintiffs rely on *Pacific Coast Fed'n of Fishermen's*
15 *Ass'ns v. U.S. Bureau of Reclamation*, 138 F. Supp. 2d 1228, 1249
16 n. 19 (N.D. Cal. 2001), in which the district court, reviewing
17 the legality of minimum flow requirements for the Klamath
18 Project, stated, in dicta:

19           [T]he operation of Klamath Project according to any
              minimum flow levels contained in such a plan would
20           constitute an irreversible and irretrievable commitment
              of resources having the effect of foreclosing the
21           formulation or implementation of any reasonable and
              prudent alternative measures which would not violate
22           subsection (a)(2) of this action, because it would
              permit the diversion of water which may be necessary to
23           protect the threatened coho salmon and its critical
              habitat from jeopardy. Once that water is diverted to
24           other uses, it may not be recaptured. Nor can the
              effect on the coho salmon or its critical habitat be
25           undone if the proposed flows are too low.

26 In support of this conclusion, the district court relied upon
27 *Lane County Audubon Society v. Jamison*, 958 F. 2d 290, 295 (9th
28 Cir. 1992), in which timber sales were found to be "irreversible

144

1   or irretrievable commitment[s] of resources."  The parallel drawn

2   between timber sales and water diversions is not persuasive.

3   Water diversions are, as a general rule, reversible.  Of course,

4   diversions or the implementation of other water management

5   measures may nevertheless threaten listed species or their

6   habitat during the reconsultation period.  All parties recognize

7   the need to further explore the possibility of adopting interim

8   remedies to address such issues.

9

10      Plaintiffs' motion for summary judgment as to the Bureau's

11  alleged violation of § 7(d) is DENIED.  The Bureau's cross-motion

12  is GRANTED on the condition that Federal Defendants continue to

13  take no actions during reconsultation that make any irreversible

14  or irretrievable commitment of resources which forecloses the

15  formulation or implementation of reasonable and prudent

16  alternative measures.  The 2004 BiOp must be REMANDED to NMFS and

17  the Bureau for further consultation in accordance with the

18  requirements of law.  It is necessary, however, that further

19  proceedings be held to determine whether the 2004 BiOp should be

20  vacated.

21

22                       VII.  <u>Conclusion</u>.

23      It is not the Court's prerogative nor within its competence

24  to usurp the executive function to perform the Agency's work to

25  determine whether Project operations will or will not jeopardize

26  the winter-run Chinook, fall-run Chinook, or CV steelhead species

27  or adversely modify their critical habitat.  These

28  responsibilities are by law committed to the discretion and

                                145

1  expertise of the expert agency, NMFS, and action agency, the
2  Bureau.   The Court's authority is limited to determining the
3  lawfulness of the Agencies' actions or inactions.

4       The 2004 BiOp did not analyze the recovery of the three
5  species and any effect global climate change will have over the
6  next 25 years, the relevant duration of Project operations.   The
7  BiOp is incomplete and in the respects specifically identified,
8  inexplicably inconsistent as to the species' survival and
9  recovery.   The BiOp is unlawfully silent on critical habitat
10 effects.

11      An entire failure to consider an important aspect of the
12 problem and a failure to explain contradictory record evidence
13 make the BiOp arbitrary and capricious under *National Ass'n of*
14 *Home Builders*, 127 S.Ct. at 2529.   Under the APA, a reviewing
15 court must then remand the BiOp to the consulting agency.   The
16 court is without authority to proceed to decide the merits of the
17 dispute until the Agencies have had the opportunity to discharge
18 their statutory duties under the ESA.   NMFS must provide rational
19 and fact-based grounds for its new biological opinion based on
20 the best science available.

21      The following rulings are issued on the pending motions:
22      1.   On the NMFS BiOp, Plaintiffs' motion for summary
23 judgment is:

24           a.   GRANTED as to NMFS's record findings and analyses
25 which fail to explain contradictory evidence as to the survival
26 and recovery of all three species.   Federal Defendants' cross-
27 motion for summary judgment on this issue is DENIED;

28           b.   GRANTED as to the failure to analyze the adverse

1  effect and modification on the critical habitat of the three

2  species.  Federal Defendants' cross-motion for summary judgment

3  on this issue is DENIED;

4          c.   GRANTED as to ESA analysis on the three species'

5  life cycles and population dynamics.  Federal Defendants' cross-

6  motion for summary judgment on this issue is DENIED;

7          d.   GRANTED on the condition that NMFS complete its

8  incremental Project impact analysis in relation to baseline

9  conditions.  Federal Defendants' cross-motion on this issue is

10  DENIED;

11          e.   DENIED as to the failure to address "Entire Agency

12  Action."  Federal Defendants' cross-motions for summary judgment

13  on this issue is GRANTED;

14          f.   GRANTED as to the issue of Global Climate Change

15  and effects of the Hydrology of Northern California Rivers.

16  Federal Defendants' cross-motion for summary judgment on this

17  issue is DENIED;

18          g.   DENIED on the issue of the sufficiency of Adaptive

19  Management Plan and Mitigation Measures.  Federal Defendants'

20  cross-motion on this issue is GRANTED;

21     2.   Plaintiffs' motion for summary judgment as to the

22  Bureau's ESA § 7(a)(2) obligations is:

23          a.  DENIED as to any political bad faith contention.

24  Federal Defendants' cross-motion on this issue is GRANTED;

25          b.  DENIED as to the issue of mitigation standards.

26  Federal Defendants' cross-motion on this issue on is GRANTED;

27          c.  GRANTED as to unexplained internal contradictions

28  about jeopardy and recovery of the species.  Federal Defendants'

1  cross-motion on this issue is DENIED;

2            d.  GRANTED as to the Bureau's reliance upon a BiOp

3  that failed to "consider all the relevant factors," namely

4  recovery and critical habitat impacts.  Federal Defendants'

5  cross-motion on this issue is DENIED.

6            e.  DENIED on the issue of Global Climate Change.

7  Federal Defendants' cross-motion on this issue is GRANTED;

8            f.  DENIED as to the issue of the Temperature Control

9  Point location.  Federal Defendants' cross-motion for summary

10 judgment on this issue is GRANTED;

11           g.  DENIED as to alleged Failure to Consider 100% of

12 Water Deliveries.  Federal Defendants' motion on this issue is

13 GRANTED;

14           h.  With the understanding that the issue of interim

15 applicability of the BiOp pending completion of reconsultation

16 will be addressed in separate proceedings, DENIED as to the issue

17 of the Bureau's "continued reliance" on the BiOp in the face of

18 post-issuance information.  Federal Defendants' motion on this

19 issue is GRANTED;

20      3.  Plaintiffs' motion for summary judgment as to the

21 Bureau's ESA § 7(d) obligations is DENIED.  The Federal

22 Defendants' cross-motion on this issue is GRANTED, upon the

23 condition that Federal Defendants continue to take no actions

24 during reconsultation that make any irreversible or irretrievable

25 commitment of resources which forecloses the formulation or

26 implementation of any reasonable and prudent alternative

27 measures.

28

1        Plaintiffs shall, within five (5) days following service of

2   this Amended Decision by the Clerk, submit a form of Order

3   consistent with this Amended Decision.   The parties shall comply

4   with the schedule for the June 6, 2008, hearing to determine

5   whether any interim remedies are necessary and if the 2004 BiOp

6   should be remanded without vacatur.

7

8   SO ORDERED.

9

10  DATED:  May 20, 2008.

11

12                              /s/ Oliver W. Wanger
                             Oliver W. Wanger
13                      United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28