UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Pacific Coast Federation of Fishermen's Associations, Institute for Fisheries Resources, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>Carlos M. Gutierrez, in his official capacity as Secretary of Commerce, *et al.*,<br><br>    Defendants,<br><br>San Luis & Delta-Mendota Water Authority, *et al.*,<br><br>    Defendant-Intervenors. | 1:06-CV-00245 OWW GSA<br><br>MEMORANDUM DECISION CONDITIONALLY GRANTING OAKDALE IRRIGATION DISTRICT, ET AL.'S, MOTION TO INTERVENE. |

## I. INTRODUCTION

A memorandum decision and order, issued April 16, 2008 as amended May 20, 2008, granted in part and denied in part Plaintiffs' Endangered Species Act ("ESA") challenges to the 2004 biological opinion ("BiOp") issued by the National Marine Fisheries Service ("NMFS") on the effects of coordinated operation of two of California's largest water projects, the federal Central Valley Project ("CVP") and the State Water Project ("SWP"), on the endangered Sacramento River winter-run

1

Chinook salmon, the threatened Central Valley spring-run Chinook salmon, and the threatened Central Valley steelhead.  (*See* Doc. 256.)  Before the court for decision is a motion to intervene filed by Oakdale Irrigation District ("OID"), South San Joaquin Irrigation District ("SSJID"), and Stockton East Water District ("SEWD") (collectively, "Applicants").  Applicants each have water rights to the surface flows of the Stanislaus River.  They seek to intervene in ongoing remedies proceedings in this case because Plaintiffs have requested injunctive relief in the form of modified temperature criteria on the Stanislaus, ostensibly to benefit the steelhead populations there.  (Doc. 377, filed Aug. 6, 2008.)  Plaintiffs oppose intervention.  (Doc. 386, filed Aug. 20, 2008.)  Federal Defendants, State Defendants, and Defendant-Intervenors do not oppose.  (Doc. 377 at 2 n.1; Doc. 387, filed Aug. 26, 2008.)

## II.   BACKGROUND

A.   Procedural History.

Shortly after summary judgment was entered, Plaintiffs moved for injunctive relief.  The parties were directed to submit briefs and evidence on whether interim remedies are necessary to protect the species from jeopardy and the species' critical habitat from adverse modification or destruction until such time as the new BiOP is released.  (*See* Doc. 233, filed Apr. 29, 2008.)  While the briefing was ongoing, Plaintiffs made a motion for emergency injunctive relief, requesting the implementation of a number of interim remedies.  They recommended that four remedies be implemented "immediately" and seven additional

remedies be implemented pending the March 2009 completion of the new BiOp.  (Doc. 280, filed May 27, 2008.)  An evidentiary hearing on both the need for interim remedies and Plaintiffs' request for injunctive relief commenced June 6, 2008 and concluded July 3, 2008.  The hearing focused on the status of the species, whether Project operations would result in jeopardy before the new BiOp is issued, and on the four "immediate" remedies, which concerned releases from Shasta and Whiskeytown Dam on the upper Sacramento River and Clear Creek, respectively, and the timing of opening of Red Bluff Diversion Dam.  Testimony on the status of the species and the impacts of Project operations on the three species was received from three expert fisheries biologists, Bruce Oppenheim, employed by NMFS, Dr. Christina Swanson of the Bay Institute, and Dr. Charles Hanson. Additional testimony was provided by Ronald Milligan, the Operations Manager of the CVP, and by John Leahigh, Chief of the Project Operations Planning Branch for the SWP, both of whom are qualified experts in water project operations.  Finally, Michael Urkov, who testified for Defendant-Intervenor Tehama Colusa Canal Authority, *et al.*, ("TCCA"), was qualified as an expert regarding fish passage and operations at RBDD.  Some evidence was received concerning Plaintiffs' seven additional proposed remedies, which included remedies on the Feather, American, and Stanislaus Rivers, and in the Delta.

On July 18, 2008, the district court entered findings of fact and conclusions of law regarding the existence of irreparable harm during the interim period.  With respect to the Stanislaus, the district court found:

3

164. The Stanislaus River supports a small population of steelhead. (DI B at ¶61.) The 2004 BiOp requires The Bureau to meet a 65°F temperature compliance point at Orange Blossom Road through the summer and fall to protect oversummering juvenile steelhead. (6/12 Tr. 56:5-8.) The Bureau's planned operations between now and March 2009 will meet this temperature requirement. (6/12 Tr. 56:17-18.)

165. There are no temperature requirements on the Stansislaus River for the steelhead spawning period of December to March. (6/12 Tr. 59:19-60:6.) However, winter water temperatures naturally occurring in the Stanslaus River are generally cool enough for steelhead spawning. (6/12 Tr. 60:6-7.) In Mr. Oppenheim's years of experience and opinion, the temperatures from December to February have never risen high enough to be of concern. (6/12 Tr. 60: 9-14.)

166. The Bureau's proposed operations on the Stanislaus River predict flows below 150 cfs in January, February, and March. (6/18 Tr. 22:18-21.) 150 cfs has been identified as the "optimal" flow for juvenile steelhead rearing. (6/11 Tr. 167:5-7.) Flows below this level would result in a loss of rearing habitat that would be "significant" to the small population of steelhead rearing there. (6/11 167:21-168:6; 6/18 Tr. 23:10-16.) As a result of these operations, the Stanislaus River steelhead population is expected to decline. (6/18 Tr. 21:9-12.) Losing this population, which is not predicted to occur in the near future, but could become more likely as a result of interim operations, "would represent a serious adverse impact by not only reducing the overall population abundance for the species, but also by reducing the spatial distribution of the species." (6/18 Tr. 21:13-16.)

167. Dr. Hanson opined the proposed Stanislaus River operations will benefit steelhead and relieve the effects of limited reservoir storage and coldwater pool volume. (DI B ¶105.)

168. Although the temperature compliance goals on the Stanislaus will be met, Dr. Swanson opines that flows below the optimal 150 cfs will reduce steelhead habitat for spawning and rearing, (6/18 Tr. 22:4-23:16.), reducing steelhead abundance in the Stanislaus River. Impacts to this small population could adversely impact their spatial distribution, but the magnitude of any such effects is unknown. The Federal Defendants' evidence proves by a preponderance that even absent the 150cfs flow level in January through March 2009, irreparable injury to steelhead on the Stanislaus is unlikely.

4

**B.  The Applicants.**

　　1.  <u>OID and SSJID</u>.

OID and SSJID jointly hold adjudicated, pre-1914 rights to 1816.6 cubic-feet per second ("cfs") of the flow of the Stanislaus River for diversion and use within their respective boundaries.  (O'Laughlin Decl. ¶3, Ex. A.)  Additionally, OID and SSJID have water rights for the diversion and use of water from the Stanislaus River for the purpose of generating hydroelectric power under permits and licenses issued by the California State Water Resources Control Board ("SWRCB").  (*Id.* at ¶4, Ex. B.)

To effectuate the diversion, conveyance, and use of the Stanislaus River water, OID and SSJID constructed Goodwin Dam in 1912.  From there, each district constructed a joint main canal, which connected to the two districts' respective distribution and conveyance systems.  In 1925, OID and SSJID agreed to construct Melones Dam and Reservoir, with a capacity of 112,500 acre-feet.  In 1938, OID and SSJID agreed to construct three additional dams and reservoirs -- Donnells, Beardsely and Tulloch -- to provide both a supplemental supply of delivered water to generate hydroelectric power to provide the districts with an additional source of revenue.  (*Id.* at ¶5.)

When, as part of the CVP, the United States began construction of New Melones dam and reservoir, it utilized the same location as the existing Melones dam and reservoir owned and constructed by the districts.  To address the inundation of old Melones, as well as the impacts that New Melones dam and reservoir would have on the districts' exercise of their right to divert and store water from the Stanislaus River, an agreement

5

was signed in 1972 between the districts and the United States. (*Id.* at ¶6.)  That agreement was superseded by an agreement signed by the same parties in 1988 ("the 1988 Agreement").  (*Id.* at ¶6; Ex. C.)

Pursuant to the 1988 Agreement, the United States shall deliver at Goodwin Dam, for use by OID and SSJID, the inflow into New Melones up to 600,000 acre-feet ("AF").  (*Id.* at Ex. C, p.1.) If the inflow into New Melones is less than 600,000 AF, then the United States will deliver to Goodwin Dam all inflow plus one-third of the difference between inflows and 600,000 AF. (*Id.*)  Further, the 1988 Agreement permits the districts to store in New Melones reservoir up to 200,000 AF for use in a subsequent water year.  However, if the United States must release water from New Melones for flood control purposes, any stored water credited to the districts is the first water released.  (*Id.* at p. 2.)

        2.    **SEWD**.

SEWD provides water for irrigation, domestic, municipal and industrial purposes to its customers in San Joaquin County. (Harrigfeld Decl. at p.2.)  In 1983, SEWD signed an agreement with the United States for annual water deliveries from New Melones of 75,000 AF.  (*Id.* at ¶3.)  The contract required SEWD to "construct and install, without cost or expense to the United States, facilities required by the Contractor to take and convey the water from the point or points of delivery."  (Harrigfeld Decl. ¶3, Ex A, p.13 at ¶7(b).)

In performance of this contractual requirement, SEWD designed, constructed, and financed the New Melones Conveyance

1  System at a total cost in excess of $65 million, and other
2  facilities.  The New Melones Conveyance System consists of the
3  purchase of an undivided one-third interest in Goodwin Dam, a
4  diversion structure at Goodwin Dam, the 3.55 mile long Goodwin
5  Tunnel, the Upper Farmington Canal, Improvements to Shirley,
6  Hoods and Rock Creeks for conveyance, the Lower Farmington Canal,
7  a new 2.5 mile-long, 78-inch diameter concrete pipeline and
8  improvements to the existing SEWD water treatment plant.
9  (Harrigfeld Decl. ¶4.)  The Goodwin Tunnel and related facilities
10 were designed and constructed for the sole purpose of conveying
11 New Melones water to SEWD, pursuant to its contract of December
12 19, 1983.  (Harrigfeld Decl. ¶4.)
13     Although construction was completed in 1994, and SEWD was
14 ready to take delivery of water from New Melones pursuant to its
15 contract, the United States did not make any water available in
16 1993 and 1994, citing new obligations contained in the Central
17 Valley Project Improvement Act.  (Harrigfeld Decl. ¶5.)  While
18 litigation over this is on-going, SEWD has maintained its
19 contract with the United States and has been receiving water from
20 New Melones.  (Harrigfeld Decl. ¶5.)
21          3.   <u>Interim Plan of Operations</u>.
22     The Interim Plan of Operations ("IOP") is a plan the United
23 States uses to guide operations at New Melones Dam and Reservoir.
24 The IOP was developed in 1997 as part of a stakeholder effort to
25 develop a long-term plan of operation for New Melones.
26 (O'Laughlin Decl. ¶7.)
27     Under the IOP, the determination of operating objectives is
28 based upon February end of month storage plus March through

September forecast of inflow into New Melones reservoir. (*Id.* at ¶8; Ex. D, p. 2.) The quantity of water allocated to each operating objective -- fishery, Vernalis water quality, Bay-Delta and CVP contractors -- is based upon ranges. Thus, when inflow plus storage ranges from 1.4 MAF to 2 MAF, the amount released for fishery purposes ranges from 98TAF to 125 TAF, the amount released for Vernalis water quality ranges from 70 TAF to 80 TAF, and there is no water released for either Bay-Delta or CVP contractors. When New Melones inflow plus storage ranges from 2 MAF to 2.5 MAF, CVP contractors are allocated between 0 TAF and 59 TAF. Finally, under the IOP guidelines, the Bay-Delta does not get an allocation until storage plus inflow is at least 2.5 MAF, while CVP contractors receive a full allocation when storage plus inflow is 2.5 MAF. (*Id.* Ex. D, p. 2.)

### III.  DISCUSSION

Applicants move to intervene as of right or, in the alternative, to permissively intervene.

**A.  Intervention as of Right.**

**1.  Legal Standard.**

Intervention is governed by Federal Rule of Civil Procedure 24. To intervene as a matter of right under Rule 24(a)(2), an applicant must claim an interest, the protection of which may, as a practical matter, be impaired or impeded if the lawsuit proceeds without the applicant. *Forest Conservation Council v. United States Forest Serv.*, 66 F.3d 1489, 1493 (9th Cir. 1993). The Ninth Circuit applies Rule 24(a) liberally, in favor of intervention, and requires a district court to "take all well-

8

pleaded, non-conclusory allegations in the motion as true absent sham, frivolity or other objections." *Southwest Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 820 (9th Cir. 2001). A four part test is used to evaluate a motion for intervention of right:

    (1)   the motion must be timely;

    (2)   the applicant must claim a "significantly protectable" interest relating to the property or transaction which is the subject of the action;

    (3)   the applicant must be so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest; and

    (4)   the applicant's interest must be inadequately represented by the parties to the action.

*Forest Conservation Council*, 66 F.3d at 1493.

    2.   **Timeliness**.

In assessing timeliness, courts in the Ninth Circuit must consider: (1) the current stage of the proceedings; (2) whether the existing parties would be prejudiced; and (3) the reason for any delay in moving to intervene. *League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1302 (9th Cir. 1997). (Doc. 19.) Any substantial dely weighs heavily against intervention." *Id*.

    a.   **Stage of the Proceedings/ Reason for Delay in Moving to Intervene**.

Applicants seek to intervene at a relatively late stage in this litigation, after cross-motions for summary judgement have bene decided and in the middle of ongoing remedies proceedings, after significant briefing and evidence was received on remedies issues. The fact that the district court and the existing

9

1  parties have "substantively [] and substantially [] engaged in
2  the issues" weighs against Applicants' intervention.  *Wilson*, 131
3  F.3d at 1303.

4  However, Applicants point out that the Ninth Circuit has
5  held that the key date for assessing the timeliness of a motion
6  to intervene is the date that the applicant should have been
7  aware that its interests would no longer be adequately
8  represented by one of the existing parties.  *Smith v. Marsh*, 194
9  F.3d 1045, 1052 (9th Cir. 1999).

10  Applicants assert that they first became aware that the
11  United States was not adequately protecting their interests
12  immediately following this Court's July 18, 2008 Order,
13  explaining:

> Proposed Intervenor's counsel became aware of the issuance and substance of the Court's Order by reading press reports on or about July 19, 2008. (O'Laughlin Decl, ¶ 9; Harrigfeld Decl., ¶ 6). Thereafter, counsel obtained the Order from PACER and was surprised to find (1) that the Court had taken evidence and made findings regarding flow and temperature on the Stanislaus River (Docket #367, ¶164-168), and (2) that Plaintiffs were requesting the opportunity to present additional information on several proposed remedies, including specific temperature requirements for the Stanislaus River between Goodwin Dam and Orange Blossom Bridge. (Docket #367, ¶ 238).  (O'Laughlin Decl., ¶ 9).
>
> Counsel for Proposed Intervenors obtained and reviewed the materials from PACER dealing with the Plaintiffs' proposed temperature requirements on the Stanislaus River, and were dismayed to see that the United States made virtually no effort to address or rebut the suggested temperature requirements. (Declaration of Bruce F. Oppenheim ["Oppenheim Decl."], Docket # 301-3, ¶ 25)(O'Laughlin Decl., ¶ 10). Despite the fact that Plaintiffs suggested very specific temperature criteria for each time of the year, Mr. Oppenheim devoted only a single paragraph in response which was extremely general in nature. (Docket #301-3, ¶ 25). Discovering that the United States was not adequately addressing the Plaintiffs' temperature recommendations, and not adequately representing their interests, counsel for

> SEWD appeared at the July 23, 2008 Scheduling Conference and asked for permission to intervene. (Docket # 370, p. 2; Harrigfeld Decl., ¶ 7). Counsel for Plaintiffs orally stated that Plaintiffs would not stipulate to intervention by SEWD, and the Court thereon gave SEWD until August 6, 2008 to file a motion seeking intervention.
>
> The following day, counsel for OID contacted Mr. Ron Milligan of the United States Bureau of Reclamation by telephone to discuss the nature, extent and detail of evidence and information that the United States would provide if the Court were to permit the submission of additional evidence. (O'Laughlin Decl., ¶ 11). During the call, Mr. O'Laughlin asked if the United States would be submitting evidence from Avry Dotan of AD Consultants, Doug Demko or Andrea Fuller of FishBIO, or Daniel B. Steiner Consulting Engineer, each of whom is an acknowledged expert regarding hydrology, fishery biology and hydrologic and temperature modeling on the Stanislaus River. Mr. Milligan indicated that the United States would not be using such witnesses. (O'Laughlin Decl., ¶ 11). Mr. O'Laughlin asked if he could assist the United States by obtaining declarations or other information from these witnesses that the United States could submit. Mr. Milligan indicated that for the United States to use such witnesses, the United States would need approval from the Justice Department, the Department of the Interior, the United States Fish and Wildlife Service, the United States Bureau of Reclamation and perhaps other interested agencies. (O'Laughlin Decl., ¶ 11). Mr. Milligan thereon suggested that if OID wanted the information and evidence of Mssrs. Dotan, Steiner and Demko to be submitted, OID should seek to intervene. (O'Laughlin Decl., ¶ 11).
>
> At the conclusion of his call with Mr. Milligan, Mr. O'Laughlin immediately contacted counsel for SEWD and SSJID by telephone and e-mail, informing them of Mr. Milligan's comments and recommending that the three parties jointly seek to intervene. (O'Laughlin Decl., ¶ 12; Harrigfeld Decl., ¶ 8). The parties agreed, and on the following day, July 25, 2008, Proposed Intervenors sent out a letter to all parties seeking permission to intervene. (O'Laughlin Decl., ¶ 12, Ex. E).

(Doc. 377 at 7-10.)

Plaintiffs argue that Applicants' "claim that it only recently realized that it should intervene to protect its own interests is difficult to reconcile with the fact that most of

11

the existing Defendant-Intervenors sought to intervene at a very early stage in this litigation." (Doc. 386 at 7.) Moreover, Plaintiffs note that Applicants' admit that they were "generally aware of the litigation." (*Id*. (citing Doc. 377 at 8 n.3).)

But, given the nature of the initial claims in this case, which focused on the lawfulness of a global document -- the OCAP BiOp -- and the affects of the OCAP on salmonid species that are present throughout the Delta watershed, Applicants had no reason to believe until recently that issues specifically relating to the method and timing of deliveries on the Stanislaus River and New Melones operations would be placed directly at issue.

### b. Prejudice to Existing Parties.

The Ninth Circuit considers prejudice to be "perhaps the most important factor in determining timeliness of a motion to intervene as of right." *Peterol Stops Nw. v. Cont'l Oil Co.*, 647 F.2d 1005, 1010 (9th Cir. 1981). Plaintiffs assert that because "[a]s a general rule, intervenors are permitted to litigate fully once admitted to a lawsuit," that Applicants' admission will prolong this litigation. Applicants expressed their intention to call several expert witnesses, perhaps as many as three, regarding hydrology, fisheries biology, and the hydrology and temperature modeling on the Stanislaus.

Plaintiffs' concerns about the progress of this litigation are valid. However, the district court has the discretion to place conditions upon intervention, and has done so on several occasions in this and related cases. Applicants' participation can be appropriately constrained so that it will not result in additional delay. Applicants' will not be permitted to

12

relitigate issues or to duplicate briefing and/or testimony going forward. Moreover, Applicants will be limited to one expert witness, not three as they have proposed. Their participation will be strictly limited to Stanislaus River issues.

### 3. Significant Protectable Interests.

To demonstrate a "significantly protectable interest," "a prospective intervenor must establish that (1) the interest asserted is protectable under some law, and (2) there is a relationship between the legally protected interest and the claims at issue." *Id*. It is undisputed that altering the temperature controls on the Stanislaus river will directly affect and has potential to injure Applicants's interests.

### 4. Impairment of Interests.

Finally, disposition of this action may, as a practical matter, impair or impede Applicants' abilities to protect their interests. This requirement demands only a showing that the applicant "would be substantially affected in a practical sense by the determination made in an action." *Southwest Ctr. for Biodiversity*, 268 F.3d at 822. It is undisputed that, should an order issue requiring modifications to the operation of New Melones Dam, Applicants' interests would be significantly impaired or impeded.

### 5. Existing Parties' Ability to Represent Applicants' Interests.

The remaining issue is whether Applicant's interests are adequately protected by other defendants or defendant-intervenors. In assessing the adequacy of representation, the Ninth Circuit looks at three factors:

13

   (1) **whether the existing parties will undoubtedly make all of the applicant's arguments;**

   (2) **whether the existing parties are capable of and willing to make the applicant's arguments; and**

   (3) **whether the applicant offers a necessary element to the proceedings that otherwise would be neglected.**

*Id.* at 823. "[T]he requirement of inadequacy of representation is satisfied if the applicant shows that representation of its interests may be inadequate....[T]he burden of making this showing is minimal." *Sagebrush Rebellion Inc. v. Watt*, 713 F.2d 525, 528 (9th Cir. 1983).

    a. <u>**Federal Defendants' Ability to Represent Applicants**</u>.

 Responsible government agencies are presumed to adequately represent their citizens. *See Prete v. Bradbury*, 438 F.3d 949, 957 (9th Cir. 2006). However, this presumption may be "rebutted by if Applicants and Federal Defendants "do not have sufficiently congruent interests." *Southwest Center for Biological Diversity v. Berg*, 268 F.3d 810, 823 (9th Cir. 2001). Applicants correctly point out that Federal Defendants' interests are much broader than their own, including interests in the preservation of threatened and endangered species. Moreover, such interests are often in conflict, and do not include protection of Applicants' water rights. *Id.* (finding that Fish and Wildlife Service could not be expected to protect proposed intervenor's private interests); *see also National Farm Lines v. I.C.C.*, 564 F.2d 381, 384 (10th Cir. 1977) ("We have here...the familiar situation in which the governmental agency

14

is seeking to protect not only the interest of the public but also the private interest of the petitioners in intervention, a task which is on its face impossible. The cases correctly hold that this kind of a conflict satisfies the minimal burden of showing inadequacy of representation.").

Applicants maintain that Federal Defendants will not adequately represent their interests. Specifically, Applicants emphasize that "Mr. Milligan has already informed counsel for OID that the United States will not be presenting a robust rebuttal to Plaintiffs' proposed temperature criteria, but will likely rely again upon the information and expertise of Mr. Oppenheim. (O'Laughlin Decl. ¶11.)" (Doc. 377 at 16.) Applicants also argue that the witnesses who testified at the remedies hearing in June and July are, relatively speaking, generalists, lacking specific knowledge or expertise of the temperature requirements of steelhead found in the Stanislaus River. (*See* Oppenheim Decl., Doc. 250-1, ¶ 1). Dr. Swanson noted, for example, that steelhead egg temperature tolerance varies with different Steelhead populations. (*See* Swanson Decl., Doc. 277, Table 1.) Applicants are prepared to offer expert witnesses who can discuss the temperature requirements of steelhead located in the Stanislaus River, based on, among other things, first-hand knowledge of the Stanislaus River and its fishery. (Doc. 377 at 16.)[1]

---

[1] Applicants also argue that they have "different short-term and long-term perspective[s] on the proposed remedy than does the United States." (*Id*. at 17.) In support of this assertion, Applicants point to Mr. Oppenheim's declaration, in

15

Applicants are also concerned that Plaintiffs' temperature criteria, if approved by the Court, will become a permanent feature of temperature management on the Stanislaus, a concern they believe is not shared by the Federal Defendants. Temperature controls on the Stanislaus are already the subject of an on-going proceeding before the SWRCB to declare the Stanislaus River and others in the San Joaquin River Basin "impaired" for temperature, a process that includes requests for imposition of temperature criteria similar to that proposed by Plaintiffs. Applicants have actively participated in that process and are concerned that any factual finding by this court regarding temperature criteria would impact the SWRCB Process.

Plaintiffs respond in several ways. First, Plaintiffs point out that representations made by Mr. Milligan do not necessarily represent the position of the Federal Defendants, suggesting that Applicants should have consulted with counsel

---

which he discussed the possibility that additional releases to meet the Plaintiffs' proposed temperature criteria would impact the United States' ability to protect fall-run Chinook salmon with releases later in the year. (Oppenheim Decl., Doc. 301-3, ¶25.) Applicants expressed concern that "Mr. Oppenheim did not address the impacts of such actions on water right holders, such as the Proposed Intervenors," while "Mr. Milligan, who likewise devoted only a single paragraph in his declaration to the proposed Stanislaus River temperature criteria, made only a general reference to project purposes 'including fishery purposes.' There was no reference to the water rights of any of the Proposed Intervenors." (Doc. 377 at 17.) But, Applicants ignore or perhaps were unaware of the fact that, with a few exceptions not relevant to the Stanislaus, the evidence presented during the remedies proceedings to date was to be strictly limited to biological status of the species and the biological impacts of project operations.

for the Federal Defendants instead.  During the hearing on this motion, counsel for Federal Defendants confirmed that it would not be in the best interest of the Federal Defendants to present all of the evidence suggested by Applicants.

Second, Plaintiffs argue that the Federal Defendants plan to use different witnesses than suggested by Applicants is "a mere difference in litigation strategy and does not amount to inadequate representation.," citing *Wilson*, 131 F.3d at 1306 for the proposition that "[w]here a proposed intervenor has not alleged any substantive disagreement between it and the existing parties to the suit, and instead as vested its claim for intervention entirely upon a disagreement over litigation strategy or legal tactics, courst have been hesitant to accord the applicant full-party status."  (Doc. 386 at 10.)  However, Applicants are not suggesting a mere difference in litigation strategy.  Rather, they assert that the witnesses proposed by the Federal Defendants are incapable of conveying the substantive information Applicants believe is necessary to protect their interests.[2]

---

[2]  Plaintiffs correctly note that Federal Defendants did provide some specific information related to the proposed remedy on the Stanislaus River.  (*See, e.g.*, 6/10 Tr. 419; 6/11 Tr. 610-612; 6/12 Tr. 720-21, 24; 7/1 Tr. 100-101, 124-25; 7/2 Tr. 86-87.)  Nevertheless, although this was certainly more than the "virtually no effort" suggested by Applicants, a great deal more will be needed before a decision can be made about implementation of any specific remedy on the Stanislaus.  Applicants aver that their interests will not be protected by existing parties when such evidence is presented.

At the hearing, federal defendants asserted they were not in a position to represent or protect the interests of the proposed intervenors.

### b. Existing Defendant-Intervenors' Ability to Represent Applicants.

Plaintiffs argue that intervention as of right should be denied because Applicants and the existing Defendant-Intervenors all share the same interest in "receiving water from the Central Valley Project and State Water Project." (Doc. 386 at 11). Plaintiffs are not correct. Applicants OID and SSJID do not have contracts to receive water from either the CVP or SWP. Rather, they hold rights that pre-date and have been adjudicated to be senior to those of the United States on the Stanislaus River. (*See* Doc. 378, ¶¶ 3, 5 & 6.) OID and SSJID signed an agreement in 1988 with the United States addressing the impacts that the construction of New Melones Dam and reservoir would have on the exercise of their superior water rights, and their rights under that 1988 agreement may be adversely affected by a decision in this case. SEWD does have a contract to receive water from the United States. However, that contract does not entitle SEWD to water from the CVP as a whole, but rather only from the New Melones Unit of the CVP. As with OID and SSJID, SEWD does not have an interest in the either the SWP nor in the CVP generally, but only in water of the Stanislaus River.

While Applicants and existing Defendant-Intervenors have similar interests generally, none of the existing Defendant-Intervenors have the same, narrow interest in the

18

Stanislaus River as do Applicants.  Moreover, Applicants have a unique perspective on the remedies proposed by Plaintiffs.  Just as only Defendant-Intervenor Tehama Colusa Canal Authority, *et al.*, had an acute interest in Red Bluff Diversion Dam, so too only Applicants can be expected to represent their interests in their contracts with the Bureau for Stanislaus River water.

Plaintiffs point out that Dr. Hanson, the expert witness relied upon by existing Defendant Intervenors, does have some expertise concerning the Stanislaus River.  However, existing Defendant Intervenors were not prepared to state whether Dr. Hanson would be willing and/or able to cover the issues and information of concern to Applicants.

Applicants' participation in this litigation will ensure that the district court receives detailed information about the Stanislaus River for purposes of considering Plaintiffs' proposed temperature criteria and other remedies related to the Stanislaus River.[3]

The interests of Applicants are sufficiently divergent from those of the Federal Government and the Defendant-Intervenors to justify intervention as of right.

---

[3] Counsel for Glenn-Colusa Irrigation District, *et al.*, the California Farm Bureau Federation, and Tehama Colusa Canal Company, *et al.*, informed Applicants that they did not intend to submit any such information.  (*See* Decl. of William C. Paris, III, ¶¶ 3-5.)  Counsel for San Luis and Delta Mendota Water Authority and Westlands Water District was not sure if it would submit anything about the Stanislaus River, but did state that any submission would be from the perspective of CVP export contractors and would not represent the interests of Applicants.  (*Id*. ¶6.)  No defendant-intervenor was willing to present evidence through Applicants' expert witnesses.

19

## IV. CONCLUSION

Applicants satisfy all of the requirements for intervention as a matter of right. It is not necessary to address Applicants' alternative request for permissive intervention. If and only if issues related to the Stanislaus should arise in subsequent remedies proceedings, Applicants' motion to intervene as a matter of right is GRANTED, conditioned upon strictly limiting their participation to Stanislaus River-New Melones issues, about which they can provide unique information and/or arguments, and further conditioned on combined briefing, page limitations, and other measures to avoid duplication. Applicants' are restricted to only one expert witness in any subsequent evidentiary proceedings.

**IT IS SO ORDERED.**

**Dated:   September 2, 2008**            /s/ Oliver W. Wanger
                                **UNITED STATES DISTRICT JUDGE**