**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **Pacific Coast Federation of Fishermen's Associations, Institute for Fisheries Resources,** *et al.*,<br><br>    **Plaintiffs,**<br><br>    **v.**<br><br>**Carlos M. Gutierrez, in his official capacity as Secretary of Commerce,** *et al.*,<br><br>    **Defendants,**<br><br>**San Luis & Delta-Mendota Water Authority,** *et al.*,<br><br>    **Defendant-Intervenors.** | **1:06-CV-00245 OWW GSA**<br><br>**ORDER RE: PLAINTIFFS' REQUEST FOR ENTRY OF ORDER FOR INTERIM INJUNCTIVE RELIEF (DOC. 410)** |

This case concerns the impacts of the coordinated operations of the federal Central Valley Project ("CVP") and the State Water Project ("SWP") on the endangered Sacramento River winter-run Chinook salmon ("winter-run"), the threatened Central Valley spring-run Chinook salmon ("spring-run"), and the threatened Central Valley steelhead ("steelhead").

On June 15, 2008, the district court invalidated NMFS's biological opinion ("BiOp") covering the impacts of project operations on the three species. (Doc. 150, amended by Doc. 256.) The BiOp was remanded to the agency for reconsultation, and the parties were ordered to file briefs and supporting declarations regarding the need for any interim relief pending

completion of a new BiOp.  (Doc. 239.)

On July 18, 2008, following a 14-day evidentiary hearing on the status of the species and the need for interim relief, the district court issued extensive findings of fact and conclusions of law, concluding that Federal Defendants had not met their burden to prove that project operations during the reconsultation period, through March 2009, will not appreciably diminish the three species' present states of non-viability and non-recovery and will not adversely affect the species' critical habitats.  (Doc. 367.)  However, the district court rejected several of Plaintiffs' suggested interim remedies as unworkable, infeasible, and/or unnecessary for their failure to provide meaningful relief.  (*Id*.)  Other proposed interim remedies were not ruled upon for lack of urgent necessity, pending further proceedings and the presentation of updated information about environmental conditions and the species' status:

> 230. All three testifying experts and the Central Valley Technical Recovery Team, in its 2007 report, conclude that the three salmonid species are not viable and are all in jeopardy of extinction.  NMFS' biologist testified that a species that is not viable is "almost extinct or on the verge of being extirpated."  Dr. Hansen opined that every extant population must be viewed as necessary for recovery of the three species.  All three experts agreed that extinguishing or reducing any single population within any of the three ESUs would diminish the ESU's viability and increase the risk of extinction.  Based on two drought years, with critically dry hydrologic conditions in 2008, and the presently unpredictable risk of a third dry year, the three species are unquestionably in jeopardy.  The ESA does not permit jeopardy to a listed species to be considerably increased during a BiOp reconsultation.  Project operations through March 2009 will appreciably increase jeopardy to the three species.
>
> 231. Mr. Oppenheim and Dr. Swanson testified that the winter-run is at high risk of extinction.

232. Mr. Oppenheim opined that "any processes that increase spring-run Chinook mortality in the future can have significant impacts on the population demographics and, therefore, run the risk of extinction." The 2004 BiOp predicts a high probability of extirpation of the spring-run populations in the Sacramento River mainstem and Feather River. The condition of the species and its critical habitat in 2007 and 2008 have worsened.

233. The steelhead ESU is presently comprised of small populations, vulnerable to catastrophe and possible extirpation. NMFS predicts a steep decline in the steelhead population in the San Joaquin River Basin and "any impacts from loss of rearing habitat is considered significant." There are no presently viable steelhead populations. The three biologists agree that the steelhead ESU is in danger of extinction.

234. It is undisputed that Project operations over the next eight months will increase mortality of eggs, fry, and juveniles of all three species. Each species' spatial distribution, diversity and abundance, will be reduced.

235. Existing hydrology and operational conditions will adversely modify critical habitat to an unquantified degree and reduce the three species' prospects for long term recovery.

236. <u>Federal Defendants have not met their burden of proving that Project operations will not appreciably diminish the three species' present states of non-viability and non-recovery and will not adversely affect the species' remaining critical habitat over the next eight month period</u>.

237. Because irreparable harm will likely result during the interim period, the standard for equitable relief has been met. Whether interim remedies are necessary remains to be addressed. Plaintiffs' proposed interim remedies for Clear Creek and RBDD have been rejected because of scientific and evidentiary dispute whether and to what extent they will benefit the three ESUs. Plaintiffs' request that the Bureau model a scenario that provides for no further contractor deliveries in this water year, to the extent it has not already done so (Mr. Milligan stated no modeling had been done), to determine whether additional contractor delivery curtailments could benefit carryover storage [FN 34] is DENIED. The Bureau has established that additional contractor delivery curtailments before September 30, 2008 would not significantly improve carryover storage.

3

>        [FN 34: <u>Plaintiffs initially requested that the Bureau be ordered to maintain the TCP at Balls Ferry and also maintain 1.9 MAF carryover storage in Shasta.  The court finds that neither of these are possible given current hydrologic conditions.  If Plaintiffs are still requesting these remedies, that request is DENIED</u>.]
>
>        238. <u>Plaintiffs have requested the opportunity to present evidence on additional suggested remedies, including requests to: (1) keep combined Delta export rates below 7,000 cfs when juveniles of any of the three species are migrating through the Delta, until NMFS completes its new BiOp, or the start of VAMP, whichever is first; (2) maintain temperatures below 68°F between Nimbus and Watt Ave Bridge on the American River; (3) limit Folsom releases to 4,000 cfs or less from December 31, 2008 through May 31, 2009, with an exception for flood control; and (4) require temperatures be maintained below 52°F between Goodwin Dam and Orange Blossom Bridge from December 1 through April 30; below 60°F from May 1 through May 31; and below 65°F from June 1 through November 30</u>.[FN 35]
>
>        [FN 35: <u>Plaintiffs requests for relief as to Feather River operations are not cognizable in this court</u>.]
>
>        239. The decision about remand without vacatur is deferred to conclusion of the decision whether interim remedies are necessary.
>
>        240. A status conference will be held July 23, 2008 at 8:30 a.m. to discuss the schedule for the case.  Parties may appear telephonically.

(Doc. 367 at 115-118 (emphasis added).)

At the July 23, 2008 status conference, Federal Defendants and the Department of Water Resources ("DWR") were ordered to file "status report[s] re operations and biology addressing remedies and proposals not yet decided...."  (Doc. 369.) Defendant Intervenors were also permitted to file a status report.  (*Id.*)

A hearing to discuss the need for further remedial proceedings was set for September 4, 2008.  (Doc. 369.)  The parties stipulated to move that hearing to September 11, 2008.

4

Prior to the September 11, 2008 hearing, Federal Defendants and DWR filed a status report and supporting declarations under penalty of perjury that provided updated information about the status of the species and environmental conditions, including the following:

- The abundance of winter-run has not appreciably changed since the low numbers seen in 2007. (Stuart Decl., Doc. 394-3, at ¶¶ 5-10.)
- The abundance of the entire spring-run ESU is thought to be slightly lower than last year. Some populations have grown, while others are exhibiting reduced abundance. (*Id.* at ¶¶ 11-18.)
- Steelhead abundance is still difficult to estimate. Some steelhead smolts (984) were taken at the pumps in the 2007-08 water year, representing about one third of the 3,000 fish take limit. It is unclear whether this number is a reflection of reduced pumping levels undertaken to protect delta smelt or reduced steelhead abundance. Only five juveniles were captured in the Mossdale trawl on the San Joaquin, which is lower than last year, although within the range seen from 1991 to 2008. (*Id*. at ¶¶ 19-20.)
- Hydrologic conditions have remained very dry. Precipitation from March through July 2008 was the lowest since 1921. (Third Milligan Decl., Doc. 394-2, at ¶5.)
- Overall, end of year storage likely will be close to the levels estimated during the evidentiary hearings.

5

    (*Id.* at ¶6.)

- With respect to conditions on the upper Sacramento River, more than 99% of winter-run Redds are located above the current 56°F temperature compliance point Airport Road. (Stuart Decl. at ¶6.) The Bureau plans to gradually reduce releases from Keswick Dam to rebuild Shasta Reservoir storage until March, when Delta outflow requirements demand greater flows. (Third Milligan Decl. at ¶8.)
- With respect to conditions in the Delta, the Bureau projects that, under the 70% (dry) forecast, exports from Jones will be between 200,000 AF and 260,000 AF per month from October to January, with combined pumping from Jones and Tracy at 468,000 AF in January (approximately 7,600 cfs, on average). (*Id.* at ¶13.) From February to April D-1641's 35% E/I ratio will reduce pumping considerably to 50,000-60,000 AF per month at Jones. (*Id.* at ¶14.)

On September 10, 2008, <u>the day before the scheduled hearing</u>, Plaintiffs filed a "status conference statement" of their own, which requested entry of an order that would require project operators to:

  (1) Limit Delta exports in the months of December and January by requiring either a maximum export rate of 7,600 cfs or a 35% E/I ratio, whichever NMFS determines is <u>more</u> protective.

  (2) Limit Folsom releases to 4,000 cfs or less from December 31, 2008 to completion of a new BiOp with an

6

1           exception for flood control.
2           (3) Require the Bureau to meet a minimum of 1.9 MAF in
3           Shasta carryover storage by the end of January, and
4           2.5 MAF in Shasta by the end of February.
5  (Doc. 406.)
6     The Federal Defendants and Defendant Intervenors oppose
7  this relief.  The first request -- to limit Delta pumping to
8  7,600 cfs or a 35% E/I ratio, whichever NMFS determines is <u>more</u>
9  protective -- differs materially from the request Plaintiffs
10 made in their original motion for injunctive relief -- to "keep
11 combined Delta export rates below 7,000 cfs when juveniles of
12 any of the three species are migrating through the Delta, until
13 NMFS completes its new BiOp, or the start of VAMP, whichever is
14 first."  (*See* Doc. 367 at ¶238.)
15    The second request mirrors Plaintiffs' original request
16 regarding Folsom releases, and was not directly addressed by the
17 findings of fact and conclusions of law.  However, Federal
18 Defendants have stated under oath that they plan to operate
19 Folsom within these limits.  Absent any evidence that Federal
20 Defendants will be unable or unwilling to limit Folsom releases
21 to 4,000 cfs or less from December 31, 2008 until a new BiOp is
22 complete, there is no need for the issuance of such injunctive
23 relief.
24    The third request is closely related to Plaintiffs'
25 original two-part request to require the Bureau to maintain a
26 56°F temperature compliance point ("TCP") at Balls Ferry and
27 also maintain 1.9 MAF carryover storage in Shasta.  This dual
28 request was denied by the findings of fact and conclusions of

**7**

law which stated in footnote 34:

> Plaintiffs initially requested that the Bureau be ordered to maintain the TCP at Balls Ferry and also maintain 1.9 MAF carryover storage in Shasta. The court finds that neither of these are possible given current hydrologic conditions. If Plaintiffs are still requesting these remedies, that request is DENIED.

(Doc. 367 at 117 n.34.) Plaintiffs' revised request, which focuses only on carryover storage, without any regard for the TCP, is a new request.

As to two of the three forms of injunctive relief Plaintiffs now seek, there is no pending motion requesting such relief. In light of the potential consequences of further reducing the available CVP project water (yield) to implement such remedies, and in the face of substantial scientific disagreements about the effectiveness and need for such remedies, it is improvident to issue any such relief without further hearings. At the September 11, 2008 status conference, the parties were directed to meet and confer regarding a schedule for any such proceedings. (Doc. 407.) Instead of complying with this directive, on October 1, 2006, Plaintiffs filed a "request for entry of order," demanding that the court immediately enter an injunction imposing the three above-described measures on project operations, although no quantification of the net effects such measures will have has been provided. Plaintiffs assert that no further proceedings are required because Federal Defendants and DWR "have recommended and expect to take" these actions over the next few months, implying that the entry of an order by the court is a mere formality. (Doc. 410 at 2.)

1    Federal Defendants, DWR, and Defendant Intervenors object
2 to the issuance of any injunctive relief without further
3 proceedings.  (Docs. 411, 412 & 414.)  First, they object that
4 they have not been given formal notice of Plaintiffs' new
5 demands and have not had an opportunity to fully respond.  Among
6 other things, Defendants and Defendant Intervenors request an
7 opportunity to evaluate and present evidence on the potential
8 benefits and/or consequences of taking such actions on listed
9 species, and on human health and safety (the public interest).
10 Second, contrary to Plaintiffs' assertions, Defendants and
11 Defendant Intervenors maintain that they <u>do not expect</u> to take
12 actions one and three voluntarily.
13    Moreover, Defendants' and Defendant Intervenors' present
14 new evidence that is relevant to the impacts of Delta operations
15 on salmonids.  One of the central concerns driving the district
16 court's conclusion that Federal Defendants had not met their
17 burden of proving Delta operations were not appreciably
18 increasing jeopardy and/or adverse critical habitat modification
19 was the very substantial uncertainty surrounding the indirect
20 impacts of delta operations on salmonids.  (*See* Doc. 367 at ¶¶
21 180-187.)  DWR now offers evidence that helps to clarify some of
22 this uncertainty.  For example, Tara Smith, Chief of the Delta
23 Modeling Section at DWR's Bay Delta Office, performed
24 hydrodynamic modeling of Delta flows at four critical points in
25 the Delta, and concludes that pumping has a negligible impact on
26 flow conditions.  (*See* Doc. 403.)  Rather, flow conditions are
27 much more strongly controlled by tidal influences.  (*Id.*)
28    Sheila Green, an Environmental Scientist with DWR, reviewed

9

some of the confusing statements made about indirect mortality in the 2005 smelt BiOp, and opines that the BiOp "mis-represents" the indirect impacts of pumping. (Doc. 402 at ¶3.) She asserts that the analysis in the BiOp confused estimates of mortality to fish that had already entered the Central Delta with estimates of mortality to the entire juvenile population. (*Id*. at ¶4.) She points out other flaws in the analysis in the BiOp and in Kimmerer's study, (*id*. at ¶¶ 4-5), which is a lynchpin of scientific justification for Delta pumping measures. She presents an alternative model to estimate that the <u>total</u> export-related mortality in an average year is likely to be highest (at 19%) in December, while the total export-related mortality in a dry year is highest (at 11%) in January. However, she claims that juvenile Chinook are not always present at the export facilities in these months, and that the Salmon Decision Process helps to ensure that appropriate protective actions are taken when they are present. (*Id*. at ¶¶ 16-17.) Green also critiques the estimates used for post-salvage predation mortality at Clifton Court Forebay, and estimates it would be from 10-30%, (*id*. at ¶20), different from (lower than) estimates presented during the evidentiary hearing by fisheries scientists.

State Water Contractors present a new, third declaration of Dr. Hanson, who re-evaluated data from past coded wire-tag studies on juvenile salmon in the Delta. (Doc. 396.) He concludes that there is no statistically significant relationship between direct mortality at the pumps and the rate of pumping. (*Id*. at ¶8.) He also concludes that there is

little or no relationship between pumping and total mortality (i.e. mortality caused by all sources from birth to escape into the ocean) of juvenile salmon and steelhead. (*Id*.)  He therefore concludes that putting a 7,000 cfs cap on exports would have no appreciable benefits to salmon.  (*Id*.)

Plaintiffs imply that this evidence should not be considered, because it was not presented during the evidentiary hearing.  (*See* Doc. 410 at 2-3.)  However, the defining characteristic of the evidence presented at the evidentiary hearing regarding the issue of Delta mortality was uncertainty and confusion.  In light of the potentially draconian consequences of imposing interim remedies before preliminary 2008-09 hydrologic conditions are known, it is unreasonable to exclude such clarifying evidence.

Most importantly, because Plaintiffs have not previously moved for the specific relief they now seek to curtail Delta pumping and increase carryover storage, Defendants and Defendant-Intervenors must be afforded an opportunity to respond.  If Plaintiffs wish to file a formal motion requesting the relief they now seek, they may do so.  Absent the parties' agreement to a mutually-acceptable schedule, the matter will be heard on an expedited basis.

SO ORDERED
Dated: October 21, 2008

                              /s/ Oliver W. Wanger
                                  Oliver W. Wanger
                               United States District Judge